**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL 2724<br>16-MD-2724 |
| **THIS DOCUMENT RELATES TO**:<br><br>*The State of Connecticut, et al.*<br>*v.*<br>*Teva Pharmaceuticals USA, Inc., et al.* | HON. CYNTHIA M. RUFE<br><br>19-cv-2407-CMR |

**STATE PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT BRECKENRIDGE PHARMACEUTICAL, INC.'S
MOTION TO DISMISS THE OCTOBER 31, 2019 STATE
ATTORNEYS GENERAL AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ...................................................................................................1

II. BACKGROUND ........................................................................................................................2

III. LEGAL STANDARDS ..............................................................................................................8

IV. ARGUMENT.............................................................................................................................9

    State Plaintiffs Plausibly Allege that Breckenridge and Teva Agreed to Fix Prices and Minimize Competition ..................................................................................................................9

  A. State Plaintiffs Allege Direct Evidence of Breckenridge's Illegal Agreement .....................10

  B. State Plaintiffs Allege Circumstantial Evidence of Breckenridge's Illegal Agreement ......11

      1. State Plaintiffs Allege Parallel Conduct ................................................................12

      2. State Plaintiffs Allege Plus Factors.........................................................................14

V. CONCLUSION.........................................................................................................................15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*,
  826 F.2d 1335, 1336, 1338 (3d. Cir. 1987) ............................................................................. 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................. 9

*Bell Atl. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................ 9, 14

*In re Blood Reagents Antitrust Litig.*,
  266 F. Supp. 3d 750 (E.D. Pa. 2017) ...................................................................................... 14

*In re Chocolate Confectionary Antitrust Litig.*,
  999 F. Supp. 2d 777 (M.D. Pa. 2014), aff'd, 801 F.3d 383 (3d Cir. 2015) ...................... 12, 14

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) ................................................................................................... 14

*In re Generics Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ...................................................................................... 12

*In re Ins. Brokerage*,
  618 F.3d 300 (3d Cir. 2010) ............................................................................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................................................ 15

*SigmaPharm, Inc. v. Mut. Pharm. Co.*,
  772 F. Supp. 2d 660 (E.D. Pa. 2011) ........................................................................................ 9

*W. Penn Allegheny Health Sys., Inc.,* 627 F.3d 85 (3rd. Cir. 2010) .............................................. 9

**Statutes**

Sherman Act, 15 U.S.C. § 1 ...................................................................................................... 9, 14

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) ..................................................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 8, 9

I.  **PRELIMINARY STATEMENT**

Defendant Breckenridge Pharmaceutical, Inc.'s ("Breckenridge") Motion to Dismiss should be denied. State Plaintiffs brought this civil law enforcement action against Breckenridge, a generic drug manufacturer, because Breckenridge agreed with Defendant Teva Pharmaceutical USA, Inc. ("Teva"), a competing generic drug manufacturer, to stifle competition in the generic pharmaceutical industry. This agreement was part of an overarching conspiracy alleged in State Plaintiffs' Amended Complaint. Breckenridge agreed with Teva to fix the prices of and allocate the markets for Cyproheptadine HCL tablets ("Cyproheptadine") and Estradiol Norethindrone Acetate tablets ("ENA")[1] by participating in a scheme whereby the co-conspirators would either lead or follow each other's price increases to artificially keep the prices of those generic drugs high, and minimize competition by adhering to the "fair share" understanding.

In their Amended Complaint (Dkt. No. 106, 19-cv-2407), State Plaintiffs plead specific facts about how Breckenridge and Teva participated in a coordinated price-fixing scheme involving Cyproheptadine and ENA. The price increases involving Breckenridge were part of a pattern, beginning as early as 2012 and continuing until at least 2015, whereby Teva would identify a list of price increase candidates and then coordinate price increases with its competitors on those drugs, securing an agreement before increasing. Consistent with that repeated pattern, State Plaintiffs allege that certain employees of Breckenridge and Teva communicated with each other—as each of the companies was planning and implementing their respective price increases—to fix prices and maintain market shares in accordance with the "fair share" understanding. State Plaintiffs further allege that this understanding was memorialized by

---

[1] ENA was referred to by Defendant Teva as "Mimvey," and is consistently referred to that way throughout the State Plaintiffs' Amended Complaint. (*See, e.g.,* Am. Compl. ¶ 803).

