# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE:  GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | : : : | MDL NO. 2724 16-MD-2724 |
|  | : | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO | : : : | 19-cv-2407 CMR |
| *Connecticut et al. v. Teva Pharmaceuticals USA Inc. Inc., et al.* | : : : |  |

**States' Opposition to Defendant Maureen Cavanaugh's Motion
to Dismiss the States' Amended Complaint**

# TABLE OF CONTENTS

**PAGE**

**INTRODUCTION** ........................................................................................................................1

**FACTUAL BACKGROUND** ......................................................................................................1

    **The Count Against Cavanaugh** ......................................................................................1

    **Capecitabine market allocation** ......................................................................................5

    **Nortriptyline Hydrochloride market allocation** ...........................................................5

    **Niacin Extended Release market allocation** ................................................................6

    **Etodolac Extended Release market allocation** ............................................................7

    **May-July 2013 price increases for twelve drugs** .........................................................7

    **Enalapril price increase** ...................................................................................................7

    **Spoliation and obstruction of justice** ............................................................................8

**LEGAL ARGUMENT** ................................................................................................................8

    **The States Plausibly Allege Claims Against Cavanaugh** ..........................................8

    **The States' Claims Are Timely** ....................................................................................12

    **State Law Claims Should Not Be Dismissed** ..............................................................13

**CONCLUSION** ..........................................................................................................................13

## TABLE OF AUTHORITIES

**Cases:**                                                                                                                          **Page(s)**

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)……………………………………..12

*Higbie v. Kopy-Kat, Inc.*,
    391 F. Supp. 808, 810 (E.D. Pa. 1975) ................................................................... 10

*In re Aspartame Antitrust Litig.*,
    No. CIV.A.2:06-CV-1732, 2007
    WL 5215231, at *1 (E.D. Pa. Jan. 18, 2007) ......................................................... 12

*In re Fasteners Antitrust Litig.*,
    No. CIV.A. 08-MD-1912,
    2011 WL 3563989, (E.D. Pa. Aug. 12, 2011) ....................................................... 12

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*,
    315 F. Supp. 3d 848 (E.D. Pa. 2018) ....................................................................... 9

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ....................................................................... 8

*Invamed, Inc. v. Barr Laboratories, Inc.*,
    22 F. Supp. 2d 210 (S.D.N.Y. 1998) ..................................................................... 12

*New York v. Hendrickson Bros., Inc.*,
    840 F.2d 1065, 1083 (2d Cir. 1988) ...................................................................... 12

*United States v. Continental Group, Inc.*,
    603 F.2d 444, 466-67 (3d Cir. 1979)……………………………………………..12

**Publications:**

Holly Vedova, Keitha Clopper, and Clarke Edwards, FTC Bureau of Competition,
    *Avoiding antitrust pitfalls during pre-merger negotiations and due diligence*,
    (Mar. 20, 2018), https://www.ftc.gov/news-events/blogs/competition-matters
    /2018/03/avoiding-antitrust-pitfalls-during-pre-merger ......................................... 10

## INTRODUCTION

The States oppose Defendant Maureen Cavanaugh's Motion to Dismiss the States' Amended Complaint (the "Motion") as to her. 19-cv-2407, ECF 128. The Memorandum in support of the Motion (the "Cavanaugh Mem.," ECF 128-1), reads like a closing at trial, articulating more stringent standards than would apply at a trial of criminal antitrust claims. But the Motion is a motion to dismiss *civil* antitrust claims. Because the States easily meet (indeed, significantly exceed) those standards, Cavanaugh's Motion should be denied.

## FACTUAL BACKGROUND

**The Count Against Cavanaugh.** Count 22 of the Amended Complaint against Cavanaugh specifies the elements of an antitrust claim. 19-cv-2407, ECF 106, ¶¶ 1300-1308. The assertions in that count are supported by the factual allegations incorporated by reference into that count. Much of the Amended Complaint is focused on relationships between Defendant Teva Pharmaceuticals USA Inc. and its competitors. *Id*. ¶ 125. Cavanaugh, a senior executive at Teva, *id.* ¶ 37, was the Teva representative in many of those competitor relationships. The Amended Complaint is replete with hundreds of paragraphs detailing Teva's collusive conduct through those representatives, including individual Defendants Nisha Patel, Kevin Green, David Rekenthaler, and Cavanaugh.[1]

---

[1] Cavanaugh, as Senior Vice President, Commercial Officer, North America, was the most senior of the Teva-employed Individual Defendants. *Id. ¶* 37. Patel was Director of Strategic Customer Marketing and Director of National Accounts, *id.* ¶ 54, Green was Director of National Accounts, *id.* ¶ 43, and Rekenthaler was Vice President, Sales US Generics. *Id.* ¶ 56. None of the other Teva-employed individual Defendants have moved to dismiss the allegations against them.

