**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  GENERIC PHARMACEUTICALS | **:** | MDL 2724 |
| PRICING ANTITRUST LITIGATION | **:** | 16-MD-272 |
| | **:** | |
| | **:** | |
| THIS DOCUMENT RELATES TO: | **:** | 19-cv-2407-CMR |
| | **:** | |
| *State of Connecticut, et.al v. Teva Pharmaceuticals* | **:** | Hon. *CYNTHIA M. RUFE* |
| *USA Inc. Et al.* | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JAMES**
**GRAUSO'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    THE TWOMBLY/IQBAL GATEKEEPING FUNCTION IS CRITICALLY
IMPORTANT TO MR. GRAUSO. .................................................................... 1

III.   THE LEGAL STANDARD OF PLAUSIBILITY AT THE MOTION TO
DISMISS STAGE. ............................................................................................ 2

IV.   CONCLUSORY ALLEGATIONS BASED SOLELY ON CELL PHONE
RECORDS DO NOT PLAUSIBLY ALLEGE PARTICIPATION IN THE
OVERARCHING CONSPIRACY. ................................................................... 5

V.    THE ALLEGATIONS OF COLLUSION ON SPECIFIC DRUGS ARE
CONCLUSORY AND LACK FACTUAL SUPPORT. ..................................... 7

VI.   THERE IS NO FACTUAL BASIS UPON WHICH TO ALLEGE THAT MR.
GRAUSO FIXED ANY PRICE. ...................................................................... 10

VII.  THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. .......... 14

VIII. CONCLUSION ................................................................................................. 14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................................1, 3, 8

*Bell Atlantic v. Twombly*,
 550 U.S. 544 (2007)............................................................................................1, 2, 3, 8

*Burtch v. Milberg Factors, Inc.*,
 662 F.3d 212 (3d Cir. 2011)..............................................................................3, 6, 8, 9

*In re Chocolate Confectionary Antitrust Litig.*,
 999 F. Supp. 2d 777 (M.D. Pa. 2014) ...........................................................................6

*In re Generic Pharm. Pricing Litig.*,
 386 F. Supp. 3d 477 (E.D. Pa. 2019) .............................................................................2

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*,
 338 F. Supp. 3d 404 (E.D. Pa. 2018) ........................................................................6, 8

*In re GSE Bonds Antitrust Litig.*,
 396 F. Supp. 3d 354 (S.D.N.Y. 2019) ...........................................................................4

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
 602 F.3d 237 (3d Cir. 2010).........................................................................................8

*In re Insurance Brokerage Antitrust Litigation*,
 618 F.3d 300 (3d Cir. 2010)..........................................................................................3

*In re Interest Rate Swaps Antitrust Litig.*,
 261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...........................................................................4

*Lorenz v. CSX Corp.*,
 1 F.3d 1406 (3d Cir. 1993)...........................................................................................13

*Lubic v. Fidelity Nat'l Fin., Inc.*,
 No. C08-0401 MJP, 2009 WL 2160777 (W.D. Wash. July 20, 2009) ........................6

*Mullin v. Balicki*,
 875 F.3d 140 (3d Cir. 2017)........................................................................................13

*In re Pa. Title Ins. Antitrust Litig.*,
 648 F. Supp. 2d 663 (E.D. Pa. 2009) ............................................................................3

*In re Processed Egg Prod. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ..................................................................3

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019).............................................................................4

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)...............................................................................4

**Statutes**

15 U.S.C. § 1 .....................................................................................................3, 8

15 U.S.C. § 15b ...................................................................................................13

**Other Authorities**

Fed. R. Civ. P. 8 ...................................................................................................4

Fed. R. Civ. P. 12(b)(6).........................................................................................1

## I.    __INTRODUCTION__

Plaintiffs' Complaint, filed May 10, 2019 (Dkt. 1) and amended on November 1, 2019

(Dkt. 106) ("Complaint"), charges James Grauso (Mr. Grauso) with purposefully and knowingly