Defendant Nisha Patel, a Director of Strategic Customer Marketing and a Director of National Accounts at Teva, in one of her price increase lists identifying Breckenridge, and other Defendants, as agreeing to fix prices. The list—an image of which is embedded directly into the Amended Complaint—also identifies: (1) which generic drugs were implicated (e.g., Cyproheptadine and ENA); (2) that the markets for these drugs were "shared" between Teva and Breckenridge; (3) specific non-public Breckenridge price points obtained by Teva for both drugs; and (4) how under the agreement Teva would follow Breckenridge with respect to pricing.

Further, as the Amended Complaint illustrates, Patel took the extraordinary step of ranking the "quality" of Teva's competitors, codifying the strength of the agreement between Teva and those competitors to lead and follow each other's price increases and not compete for market share. After colluding with Teva to fix/increase the prices of Cyproheptadine and ENA, Breckenridge rose in the rankings consistent with other competitors that had recently had success colluding with Teva. The Amended Complaint also details how Breckenridge had ample opportunities to collude with competitors like Teva through phone calls and emails, and through attendance at conferences, trade shows, dinners, and other industry events.

## II.    BACKGROUND

State Plaintiffs, in their Amended Complaint, charge various generic drug manufacturers with participating in a coordinated effort to stifle competition to obtain strategic advantages and financial benefits. (Am. Compl. ¶¶ 4–6). Count Eleven of the Amended Complaint is against Breckenridge and specifies the elements of an antitrust claim. (*Id.* at ¶¶ 1217–1223). The conclusions in that count are supported by the factual allegations incorporated by reference into that count. (*Id.* at ¶¶ 1218–1219).

The Amended Complaint describes in detail an overarching conspiracy which has been in place for many years among generic drug manufacturers to minimize competition by "playing nice in the sandbox" and allocating what is generally referred to as "fair share," with the ultimate goal of minimizing price erosion in the generic drug industry. (*Id.* at ¶¶ 115–161). The State Plaintiffs' Amended Complaint provides at least 41 different substantive examples of the overarching conspiracy in operation between Teva and various competitors. (*Id.* at ¶¶ 166–535). Over time, however, manufacturers became unsatisfied with simply maintaining prices, and started to focus more on raising prices. (*Id.* at ¶¶ 536–537).

Starting in approximately 2012, a troubling pattern began to emerge. (*Id.* at ¶ 538). State Plaintiffs allege that competitors began systematically communicating with each other as they were identifying opportunities and planning new prices increases. (*Id.*). The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement—*i.e.*, that they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase. (*Id.*). The first example of this in the Amended Complaint is on July 31, 2012, when Teva sought to raise prices on several different drugs in coordination with competitors. (*Id.* at ¶ 540). The Amended Complaint alleges that, as part of that price increase event, Teva coordinated a price increase with Breckenridge for ENA, through a phone call between Defendant David Rekenthaler, Vice President of Sales at Teva, and D.N., a senior sales executive at Breckenridge (*Id.*), and continued to coordinate with Breckenridge after the price increase. (*Id.* at ¶ 541).

Despite this initial attempt at raising prices, as of early 2013 Teva realized that it needed to do something drastic to increase its profitability. (*Id.* at ¶¶ 565–566). So, in April 2013, Teva hired Nisha Patel to focus on implementing price increases for Teva. (*Id.* at ¶¶ 567–569).

3

Specifically, Teva hired Patel to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships in the generic pharmaceutical industry to help effectuate those price increases. (*Id.* at ¶ 570). The Amended Complaint describes Patel's monumental efforts to do that as she began at Teva, by systematically communicating with and obtaining agreements from many of Teva's competitors, culminating in large coordinated price increase events on July 3, 2013 and August 9, 2013. (*Id.* at ¶¶ 567–723).