The Amended Complaint alleges that Cavanaugh, as well as other Teva high-level executives, were aware that Cavanaugh's subordinates were engaging in collusive conduct in violation of the antitrust laws. *Id.* ¶¶ 741 (price increase strategy based on "leveraging Teva's collusive relationships with high-quality competitors" was well known, understood, and authorized by Cavanaugh), 1065, 1110, 1111. The Amended Complaint specifically alleges that Cavanaugh was aware that Patel was communicating with competitors about price increases and making recommendations based on those communications because ***Patel told Cavanaugh that she was doing so.*** *Id.* ¶ 1115. The Amended Complaint alleges, as an example of Cavanaugh's knowledge, that in a 2013 sales and pricing meeting "Patel was discussing her communications with certain competitors about price increases when Defendant Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said." *Id.* Cavanaugh did not condemn Patel's conduct, nor instruct Patel (or any other Teva employees) to stop. *Id.* Cavanaugh approved Teva price increases and endorsed the conduct and strategy of her subordinates both before and after that 2013 meeting. *Id.* ¶¶ 205-218, 461-472, 473-481, 729-739.

Indeed, the Amended Complaint alleges that many of the Teva price increases approved by Cavanaugh were almost entirely the result of collusive communications and agreements between Teva and its competitors. For example, the following graphic from the Amended Complaint, *id.* ¶ 627, details some of the calls between Teva representatives and Teva's competitors leading up to July 3, 2013, when Teva collusively raised prices on several drugs:



In the days and weeks leading up to the increase, Teva employees coordinated with competitors as set forth above. *Id.* ¶ 626-627.[2] Cavanaugh approved those price increases, recommended by Patel, based specifically on certain information and assurances that could have only come from competitors, such as "Sandoz also bidding high [on Nabumetone]" and "[r]umors of a Taro increase [on Adapalene Gel]." *Id.* ¶¶ 604-605, 615-616, 623-625, 1113-1114.

Similarly, on August 9, 2013, Teva implemented price increases, again in coordination with its competitors as set forth in the following graphic from the Amended Complaint:

---

[2] The only drugs on this list that Cavanaugh's subordinates did not coordinate with Teva's competitors (those not highlighted on the list) were drugs where Teva was exclusive and thus had no competitors. *Id.* ¶ 627.

3



*Id.* ¶ 670.[3]  Patel prepared a summary of these price increases for Cavanaugh, which included competitively sensitive information about competitors' plans regarding future price increases that (again) could have only been learned by communicating with competitors. *Id.* ¶ 668. Her supervisor then instructed Patel to delete the incriminating references. *Id.* ¶ 669. Nonetheless, Cavanaugh was directly involved in the decision to include Pravastatin – a high-volume cholesterol lowering medication – on the price increase list after a discussion with Patel following Patel's collusion with a number of competitors on that drug. *Id.* ¶ 697. The Amended Complaint alleges that this pattern of collusive price increases on large batches of drugs continued at Teva until at least early 2015. *E.g., id.* ¶¶ 739-749 (April 4, 2014), 846-852 (August 28, 2014), 887-892 (January 28, 2015).

---

[3] Again, the only drug on the list that Teva did not coordinate in advance with competitors was a drug where Teva was exclusive. *Id.* ¶ 671.

4

In addition, the Amended Complaint alleges that Cavanaugh personally coordinated with certain competitors "directly when necessary to further the agreements" and provides date ranges and enumerates 568 phone calls and text messages between Cavanaugh and over ten employees of Teva's competitors. *Id.* ¶ 1065. *See also id.* ¶ 590 (detailing Cavanaugh's relationship and communications with Defendant Marc Falkin of Teva's competitor Actavis).