"embark[ing] on one of the most egregious and damaging price-fixing conspiracies in the history

of the United States."  Compl.  ¶ 2.  There is no direct evidence against Mr. Grauso.  Despite a

multi-year investigation that began in 2014 through which Plaintiffs acquired millions of emails

and other documents, text messages and the cooperation of many witnesses, Plaintiffs'

allegations against Mr. Grauso are based solely on cell phone company records which record the

parties to a call, its date/time and duration.  There is no evidence of what was actually discussed

during any call.  There is no allegation of any act in furtherance of the alleged conspiracy except

a naked record of a call.

The Complaint against Mr. Grauso should be dismissed under Fed. R. Civ. P. 12(b)(6)

because the conclusory allegations do not contain facts sufficient to plausibly allege he

participated in any conspiracy.  The allegations are also as time barred under the statute of

limitations.  Plaintiffs supplemental state law claims against Mr. Grauso should be dismissed as

well with the federal claims.

## II.    THE *TWOMBLY/IQBAL* GATEKEEPING FUNCTION
## __IS CRITICALLY IMPORTANT TO MR. GRAUSO__

The States have taken the extraordinary step of naming individuals, including Mr.

Grauso, as defendants, potentially on the hook for billions of damages which he could never pay.

The collateral consequences of being an individual defendant in this suit are immediate and

severe.  This potential liability, for a mid-level executive no longer employed by any of the

corporate defendants, destroys credit ratings, makes one kryptonite in the job market, indefinitely

postpones any retirement planning and creates a stress level for the Mr. Grauso and his family

that will endure for years until the summary judgment stage if this motion is denied.   The

rationale in *Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662

(2009*)* for the requirement that plaintiffs allege well-pled facts plausibly suggesting a conspiracy

was to give a defendant such as Mr. Grauso a remedy to escape the massive damage that can

occur simply by being named as a defendant in sprawling, multi-year litigation such as this.   The

concern in *Twombly*, that the corporate defendant might be pressured into agreeing to an

unwarranted monetary "settlement" in order to avoid the cost burdens of litigating its defense, is

equally compelling here where the pressure is enormous for an individual to abandon his

legitimate defense, adopt the Plaintiffs' theory of the case and be dismissed.

 If Plaintiffs' Complaint passes the test set forth in *Twombly* and explained in the Third

Circuit, so be it.  He will deal with the severe consequences, even if he ultimately prevail on the

merits at summary judgment of trial. But this Complaint fails to state a claim against Mr. Grauso

and he should be dismissed as a defendant.

## III.    THE APPLICABLE LEGAL STANDARD

 The Court is familiar with the allegation in the Complaint and has ruled on earlier

Motions to Dismiss in the case.  The Legal Standard section, therefore, will be brief.

 As the Court previously held in dismissing claims in a prior opinion, to go forward the

Complaint must allege facts that give rise to the plausible inference that Mr. Grauso joined the

alleged overarching conspiracy and had "a unity of purpose or a common design and

understanding or meetings of the minds in a conscious commitment to a common scheme…." *In

re Generic Pharm. Pricing Litig.,* 386 F. Supp. 3d 477, 482 (E.D. Pa. 2019).  A complaint must

be dismissed if it fails to "'delineate[] to some sufficiently specific degree that a defendant

purposefully joined and participated in the conspiracy.'" *Id.* at 482 (quoting *In re Processed Egg

Prod. Antitrust Litig.,* 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011). Where a complaint alleges a

larger "overarching conspiracy," the plaintiff must allege "particularized facts that each

Defendant undertook certain acts, or engaged in certain conduct . . . that plausibly suggest that

particular Defendant's embrace of that overarching conspiracy." *Processed Egg Prod*, 821 F.

Supp. 2d. at 721 (emphasis added)."