Shortly after Teva's August 9, 2013 coordinated price increase event, Patel left the office for several months on maternity leave. (*Id.* at ¶ 724). During the time period when she was out of the office, Teva did not plan or implement any new price increases, choosing to instead wait for Patel to return to Teva and continue her work. (*Id.* at ¶ 725). It did, however, continue to coordinate with certain competitors who were raising their own prices, and agreed to follow. (*Id.* at ¶¶ 751–60 (Lupin), 761–68 (Greenstone), 769–82 (Actavis)). Breckenridge was one of those companies.

Breckenridge raised pricing on Cyproheptadine and ENA on November 14, 2013. (*Id.* at ¶ 798). Before doing so, however, it made sure Teva would follow. In the weeks leading up to the Breckenridge increases, the Amended Complaint alleges that Rekenthaler had several phone calls with D.N., a sales executive at Breckenridge, "to coordinate the price increases." (*Id.* at ¶ 799). This included two phone calls on October 14, 2013 and a 26-minute call on October 24, 2013. (*Id.*). After those phone calls, Rekenthaler and D.N. did not speak again until mid-January 2014, as Teva began preparing to implement its own increases. (*Id.*).

During the time period before Teva was able to implement its own price increases to follow Breckenridge on Cyproheptadine and ENA, the Amended Complaint alleges that the competitors followed the "fair share" understanding to the letter. (*Id.* at ¶ 800). That

4

understanding dictated that a competitor follows a price increase quickly, but if it could not[2] it would—at a minimum—not seek to take advantage of a competitor's price increase by increasing its own market share "*unless it had less than 'fair share.'*" (*Id.* at ¶ 538) (emphasis added). For Cyproheptadine—a market that was evenly split between the competitors—Teva refused to bid and take any market share from Breckenridge. (*Id.* at ¶ 801). Patel even spoke to S.C., a senior sales executive at Breckenridge, on the same day she made the decision not to bid. (*Id.*). For ENA, on the other hand—a market where Teva had only 19% market share in a two-player market—Teva sought to pick up a few customers "to level the playing field – before raising its own prices to follow Breckenridge." (*Id.* at ¶ 802).

Once Patel returned full time to Teva in early 2014, she began planning the next set of Teva price increases. (*Id.* at ¶ 742). On February 7, 2014, Patel created a list of "PI Candidates" in a spreadsheet. (*Id.* at ¶ 744). In the days leading up to February 7, Patel was feverishly coordinating by phone with several different competitors to identify price increase candidates. (*Id.* at ¶ 743). The Amended Complaint lists 18 different phone calls between Patel and at least eight different competitors from February 4 through February 7, 2014. (*Id.* at ¶ 744). Included on that list were two phone calls between Patel and S.C. at Breckenridge on February 7, 2014—the same day that Patel created the price increase spreadsheet. (*Id.* at ¶ 744). The point of these phone calls was to secure or confirm an agreement with each competitor. (*Id.* at ¶ 538).

By February 26, 2014, Patel had a more refined list of price increase candidates. (*Id.* at ¶ 745). In that spreadsheet—which is embedded in the Amended Complaint and shown below—

---

[2] The Amended Complaint makes it clear that generic drug manufacturers could not always follow a competitor's price increase quickly for various reasons including supply or contractual limitations. (*Id.* ¶ 538.) This is not necessarily an indication that there is no agreement between the parties. To the contrary, "[i]n those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net" to ensure that the competitor would not seek to take more than its fair share. (*Id.*)

5

Patel indicated that the markets for ENA (Mimvey) and Cyroheptadine were "Shared" with Breckenridge. (*Id.*). Patel also listed non-public (contract) price points she had obtained for both drugs, with a notation to "Follow Breckenridge."

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 55.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMEBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting; CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE; several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

(*Id.*).