The Amended Complaint also contains detailed factual allegations for multiple individual conspiracies between Teva and its competitors, and describes Cavanaugh's active role in *six* of those conspiracies, as follows:

**Capecitabine market allocation:** In 2014, Teva and Mylan conspired to allocate the market for their generic launch of this chemotherapy drug used to treat breast and colon cancer. *Id.* ¶¶ 205-218. On August 4, 2014, Rekenthaler spoke with Defendant James Nesta (Mylan) and then sent an email to Cavanaugh and others with the subject line "Capecitabine," stating that he had learned that Mylan would get approval that week and "we need to look at our market and discuss defense strategy." *Id.* ¶¶ 210-211. Cavanaugh responded that she would be in the office the next day and wanted to discuss the strategy in person. *Id.* ¶ 211. Six days later, on August 10, 2014, Defendant Rekenthaler wrote an email confirming that Teva would concede to Mylan the sale of this drug to McKesson, ABC, and Econdisc. *Id.* ¶ 215.

**Nortriptyline Hydrochloride market allocation:** Beginning in 2013, Teva conspired with Defendants Taro and Actavis to allocate the market for this drug used to treat depression. *Id.* ¶¶ 411-428. In multiple text messages and telephone calls between November 10 and 22, 2013, the conspirators discussed "how Teva and Actavis would make room for Taro"; they decided that Taro would take the customer Cardinal from Teva and would not pursue Teva's

5

customers McKesson or HD Smith but would instead take customers from Actavis. *Id*. ¶¶ 417-422. In furtherance of this conspiracy, Cavanaugh exchanged three text messages with Actavis employee Defendant Falkin on November 17 and 18, only days before Teva informed a customer on November 21 that Teva was "going to concede the business with Cardinal." *Id.* ¶ 419. The next month, Taro and Actavis further agreed that Taro would take the customer HEB from Actavis. *Id*. ¶ 423.

**Niacin Extended Release market allocation**: In 2014, Teva conspired with Defendants Lupin and Zydus to allocate the market for this drug used to treat high cholesterol. *Id.* ¶¶ 461-472, 729-739. On February 28, 2014, a few weeks before either competitor entered the market, Cavanaugh instructed her Teva subordinates to raise prices on the drug. *Id.* ¶ 732. Defendants Patel and Rekenthaler then met on March 6 to establish the plan for when Teva lost exclusivity. *Id.* ¶ 734. Patel then spoke with Lupin employee Defendant David Berthold the same day, agreeing that Teva would concede to Lupin customers totaling 40% of the market. *Id.* ¶ 735. On March 24, two internal Teva emails, each copying Cavanaugh, confirmed that Teva's strategy for Niacin Extended Release ("ER") was to concede. *Id.* ¶ 738.

Next, Teva agreed with Zydus that Teva would retain Niacin ER business from customer ABC and concede customer McKesson to Zydus. *Id.* ¶¶ 461-472. To further this conspiracy, Teva employees Defendants Rekenthaler and Patel spoke to Zydus employee Defendant Kevin Green in multiple calls on May 29 and June 2, totaling 59 minutes in length. *Id.* ¶¶ 469-470. Multiple internal Teva emails between May 29 and June 5 relate to this market allocation, culminating in an internal Teva email titled "McKesson Niacin" and stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede." *Id.* ¶¶ 469-471.

6

**Etodolac Extended Release market allocation:** In 2014, Teva conspired with Defendants Taro and Zydus to allocate the market for this drug used to treat arthritis symptoms. *Id.* ¶¶ 473-481. On May 14, 2014, Teva learned that its customer Anda had received a bid from Zydus for this drug. *Id.* ¶ 476. Over the following week, Teva and Zydus employees had multiple calls and communications, including two text messages and one telephone call between Cavanaugh and a Zydus senior sales executive on May 20 and an additional four text messages between Cavanaugh and that Zydus executive on May 21. *Id.* ¶¶ 476-477. On May 22, Teva decided to concede Anda to Zydus. *Id.* ¶ 478.

**May-July 2013 price increases for twelve drugs:** Beginning in May 2013, Teva conspired with multiple defendants to obtain sensitive pricing information and then used this information to raise its own prices for twelve separate drugs treating a number of health conditions. *Id.* ¶¶ 602-625, 1113-1114. Defendant Patel first communicated with Teva's competitors regarding their pricing plans. *Id.* ¶¶ 606-625. On May 24, 2013, Patel prepared a spreadsheet recommending immediate price increases for twelve drugs, using and revealing competitively sensitive information about Teva competitors' future pricing and bidding practices that she could only have learned through her discussions with these competitors. *Id.* ¶ 602. This spreadsheet, including the competitors' sensitive information, was sent to Cavanaugh on May 28, and Cavanaugh adopted and approved these price increase recommendations the next day. *Id.* ¶ 605.