There is "a difference between allegations that stand on well pleaded facts and allegations

that stand on nothing more than supposition." *Finkelman v. Nat'l Football League*, 810 F. 3d

187, 2011 (3d Cir. 2016). Because the allegations against Mr. Grauso are based solely on cell

phone records, "[T]he court should identify allegations that, because they are no more than

conclusions, are not entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc*., 662

F.3d 212, 221 (3d Cir. 2011)(internal quotation marks omitted). The plausibility standard set

forth in *Twombly* and *Ashcroft* requires "more than a sheer possibility that a defendant has acted

unlawfully" and a complaint which pleads facts "'merely consistent with a defendant's liability,

stops short of the line between possibility and plausibility of 'entitlement of relief.'" *Id. at* 220-

21 (quoting *Iqbal*, 556 U.S. at 678). Where there is an obvious alternative explanation, a

plaintiff's allegation does not satisfy the plausibility standard. *Iqbal*, 556 U.S. at 682; *In re*

*Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 322-23 (3d Cir. 2010).

The Complaint must be scrutinized as to each defendant. Courts rightly dismiss a

particular defendant from a case in which the plaintiff alleges a violation of Section 1 of the

Sherman Act because the allegations as to that particular defendant are insufficient to state a

claim. See, e.g., *In re Processed Egg Prod. Antitrust Litig.,* 821 F. Supp. 2d at 746-47

(dismissing Section 1 conspiracy claims against certain defendants for whom plaintiffs did "not

directly allege[] that any of [those defendants] individually agreed to or participated in the

conspiracy" and finding there was "an absence of specific factual allegations in the SAC to

connect each (or any) of [those particular defendants] directly to the conspiracy"); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009) (dismissing Section 1 conspiracy claims against certain defendants as to whom "Plaintiffs have not sufficiently alleged participation in the conspiracy"); see also *In re GSE Bonds Antitrust Litig.,* 396 F. Supp. 3d 354, 360, 363-65, 368 (S.D.N.Y. 2019) (dismissing antitrust claims against defendants against whom there were no "allegations relating to specific actions," while permitting claims to go forward against defendants identified in transcripts of direct seemingly anticompetitive communications with competitors); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 484 (S.D.N.Y. 2017) (dismissing Section 1 conspiracy claims against certain defendants where the allegations merely stated those particular defendants "communicated with representatives of the [other defendants] in the late spring and early summer of 2009" and that "[a]s a result of their discussions" the parties "agreed to a détente") (internal quotation marks omitted);

The absence of any facts to support Plaintiffs' allegations other than cell phone records comes after the Plaintiffs have had years of discovery both in their investigation and this litigation.[1] "[J]udging the sufficiency of a pleading is a context-dependent exercise." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010); see also *Sweda v. Univ. of Pa.,* 923 F.3d 320, 326 (3d Cir. 2019) (Rule 8 "operate[s] with contextual specificity.").

---

[1]  The State of Connecticut commenced it antitrust investigation in July 2014. Compl. ¶1119. Plaintiffs conducted  a  lengthy investigation using subpoena and other powers of the State to gather evidence. "During the course of the investigation, the Plaintiff States have issued over 30 subpoenas to various generic drug manufacturers, individuals and third parties, and have compiled over 7 million documents in a shared document review platform." Compl. ¶65.  The Plaintiff States have also issued more than 300 subpoenas to various telephone carriers, and have obtained phone call and text message records for numerous companies and individuals throughout the generic pharmaceutical industry. Compl. ¶66.  Plaintiffs have also obtained the cooperation of at least five Confidential Witnesses who  were "directly involved in the conduct alleged herein." Compl. ¶4.

While the Complaint references dozens of emails, none were sent to, received by or referred to Mr. Grauso.  The same is true for text messages.  And none of the Confidential Witnesses or other witnesses referred to by initials in the Complaint makes any allegation implicating Mr. Grauso.  Finally, the Complaint details many trade associations, industry dinners and other gatherings.  Compl. ¶13.  Mr. Grauso is not a placed at any of these meetings.