On April 4, 2014, Teva followed Breckenridge's price increases for Cyproheptadine and ENA. (*Id.* at ¶¶ 803, 967). Teva increased the WAC pricing for Cyproheptadine "over 90%" and raised the customer contract pricing for that same generic drug "by as much as 526%" while ENA experienced a WAC pricing increase of "over 100%" and an upsurge in customer contract pricing "by as much as 393%[.]" (*Id.*). Importantly, Teva increased the WAC pricing for Cyproheptadine and ENA to precisely match Breckenridge's WAC pricing for both of those medications. (*Id.*).

The price increases on Cyproheptadine and ENA were not implemented in isolation; but rather were part of a much larger list of increases implemented by Teva on April 4, 2014. (*Id.* at ¶ 749). As the Amended Complaint demonstrates, consistent with previous price increases, "Defendants Patel and/or Rekenthaler communicated directly with all of their key competitors in

6

the days and weeks leading up to their increase." (*Id.*; *see also* ¶¶ 746-747). Many of those communications are set forth in the graphic below:



(*Id.* at ¶ 749).

Further supporting the allegations that Teva and Breckenridge were conspiring, the Amended Complaint alleges that Patel maintained a list of 56 generic drug manufactures ranked by their "quality"; codifying the strength of the agreement between Teva and those competitors to lead and follow each other's price increases and not compete for market share. (*Id.* at ¶¶ 578–581). Specifically, "[r]anking was done numerically, from a +3 ranking for the 'highest quality' competitor to a -3 ranking for the 'lowest quality' competitor." (*Id.* at ¶ 578). Among the generic drug manufacturers that Patel listed was Breckenridge, which she initially (in May 2013) gave a

7

quality competitor ranking of +1. (*Id.* at ¶ 964). After the successful price fixing agreements mentioned above, however, Patel later (in May 2014) increased Breckenridge's quality ranking to +2, demonstrating that by colluding with Teva Breckenridge had become one of Teva's "highest quality" competitors. (*Id.* at ¶¶ 964–969). Other competitors saw a similar rise in Patel's rankings after successfully colluding with Teva. (*Id.* at ¶¶ 915–969).

State Plaintiffs further allege that Breckenridge regularly sent representatives to "industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements." (*Id.* at ¶ 13). For example, in January 2014, Breckenridge sent an executive to attend an industry dinner in Bridgewater, New Jersey where at least 13 executives of competing generic drug manufactures also attended. (*Id.* at ¶¶ 108). Breckenridge sales executives also stayed in close communication with other competitors by phone and text message, and the Amended Complaint details nearly two hundred communications between Breckenridge executives and individual Defendants David Berthold (Lupin), Jim Brown (Glenmark), Jim Grauso (Aurobindo/Glenmark), Kevin Green (Teva), Konstantin Ostaficiuk (Camber), Nisha Patel (Teva), David Rekenthaler (Teva) and Tracy Sullivan (Lannett). (*Id.* at ¶¶ 1060–1079).

### III. <u>LEGAL STANDARD</u>

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint if the defendant is able to show that the plaintiff "[f]ailed to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). Moreover, under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint is subject to a notice pleading standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2).

8

In *Bell Atlantic v. Twombly*, the Supreme Court determined a complaint need only include enough factual allegations "to raise a right to relief above the speculative level . . . ." under a Rule 12(b)(6) analysis. 550 U.S. 544, 555–56 (citations omitted). The Court also stressed that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. In *Ashcroft v. Iqbal*, the Court further stated that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." 556 U.S. 662, 678 (citing *Twombly*, 550 U.S., at 556).

## IV. ARGUMENT

### STATE PLAINTIFFS PLAUSIBLY ALLEGE THAT BRECKENRIDGE AND TEVA AGREED TO FIX PRICES AND MINIMIZE COMPETITION

The allegations in State Plaintiffs' Amended Complaint are more than sufficient to plausibly allege that Breckenridge entered into an agreement with Teva to participate in a coordinated scheme to fix prices and minimize competition involving Cyproheptadine and ENA. To plausibly allege a violation of Section 1 of the Sherman Act, a plaintiff needs only to "state enough facts to 'raise a reasonable expectation that discovery will reveal evidence of illegal agreement,' even if the court believes such proof is improbable." *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 669 (E.D. Pa. 2011) (quoting *Twombly*, 550 U.S. at 556). To meet this burden, a plaintiff may allege "direct or circumstantial evidence, or a combination of the two." *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d 85, 99 (3d Cir. 2010).