**Enalapril price increase:** In July 2013, Teva conspired with Defendants Mylan and Wockhardt to raise prices for this drug to treat high blood pressure. *Id.* ¶¶ 650-662. On July 2, Mylan raised its price for this drug; on July 12 and 15, Teva employee Defendants Patel and Green spoke with Mylan and Wockhardt regarding Mylan's increase and Wockhardt's proposed

7

price increase to match. *Id.* ¶¶ 652, 656, 658.  On July 16, Patel emailed a pricing recommendation, which was later forwarded to Cavanaugh, using the term "rumors" to describe a future Wockhardt price increase and obfuscate that Wockhardt and Teva had spoken directly. *Id.* ¶¶ 659-660.  Cavanaugh approved the price increase that same day.[4]  *Id.* ¶ 660.  Wockhardt and Teva simultaneously raised their prices three days later.  *Id.* ¶ 661.

**Spoliation and obstruction of justice:**  In 2015, Teva employee Defendant Rekenthaler warned Patel to be careful about communicating with competitors and told her that the government was showing up on people's doorsteps.  *Id.* ¶ 1129.  At some point after that warning, and before producing text messages in response to the States' subpoena, Patel deleted many of her text messages, including many messages between her and Cavanaugh.  *Id.* ¶¶ 1128-1129.  Then, when the federal government in 2017 executed a search warrant against Patel at her home and seized her phone, Patel immediately called Rekenthaler using another phone.  *Id.* ¶ 1133.  Rekenthaler – who was no longer employed by Teva but was at that point working at Defendant Apotex – then immediately called Cavanaugh and spoke to Cavanaugh several times before calling his own lawyer.  *Id.*

## LEGAL ARGUMENT

**The States Plausibly Allege Claims Against Cavanaugh.**  This Court has set forth the standards for considering a motion to dismiss in this MDL:

> To plead a Section 1 claim, [the complaint] must include "enough factual matter (taken as true) to suggest that an agreement was made." "The crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." "[T]he issue is whether the pleading delineates to some

---

[4] "Rumors" was a term consistently used by Patel in internal documents to camouflage that she and her co-conspirators within Teva were communicating with competitors about future price increases. *Id.* ¶ 644.

8

sufficiently specific degree that a defendant purposefully joined and participated in the conspiracy." "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two."

> "To evaluate the articulated allegations as to an individual defendant in the context of a multi-defendant, multi-faceted conspiracy, the conspiracy must not be 'compartmentalized.'". . . . "To provide reasonable notice to a specific defendant of the claim(s) against it, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy."

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 437-38 (E.D. Pa. 2018) (citations omitted).

And as this Court explained in the context of granting the States leave to amend the Heritage-centric complaint:

> An antitrust complaint is sufficient if it contains "enough factual matter (taken as true) to suggest that an agreement was made." As long as the facts pleaded provide "plausible grounds to infer an agreement," a well-pleaded complaint may proceed even if it seems that "actual proof of those facts is improbable . . . ." State Plaintiffs allege that the typical pattern has been that as more manufacturers market a particular generic pharmaceutical, the more the average price falls in relation to the price of the branded drug, making generic drugs a relative health care bargain, but that "[a]t some point, the price dynamic changed for many generic drugs," and the prices of dozens of generic drugs have risen, some dramatically. The proposed [Heritage-centric complaint] alleges that Defendants reached agreements as to specific drugs and that groups of Defendants entered into agreements to allocate market share as competitors entered the market for a particular drug. From the facts alleged in the [Heritage-centric complaint] — which resulted in part from an investigation commenced in 2014 by the State of Connecticut — it is plausible to infer that there was a broader conspiracy.

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) (citations omitted).