## IV.   CONCLUSORY ALLEGATIONS BASED SOLELY ON CELL PHONE RECORDS DO NOT PLAUSIBLY ALLEGE PARTICIPATION IN THE <u>OVERARCHING CONSPIRACY.</u>

Count Twenty Four of the Complaint alleges: "Defendant Grauso participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Aurobindo and/or Glenmark to communicate with competitors, or tacitly approving of those communications by other Aurobindo and/or Glenmark employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Aurobindo and/or Glenmark, and their competitors." ¶1320.  There are no emails, texts, spreadsheets, witnesses or other factual heft used to support the allegation that Mr. Grauso participated in this massive conspiracy.  Without any particularized facts other than a cell phone company record, Plaintiffs' allegations do not satisfy the plausibility standard because there are other obvious explanations for why these phone calls may have occurred.

Only Count Twenty-Four of the Complaint is directed to Mr. Grauso and it attempts to implicate Mr. Grauso in the massive overarching conspiracy by reference to alleged price fixes on three specific drugs: Combivir, Kariva and Gabapentin. Compl.  ¶1321  ("The generic drugs subject to these market allocation and price fixing agreements include at least the following: Desogestrel/Ethinyl Estradiol Tablets (Kariva); Gabapentin Tablets; and Lamivudine/Zidovudine (generic Combivir)"  Plaintiffs aver that each drug-specific conspiracy was part of a large "overarching conspiracy" in the industry "which ties together all of the agreements on individual

drugs." Id. at ¶ 116.  In each case, the allegations fail to plausibly allege Mr. Grauso agreed to fix

the price of that specific drug, let alone he participated in the overarching sprawling conspiracy

with dozens of drugs and other conspirators.  In each case, Plaintiffs place cell phone records of

Mr. Grauso in a chart.  From that they draw a conclusory allegation of collusion.  But, there is no

content to these calls; just the parties to the call, the date and length of the call.  There are no

facts negating an equally plausible reason why someone in charge of Commercial Operations

would be speaking to a competitor about supply issues, buy/sell or other legitimate topics.[2]   See

e.g., *Burtch v. Milberg Factors, Inc.* 662 F.3d 212, 228 (3d Cir. 2011)(Appellant does not

adequately plead circumstantial evidence of an agreement.  Conversations between the

[Defendants} do not alone raise an inference of an agreement.").  A plaintiff must allege

"particularized facts that each Defendant undertook certain acts, or engaged in certain

conduct…that plausibly suggest that particular Defendant's embrace of the overarching

conspiracy." *Processed Eggs*, 821 F. Supp. 2d at 721. Since the only "fact" the Plaintiffs can

allege is a cell phone record; they cannot allege with any specificity and particularity that Mr.

Grauso had any collusive agreement let alone participated in the overarching conspiracy with 21

generic pharmaceutical manufacturers and 16 individual  defendants affecting over 100 drugs.

While price fixing is *per se* illegal, speaking to a competitor is not.  This Court has

correctly stated that "participation in a trade group association and/or attending trade

group meetings, even those meetings where key facets of the conspiracy allegedly were adopted

or advanced, are not enough on their own to give rise to the inference of agreement to the

conspiracy."  *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 439

---

[2]  The Complaint notes how many of the executives in this industry have spent their entire career
in generic pharmaceuticals and worked at a number of companies.  Many of these individuals are
not just business colleagues but close personal friends.

(E.D. Pa. 2018); *see also In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 803 (M.D. Pa. 2014) ("The Third Circuit and other appellate courts have routinely held that mere opportunities to conspire . .. are insufficient to establish an inference of conspiracy."); *Lubic v. Fidelity Nat'l Fin., Inc.*, No. C08-0401 MJP, 2009 WL 2160777, at *3 (W.D. Wash. July 20, 2009) ("The case law is replete with instances where participation in trade organizations has been held insufficient to establish proof of a conspiracy.").