State Plaintiffs allege both direct and circumstantial evidence to show that Breckenridge entered into an agreement with Teva to fix the prices for Cyproheptadine and ENA. Breckenridge's arguments to the contrary are baseless.

9

### A. State Plaintiffs Allege Direct Evidence of Breckenridge's Illegal Agreement

State Plaintiffs allege direct evidence in their Amended Complaint to show that Breckenridge entered into an agreement with Teva to fix the prices of and minimize competition for Cyproheptadine and ENA. Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Ins. Brokerage*, 618 F.3d 300, 323–24 n.23 (3d Cir. 2010) (citation omitted). Examples include documents or conversations "explicitly manifesting the existence of the agreement in question." *Id*. As an illustration, the plaintiff in *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*, alleged that four defendant automobile dealers with Buick franchises conspired to prevent the plaintiff from acquiring a Buick franchise by threating to boycott the General Motors Corporation ("GMC") if GMC granted a Buick franchise to the plaintiff. 826 F.2d 1335, 1336, 1338 (3d. Cir. 1987). That threat was memorialized in a memorandum, which the court determined to be direct evidence that demonstrated coordinated effort between the four defendant automobile dealers to commit antitrust misconduct. *Id*. at 1338.

Here, the Amended Complaint is replete with allegations of direct evidence showing that Teva was engaging in rampant collusion with numerous competitors to fix prices and allocate markets for generic drugs. Specific examples of Teva's agreements with competitors, and how these companies were engaging in business generally, abound throughout the Amended Complaint.[3] Indeed, it is hard to imagine a Complaint with more direct evidence.

---

[3] *See, e.g.*, Am. Compl. ¶¶ 191 (Teva employee describing agreement with Mylan to raise prices); 249 (Teva employee describing agreement with Sandoz to keep prices high and be responsible with market share); 265 (instruction to Teva employee to send a sham bid to avoid competing with Aurobindo and Lupin); 272 (discussions with Lupin regarding market share allocation); 302 (agreement to give up Cardinal to Greenstone); 497 (Facebook messages between Teva and Lannett coordinating market entry); 530 (referring to fake bids as "fluff pricing"); 601 (Teva May 24, 2013 price increase list with information about competitor plans that could have only been learned from competitors); 642 (Teva with advance notice of Mylan price increases); 647 (Teva employee sending price increase list to competitor using personal email account); 667 (Teva August 9, 2013 price increase list with

10

With regard to Breckenridge, there are also multiple forms of direct evidence linking it to the conspiracy. First, Patel created a price increase spreadsheet on February 26, 2014, memorializing the agreements she had been able to procure in advance of Teva's April 4, 2014 price increases. (Am. Compl at ¶ 745). That document confirmed that the markets for Cyproheptadine and ENA were being "[s]hared" with Breckenridge and included non-public (contract) price points to which Teva planned to "[f]ollow Breckenridge." (*Id.*). Separately, Patel kept a running list ranking the "quality" of Teva's competitors based on the strength of the agreement between them to fix prices and abide by the "fair share" understanding—with Breckenridge receiving a high ranking after colluding with Teva to fix the pricing of Cyproheptadine and ENA. (*Id.* at ¶¶ 578–581, 964–69). Patel's documents, like the memorandum in *Arnold Pontiac-GMS, Inc.*, explicitly manifest the existence of the agreement between Breckenridge and Teva and detail their complicity in committing antitrust misconduct. (*See id.*).

Thus, contrary to Breckenridge's arguments, State Plaintiffs, like the plaintiff in *Arnold Pontiac-GMS, Inc.*, have alleged direct evidence highlighting Breckenridge's illegal agreement. No further analysis is necessary. *See In re Ins. Brokerage*, 618 F.3d at 323 ("[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate.").