The States' Teva-centric complaint easily satisfies those standards, including as to Cavanaugh. The States allege that Cavanaugh directly communicated with competitors. Contrary to Cavanaugh's argument, Cavanaugh's communications with her competitors are *not* "background information, unsubstantiated conclusory assertions, or threadbare and legally irrelevant allegations." Cavanaugh Mem. at 1. Rather the Amended Complaint alleges facts that

9

are more than sufficient to show that Cavanaugh communicated directly with key co-conspirators. For example, the Amended Complaint details her communications with Actavis[5] and Zydus, respectively, when Teva was finalizing its conspiracy with those Defendants to carve up the customer markets for drugs treating depression and arthritis. *See* Amended Complaint ¶¶ 419 (detailing that Cavanaugh, in furtherance of a conspiracy related to Nortriptyline Hydrochloride, exchanged three text messages with Actavis employee Defendant Falkin); 477 (explaining that Cavanaugh had six text messages and one telephone call with a Zydus senior sales executive to further a conspiracy related to Etodolac Extended Release).

The Amended Complaint further alleges that Cavanaugh approved price increases based specifically on information and assurances that could only have come from competitors, *id.* ¶¶ 604-605, 615-616, 623-625, 1113-1114, and ratified other illicit anticompetitive conduct even after being specifically made aware that her subordinates were coordinating with competitors. *Id.* ¶¶ 205-218, 461-472, 473-481, 729-739. "[I]t is also well established that a corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where [s]he participated in the unlawful acts, or where [s]he has acquiesced or ratified the actions of

---

[5] Cavanaugh's counsel theorizes that Cavanaugh's more than 500 text messages with competitor Actavis's employees between 2013 and July 2016 might have been related to Teva's August 2016 acquisition of Actavis. Cavanaugh Mem. at 8 n.3. To begin, Cavanaugh's communications were with *sales and marketing* employees of competitors, who have competitively sensitive information that should not have been shared before consummation of the transaction. *See* Holly Vedova, Keitha Clopper, and Clarke Edwards, FTC Bureau of Competition, Avoiding antitrust pitfalls during pre-merger negotiations and due diligence (Mar. 20, 2018), available at https://www.ftc.gov/news-events/blogs/competition-matters/2018/03/avoiding-antitrust-pitfalls-during-pre-merger. Moreover, this unsupported supposition by counsel is insufficient to rebut the well-pleaded factual allegations that: (1) Cavanaugh "had a very strong relationship with Defendant Falkin" of Actavis, (2) she communicated with him "with great frequency," including 410 separate telephone conversations or texts between August 7, 2013 and late May 2016, and (3) at least three of those texts were sent in November 2013, years before the acquisition, but contemporaneous with Teva's and Actavis' conspiracy to concede shares of their market to a new entrant. *Id.* ¶¶ 419, 590.

other officers or agents of the corporation which were in violation of the anti-trust laws." *Higbie v. Kopy-Kat, Inc.*, 391 F. Supp. 808, 810 (E.D. Pa. 1975).  Here we have both.

The Cavanaugh Mem. tries to argue otherwise by sanitizing and separating the factual allegations made in the Amended Complaint from the conclusions drawn in the count against Cavanaugh.  The Cavanaugh Mem. tries to divorce the facts alleged from the conclusions plausibly drawn from those facts by beginning with the count against Cavanaugh and working backwards.  First, the Cavanaugh Mem. at 6-7 argues that the conclusions and inferences drawn in the count against Cavanaugh are forbidden conclusory allegations.  Second, the Cavanaugh Mem. at 7-8 argues that the specific competitor communications alleged in the preceding paragraphs of the complaint "contain no discussion whatsoever of the substance of the communications."  *Id.* at 7.  Third, the Cavanaugh Mem. at 8-12 argues that competitor pricing and entry plans or other market information weighed by Cavanaugh were not known by Cavanaugh to be from competitors.  Of course, the States allege that communications with a competitor accompanied by consideration of competitively sensitive information from that competitor are related and plausibly support the conclusion that anticompetitive agreements were reached in those competitor communications.  Moreover, the States specify competitor communications by Cavanaugh that even more directly evidence the connection between *her* competitor communications and the competitive decisions made by Cavanaugh for Teva.  *See, e.g.*, Amended Complaint ¶¶ 419, 477.