## V.     THE ALLEGATIONS OF COLLUSION ON SPECIFIC DRUGS ARE CONCLUSORY AND LACK FACTUAL SUPPORT.

The three episodes Complaint alleges Mr. Grauso conspired to allocate customers on three drugs: Combivir, Kariva and Gabapentin Tablets.  In each case, the sole fact the allegation of collusion is based on is cell phone records.

- **Combivir**

Plaintiffs allege in Compl. ¶ 257 through ¶ 269 under a heading *Teva/Lupin* that there were discussions between Teva, Lupin and Aurobindo (Mr. Grauso) to fix the price and allocate customers for Combivir when Lupin and Aurobindo were planning to enter the market that Teva was in already.  There is no allegation that Mr. Grauso provided any information to Teva. Importantly, the Complaint admits that Teva had a "good friend" at Aurobindo identified only as RC. Compl. ¶ 261.  The Complaint alleges that RC, not Mr. Grauso, confirmed that Aurobindo planned to enter the Combivir market (and there is nothing improper about RC providing that information which was already publicly available).

There were several calls between Mr. Grauso and Teva and Lupin during the four day period in Plaintiff's phone chart.  From the contentless cell phone records, Plaintiffs conclude that "During this four-day period, the three individuals [including Mr. Grauso] were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin

and Aurobindo's entry into the generic Combivir market as seamless as possible."  Compl. ¶263.
This is speculation--a conclusory allegation based on no more facts than phone records which do
not contain any content.  For example, Mr. Grauso, in charge of Commercial Operations could
have been talking about supply issues, potential buy sell or any number of other commercial
topics.  Without any additional facts, it cannot simply be assumed that every call between
competitors involved price fixing.  In the entire Complaint there is not even an allegation that
Mr. Grauso (Senior VP, Commercial Operations), had any authority or role in marketing or sales.
There's no plausible explanation for why, *if* customers were discussed, RC, Teva's "good friend"
at Aurobindo who allegedly confirmed that Aurobindo planned to enter the market, would not
have been the one to have had the discussion.  RC's phone calls are conspicuously absent from
Plaintiffs' phone chart.

The *Iqbal* Court clarified the reasoning for discarding conclusory allegations such as this
noting that "we do not reject these bald allegations on the ground that they are unrealistic or
nonsensical ... It is the conclusory nature of [such] allegations, rather than their extravagantly
fanciful nature, that disentitles them to the presumption of truth."  *Iqbal*, 556 U.S. at 680.  As this
Court has previously stated: "Courts are not, however, bound to accept as true legal conclusions
couched as factual allegations. I*n re Generic Pharma Pricing Antitrust Litig.,* 338 F. Supp 3d
404, 436 (E.D. Pa. 2018) (citing Twombly 550 U.S. at 555).  See also, *Howard Hess Dental
Labs. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 255 (3d Cir. 2010) (affirming dismissal where the
plaintiffs' amended complaint made only conclusory allegations that the defendants "conspired
and knew about the alleged plan to maintain Dentsply's market position" and "It is an axiom of
antitrust law [] that merely saying so does not make it so for pleading-sufficiency purposes." *Id.*
at 258.  To allege violation of Section 1 of the Sherman Act, a complaint must contain "enough

factual matter (taken as true) to suggest an agreement was made." *Twombly*, 500 U.S. at 556. The cell phone records cited by the Plaintiff fall far short of that requirement.

The allegation that Mr. Grauso allocated accounts or fixed the price of Combivir is patently deficient reason. The last paragraph in this section, ¶ 269, reads: "Lupin was able to enter the market for generic Combivir and obtain more than 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market." There is *no allegation that Aurobindo even entered the market for Combivir.* Without an allegation that Aurobindo entered the market, and therefore no price fixing/customer allocation allegation, it simply can't plausibly be alleged that Mr. Grauso participated in a conspiracy to fix the price of Combivir. See, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (affirming dismissal where "allegations fall far short of demonstrating parallel behavior"). When asked to infer a conspiracy from circumstantial evidence, courts first require evidence of parallel conduct. See, e.g., Valspar Corp. v. E.I. Du Pont De Nemours & Co., 873 F.3d 185, 193 (3d Cir. 2017) (Valspar II) ("Our analysis often begins with evidence of parallel price movements.").