### B. State Plaintiffs Allege Circumstantial Evidence of Breckenridge's Illegal Agreement

In addition to the direct evidence of an illegal agreement between Breckenridge and Teva, State Plaintiffs (although not required) also allege circumstantial evidence of Breckenridge's agreement with Teva to illegally fix the prices of Cyproheptadine and ENA. As a

---

competitive information about future price increases that could have only been learned from competitors). These are merely a few examples.

preliminary matter, circumstantial evidence of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 324 (quoting *Bell Atlantic*, 550 U.S. at 557). Accordingly, "parallel conduct is . . . consistent with the existence of an agreement . . . in many cases where an agreement exists, parallel conduct--such as setting prices at the same level--is precisely the concerted action that is the conspiracy's object." *Id.* at 321.

### 1. State Plaintiffs Allege Parallel Conduct

Parallel pricing supports the inference of an agreement if such conduct is "reasonably proximate in time." *See In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), aff'd, 801 F.3d 383, 392 (3d Cir. 2015) (citations omitted). Moreover, "parallel pricing does not require absolutely uniform pricing decisions." *Id*.

This Court has already held in this MDL that the context of the allegations needs to be considered when the pricing allegations are separated in time. *See In re Generics Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018). This Court held that the Clobetasol Plaintiffs plausibly alleged that Perrigo New York, Inc. ("Perrigo") engaged in parallel conduct by following its co-conspirators' price increases for Clobetasol gel two years after the original price increases. *Id*. at 443–44. This Court reasoned that even though Perrigo took two years to follow its co-conspirators' price increases, circumstantial evidence showing that Perrigo's Executive Vice-President and General Manager served on the board of the Generic Pharmaceutical Association ("GPhA") with the executives of its co-conspirators from 2013 to 2014 and that Perrigo was a regular member and had sent employees to attend GPhA events was sufficient to support a plausible inference that Perrigo engaged in parallel conduct. *Id*. at 444.

12

Here, State Plaintiffs' allege that, pursuant to their illegal agreement, Teva increased the prices for Cyproheptadine and ENA less than five months after Breckenridge's initial price increase. (Am. Compl. ¶¶ 798, 803, 966-67). The State Plaintiffs allege that Teva's delay in following the Breckenridge price increases was due to Nisha Patel being out of the office on maternity leave for several months and Teva's decision not to plan or implement any new price increases during that time, choosing to instead wait for Patel to return to Teva and continue her work. (*Id*. at ¶ 725). Furthermore, State Plaintiffs allege phone calls between the two companies in advance of each increase and Teva's documentation of the conspiracy prior to Teva following Breckenridge's lead in increasing the prices on Cyproheptadine and ENA. (*Id.* at ¶¶ 742–44, 538, 799). These additional allegations support the conclusion that the increases constitute parallel conduct. (*See id.*).

Consequently, State Plaintiffs, like the Clobetasol plaintiffs, allege circumstantial evidence to support a plausible inference that Breckenridge and Teva engaged in parallel conduct with respect to Cyproheptadine and ENA and such conduct occurred in a reasonably proximate time. (*Id.* at ¶¶ 799. 801, 803, 966–68). State Plaintiffs also allege circumstantial evidence showing that: Rekenthaler and Patel communicated with Breckenridge sales executives starting in October 2013 through February 2014 to coordinate pricing for Cyproheptadine and ENA, and that Teva increased the WAC pricing for Cyproheptadine and ENA to precisely match the WAC pricing set by Breckenridge for those generic drugs. (*Id.*).

Thus, although Breckenridge would like to ignore these specific factual allegations—which are far from labels or conclusions—they provide contextual support for the claim that Breckenridge and Teva agreed to engage in parallel conduct.