Indeed, paragraph 1115 of the Amended Complaint expressly connects – in Cavanaugh's presence – the competitor communications by subordinates to the competitive decisions being made by Teva and in particular Cavanaugh.  The States allege that Cavanaugh, *while smiling*, covered her ears and pretended not to hear, supporting the inference that Cavanaugh wanted her

11

role to be obscured. She was not appalled by competitor communications. She did not instruct her subordinates to stop communicating with competitors and remedy the collusion. Despite this clear direct evidence of knowing ratification of the collusion by Cavanaugh, the Cavanaugh Mem. strains credibility and ignores that complaint allegations must be "taken as true"[6] by arguing that those facts show "Cavanaugh did *not* want to be a part of any use of information obtained from competitors." Cavanaugh Mem. at 13 (emphasis in original).

**The States' Claims Are Timely.** Next, the Cavanaugh Mem. at 14-15 argues that the States' claims against Cavanaugh are time barred. That argument fails for several reasons. First, competitor collusion is self-concealing fraud that equitably tolls the statute of limitations. *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083-84 (2d Cir. 1988).[7] Second, the States allege acts of concealment, *e.g.,* Amended Complaint ¶¶ 1123-1134, including by Cavanaugh in 2017, *id*. ¶ 1133, that toll the running of the statute of limitations. Finally, the conspiracy continued into the period of the statute of limitations, so the statute has not run. Indeed, the case purportedly to the contrary cited in the Cavanaugh Mem. at 14-15, *Invamed, Inc. v. Barr Labs., Inc*., 22 F. Supp. 2d 210, 222 (S.D.N.Y. 1998), illustrates the opposite: a continuing conspiracy defeats a statute of limitations defense. The continuing conspiracy is "beside the point" *only if* the defendant had not engaged in the conspiracy in the first place. The *Invamed* court was distinguishing *United States v. Continental Group, Inc*., 603 F.2d 444, 466-67 (3d Cir. 1979)

---

[6] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[7] Most district court cases in the Third Circuit have followed *Hendrickson Bros.,* holding that the essential nature of an antitrust conspiracy is "self-concealing." *In re Fasteners Antitrust Litig*., CIV. A. No. 08-MD-1912, 2011 WL 3563989, at *5 (E.D. Pa. Aug. 12, 2011) (price fixing and market allocation conspiracies are inherently self-concealing); *In re Aspartame Antitrust Litig.*, CIV. A. No. 2:06-CV-1732, 2007 WL 5215231, at *6 (E.D. Pa. Jan. 18, 2007) (price fixing and a market allocation conspiracy was self-concealing since secrecy "was a necessary element to the success of defendants' alleged conspiracy").

(discussing jury instructions on the stringent requirements of establishing withdrawal from a conspiracy), which held that "a conspirator at one phase of the conspiracy is liable for the subsequent action taken during the conspiracy." *Invamed*, 22 F. Supp. 2d at 222.

**State Law Claims Should Not Be Dismissed.** Finally, the Cavanaugh Mem. at 15 inaccurately argues that the supplemental state law claims warrant dismissal because they are derived from the federal claims. Because the federal claims should not be dismissed, neither should the state law claims. In addition, many of the state law claims are not derived from federal claims. Because the Cavanaugh Mem. does not address the specifics of any state law claims, those issues do not merit briefing at this point.

## CONCLUSION

For the foregoing reasons, Defendant Maureen Cavanaugh's Motion to Dismiss the States' Amended Complaint must be denied.

Dated: February 28, 2020                                         Respectfully submitted,

PLAINTIFF STATE OF CONNECTICUT                  PLAINTIFF STATE OF IDAHO
WILLIAM TONG                                                       LAWRENCE WASDEN
ATTORNEY GENERAL                                              ATTORNEY GENERAL

By:   /s/ *W. Joseph Nielsen*                                  By:   /s/ *John K. Olson*
        W. Joseph Nielsen                                                    John K. Olson
        Assistant Attorney General                                     Deputy Attorney General
        55 Elm Street                                                              Office of the Attorney General
        P.O. Box 120                                                              954 W. Jefferson, 2d floor
        Hartford, CT  06141-0120                                       P.O. Box 83720
        Tel: (860) 808-5040                                                  Boise, ID 83720-0010
        Joseph.Nielsen@ct.gov                                           Tel: (208) 332-3549
                                                                                          john.olson@ag.idaho.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2020, I caused the foregoing document to be filed electronically with the Clerk of Court by using the CM/ECF system, which will serve a copy on all interested parties registered for electronic filing.

/s/ *John K. Olson*
John K. Olson
Deputy Attorney General