- **Kariva**

The above Combivir episode with Aurobindo not only fails on its own to plausibly allege that Mr. Grauso joined a conspiracy, it is also well outside the statute of limitations. Mr. Grauso left Aurobindo and began working at Glenmark in February 2014. He continued his role in Commercial Operations.

In ¶488 through ¶491, Plaintiffs allege that Glenmark and Teva fixed the price of Kariva. The Complaint alleges that "During the morning of May19, 2014 Defendant Patel learned that Glenmark had bid a low price for its own version of Kariva--Viorele--at Publix…." ¶489.

Glenmark had bid $23.50, a price significantly below Teva's price. Id.  Teva lowered its own

price only minimally "virtually guaranteeing that the business would be awarded to Glenmark."

¶491.  The Complaint fails to explain how Glenmark's bidding significantly below Teva and

leaving a huge profit on the table is evidence of a conspiracy.  (If there had been collusion, one

would have expected Glenmark to *raise* its price.). More importantly, with respect to Mr.

Grauso, the Complaint allegedly ties Mr. Grauso into this episode by a phone chart which shows

a voice call from Teva's Nisha Patel to Mr. Grauso of "Duration: 0:00:00."  ¶490.  This is not a

typo.  Plaintiffs ask the Court to infer from a phone record of 0:00:00 that Mr. Grauso was part

of the "scheme" to have Glenmark underbid Teva by a massive amount.  The only reasonable

conclusion to be drawn from this is the opposite—i.e., that Mr. Grauso and Ms. Patel never

spoke with one another on that date..  As will be shown later, this inference is corroborated by

the Plaintiffs' own admission that Mr. Grauso was not a contact at Glenmark.  See Section 4 ii.

- **Gabapentin Tablets (Glenmark)**

Gabapentin Tablets is third drug the Complaint alleges was subject to a price dix by Mr.

Grauso.  In ¶492 to ¶495 of the Complaint, Plaintiffs allege collusion between Teva and

Glenmark on Gabapentin Tablets.  There is no mention of Mr. Grauso whatsoever. Plaintiffs do

not even cite a cell phone bill showing any call.

## VI.    THERE IS NO FACTUAL BASIS UPON WHICH TO ALLEGE THAT MR. GRAUSO FIXED ANY PRICE.

The Complaint also has a Section titled "*Taking The Overarching Conspiracy To A New*

*Level: Price Fixing (2012-2015).*" Complaint page 147.  Plaintiffs allege "…there was a

concerted effort by many in the industry to significantly prices."  ¶536.  This section of the

Complaint covers 120 paragraphs, replete with emails, spreadsheets, texts, and allegations from

Confidential Witnesses.  The section covers dozens of drugs that were allegedly the subject to

-10-

massive fixed price increases.  Again, the sole facts proffered to implicate Mr. Grauso are cell phone company billing record.

- **There is No Plausible Allegation that Mr. Grauso Fixed Prices While at Aurobindo**

In the "Taking the Overarching Conspiracy to a New level: Price Fixing (2012-2015). Under the Section August 9, 2013 Price Increases ("Round 2") the Complaint states "On August 9, 2013, Teva raised prices on twelve (12) different drugs. These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex."  Compl. ¶663.  Aurobindo, where Grauso was employed at the time, is <u>not</u> listed as one of the coordinating companies.  The Complaint goes on to show a "spreadsheet include[ing] competitively sensitive information about certain competitors' plans regarding future price increases that Defendants Patel and/or Green could have only learned from directly colluding with those competitors…." Compl. ¶668.  There is no information about Aurobindo.  None.  Despite no allegation that Aurobindo followed a price increase on any drug, Mr. Grauso is identified in a chart allegedly detailing calls relating to these price increase.  Mr. Grauso had a July 8, 2013 call from Nisha Patel of 8:34 duration. Compl. ¶665  It cannot possibly, let alone plausibly, be inferred that in this call Mr. Grauso colluded to follow Teva's price increases because there is no related allegation that Aurobindo increased prices.