### 2. State Plaintiffs Allege Plus Factors

Alleging "parallel conduct is . . . much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitle[ment] to relief." *Twombly*, 550 U.S. at 557. In the Third Circuit, *further factual enhancements* manifest themselves in at least 3 *plus factors*: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'" *In re Ins. Brokerage*, 618 F.3d 300, 321–22 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). State Plaintiffs' allegations highlight the existence of plus factors that support a plausible claim that Breckenridge has violated the law.

The first plus factor addresses motive to enter into a conspiracy, which is determined by how conducive a market is to price-fixing. *In re Chocolate*, 801 F.3d at 398 (citing *In re Flat Glass*, 385 F.3d at 360–61). A market consisting of only two players "[is] highly concentrated and [is] conducive to collusion." *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017) (citing *In re Flat Glass*, 385 F.3d at 361). Here, State Plaintiffs allege that the only market participants for Cyproheptadine and ENA are Breckenridge and Teva—indicating that the markets for those drugs are highly concentrated and, therefore, ripe for collusion to occur. (*See* Am. Compl. ¶¶ 801–802 & n.6).

The State Plaintiffs have also alleged actions against self-interest, which consist of "conduct that would be irrational assuming that the defendant operated in a competitive market." *In re Flat Glass*, 385 F.3d at 360–61. In particular, State Plaintiffs allege that Breckenridge and Teva adhered to a "fair share" understanding where each would bilaterally refrain from

competition, including when a co-conspirator conducts a price increase. (*See* Am. Compl. ¶¶ 136, 800, 968). This "fair share" understanding is irrational in a competitive market. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986) (". . . cutting prices in order to increase business often is the very essence of competition."). Similarly, Breckenridge's decision to unilaterally raise prices on Cyproheptadine and ENA, even in the absence of a fair share agreement, would be irrational without an agreement from Teva to follow or not compete.

The third plus factor deals with evidence implying a traditional conspiracy, which "consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Ins. Brokerage*, 618 F.3d 300, 321–22 (citation omitted). Here, as noted above, the State Plaintiffs allege that Teva, through Rekenthaler and Patel, communicated and coordinated with Breckenridge sales executives to fix the prices of and minimize competition for Cyproheptadine and ENA and regularly sent employees to trade shows, customer conferences, and dinners to communicate and interact with competing generic drug manufacturers. (Am. Compl. ¶¶ 13, 102–108, 111–12, 747–49, 798–99, 803, 966–68, 1060–64, 1067–70, 1075–77, 1079).

## V. **CONCLUSION**

Based on the foregoing, State Plaintiffs respectfully submit that Breckenridge has not met the heavy burden of establishing that the Amended Complaint fails to plead a plausible claim of liability. Thus, Breckenridge's Motion to Dismiss should be denied.

Respectfully submitted,

| STATE OF CONNECTICUT<br>WILLIAM TONG<br>ATTORNEY GENERAL | STATE OF OHIO<br>DAVE YOST<br>ATTORNEY GENERAL |
|---|---|
| By: /s/ W. Joseph Nielsen<br>Federal Bar No. ct20415<br>Assistant Attorney General<br>55 Elm Street<br>P.O. Box 120<br>Hartford, CT 06141-0120<br>Tel: (860) 808-5040<br>Fax: (860) 808-5391<br>Joseph.Nielsen@ct.gov | By: /s/ Edward J. Olszewski<br>Edward J. Olszewski<br>Matthew K. McKinley<br>Robert J. Yaptangco<br>Assistant Attorneys General<br>150 East Gay Street, 22nd Floor<br>Columbus, OH 43215<br>Tel: (614) 466-4328<br>Fax: (866) 533-7140<br>edward.olszewski@ohioattorneygeneral.gov<br>matthew.mckinley@ohioattorneygeneral.gov<br>robert.yaptangco@ohioattorneygeneral.gov |

*Liaison Counsel for the State Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of February, 2020, I caused State Plaintiffs' Memorandum of Law in Opposition to Defendant Breckenridge Pharmaceutical, Inc.'s Motion to Dismiss the October 31, 2019 State Attorneys General Amended Complaint to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

/s/ Edward J. Olszewski
Edward J. Olszewski
Assistant Attorney General