Near the end of this "Price Increase" section, the Complaint has a phone call summary purporting to show phone calls followed by price increase by various companies. Compl. ¶670, Not surprisingly, neither Aurobindo and Mr. Grauso are not listed since his company is not alleged to have participated in these price increases.  There is no inference that can be drawn from this except that Mr. Grauso did not participate in any price increase.

- **The Is No Plausible Allegation that Mr. Grauso Fixed Prices While He Was At Glenmark**

Mr. Grauso joined Glenmark in February 2014.  The Complaint outlines the alleges ""High Quality Competitor Relationships" defined as,  "The highest quality competitors in Defendant Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases." Compl. ¶581.  According to the Complaint, "Glenmark was one of Teva's highest-ranked competitors primarily because Defendant Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Defendant Brown and J.C., a sales and marketing executive at Glenmark."  Compl. ¶594.  Mr. Grauso is not mentioned.  The Complaint outlines Ms. Patel's' relationships with several Glenmark employees. Mr. Grauso in not mentioned.  Compl. ¶596.  Mr. Grauso is not mentioned in a section of the Complaint titled "August 28, 2014 Price Increases," Complaint, page 248, the Plaintiffs allege "The day before the increases became effective – August 27, 2014 – Defendant Patel spent most of her morning discussing the price increases *with her contacts* at Sandoz, Actavis, Taro, Zydus and *Glenmark….*"  Compl. ¶848. (emphasis added). The Complaint sets forth a phone chart showing calls between Ms. Patel and employees of the various companies alleged to have fixed the price, including Glenmark. There are no calls involving Mr. Grauso.  The section of the Complaint "August 28, 2014 Price Increases" covers ¶ ¶847 to 887 detailing, emails, spreadsheets and other evidence.  Mr. Grauso is not mentioned in any of these.

Final confirmation that Mr. Grauso was not a member of this cartel comes towards the end of the  Complaint.  There is a section titled "Competitors Become "High Quality" After Successfully Colluding with Teva."  Compl., page 268. The Complaint goes on to discuss how, "This updated list reflected changes in Teva's conspiratorial relationships." Complaint ¶ 915.

According to the Complaint, Glenmark (Mr. Grauso's employer) remained a "quality competitor." ¶970. The Complaint alleges:

> In addition to CW-5, Defendant Patel also had other contacts at Glenmark--which is why Glenmark did not fall dramatically in the quality competitor rankings when CVW-5 left the company. For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Defendant Patel exchanged 36 calls with Defendant Jim Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. As discussed more fully above, Defendant Patel continued to coordinate with J.C. and Defendant Brown throughout 2014 on several drugs, including Kariva and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company. ¶ 972.

This paragraph speaks for itself. Mr. Grauso worked at Glenmark in Commercial Operations from March 2014 through the end of the alleged conspiracy period. While the Complaint alleges Glenmark was a "high quality competitor" during this time, and makes detailed allegations as to who in Glenmark allegedly participated in the conspiracy, the Complaint repeatedly fails to mention Mr. Grauso. Alternatively, and additionally the Sherman Act claims against Mr. Grauso are barred by the four year statute of limitations in civil Sherman Act cases. *See* 15 U.S.C. § 15b. Plaintiffs filed the original Complaint in this action on May 10, 2019 (Dkt No. 1). The Complaint on its face exonerates, not implicates Mr. Grauso during his time at Glenmark from February 2014 on. There is an allegation that in May of 2012 Mr. Grauso conspired to allocate customers and fix the price of Combivir while he was at Aurobindo. As explained, this allegation does not plausibly allege Mr. Grauso conspired on that drug, let alone joined and participated in the overarching conspiracy, since it does not even allege Aurobindo entered that market. But even if the allegation plausibly alleges Mr. Grauso conspired to violate the Sherman Act on that one drug, that episode happened in May 2012, and Mr. Grauso left Aurobindo well outside the four year statute of limitations.

## VII.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

The Complaint should be dismissed with prejudice as to Mr. Grauso  because the States have had ample opportunity to assert sustainable allegations against Mr. Grauso but have failed to do so.  If the States had facts to support well-pleaded factual allegations against Mr. Grauso, they should have pled them by now. See, e.g., *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (affirming denial of leave to amend where "[m]ost of the facts were available to plaintiff [] before she filed her original complaint").

Allowing the Plaintiffs to amend the Complaint again would result in severe prejudice to Mr. Grauso. "All factors [for denial of leave to amend] are not created equal, however, as 'prejudice to the non-moving party is the touchstone for the denial of an amendment.'" *Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017)(citing *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (internal quotation marks and citation omitted).  For the reasons already discussed, simply being named as a defendant in this multi-billion dollar highly publicized lawsuit has dramatic negative consequences that should not be prolonged.

## VIII.    CONCLUSION

Plaintiffs allege as a result of this massive cartel: "Prices for hundreds of generic drugs have risen – while some have skyrocketed, without explanation, *sparking outrage from politicians, payers and consumers across the country* whose costs have doubled, tripled, or even increased 1,000% or more." Compl. ¶11 (emphasis added).  Mr. Grauso is a subject of that outrage and is suffering consequences from it based solely on contentless cell phone records,[3]

---

[3]  The unfairness of Plaintiffs' allegation by cell phone record is further exemplified by ¶1134 of the Complaint which alleges Mr. Grauso obstructed justice based on no more than cell phone records showing calls with another defendant (before the case was filed).  There is no allegation of the content of what was discussed.  There isn't even any allegation of how Mr. Grauso obstructed justice. The statement that he obstructed justice is baseless and highly prejudicial.

(including one of 0:00:00 duration).  The Complaint alleges "At the zenith of this collusive activity involving Teva, during a 19-month period beginning in that July 2013 and continuing through January 2015, Teva significantly raised prices on approximately 112 different generic drugs. Of those 112 different drugs, Teva colluded with its "High Quality" competitors on at least 86 of them (the others were largely in markets where Teva was exclusive). The size of the price increases varied, but a number of them were well over 1,000%." Compl.  ¶3.  Mr. Grauso is not tied to a single of these price increases.  The Complaint, perhaps in unintentional candor, fails to even mention Mr. Grauso when identifying alleged members of the conspiracy at Glenmark.  Mr. Grauso's next opportunity to be dismissed from the case is years away.  Based on this motion, however, Mr. Grauso respectfully asks the Court to exercise its gatekeeping function and dismiss him from the case with prejudice.[4]


Dated: November 2, 2020                      Respectfully submitted,

                                             /s/ Robert E. Connolly
                                             Robert E. Connolly
                                             Law Office of Robert Connolly
                                             301 N. Palm Canyon Dr.
                                             Palm Springs, CA. 92262
                                             bob@reconnollylaw.com
                                             (215) 219-4418
                                             Counsel for James Grauso

---

[4]  Mr. Grauso joins, adopts, and incorporates by reference as though fully set forth herein the three motions to dismiss and memoranda of law in support thereof filed by Defendants on the grounds that (1) the Plaintiff States lack standing to bring their federal law claims, (2) the state law claims fail for a variety of reasons, and (3) the Plaintiff States have engaged in impermissible claim splitting.  Further, for the reasons set forth in detail below, the Plaintiff States' claim against Grauso under Section 1 of the Sherman Act, 15 U.S.C. § 1, must be dismissed as time-barred by the applicable four-year statute of limitations.