**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>16-MD-2724<br><br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>*State of Connecticut, et al., v. Teva Pharmaceuticals USA, Inc., et al.* | No. 19-CV-2407 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**KONSTANTIN OSTAFICIUK'S MOTION TO DISMISS**
**THE AMENDED COMPLAINT**

*/s/ David Schertler*
David Schertler
Lisa Manning
Schertler Onorato Mead & Sears, LLP
901 New York Avenue, N.W.
Suite 500 West
Washington, DC 20001
(202) 628-4199
(202) 628-4177 (fax)
dschertler@schertlerlaw.com
lmanning@schertlerlaw.com

*Attorneys for Defendant Konstantin Ostaficiuk*

1

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

RELEVANT FACTUAL ALLEGATIONS ............................................................................... 2

ARGUMENT ......................................................................................................................... 7

    I.    Plaintiffs do not plausibly allege that Mr. Ostaficiuk entered into an unlawful
        agreement. ............................................................................................................... 7

        A.  Plaintiffs allege no direct evidence that Mr. Ostaficiuk conspired to fix prices
            or allocate markets. ......................................................................................... 8

        B.  Plaintiffs allege no circumstantial evidence that Mr. Ostaficiuk conspired to
            fix prices or allocate markets. ....................................................................... 11

            1.  Plaintiffs have not alleged parallel conduct. ...................................... 12

            2.  Plaintiffs have not alleged motive. ..................................................... 13

            3.  Plaintiffs have not alleged actions contrary to self-interest. ............. 15

            4.  Plaintiffs have not alleged traditional evidence of a conspiracy ....... 15

               a.  The trade group and phone call allegations are insufficient to support an
                  inference of collusion against Mr. Ostaficiuk .................................. 16

               b.  An inference of collusion against Mr. Ostaficiuk is logically inconsistent
                  with Plaintiffs' case theory. ........................................................... 18

    II.    The Sherman Act claim against Mr. Ostaficiuk is untimely ........................................ 19

    III.    Plaintiffs' pendent state-law claims must be dismissed ............................................. 20

    CONCLUSION .................................................................................................................. 20

i

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

## TABLE OF AUTHORITIES

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................1, 7, 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................1, 8

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) .....................................16

*Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860 (6th Cir. 2012).....................9, 10

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999)............................. 8, 10, 11, 14-16

*In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750 (E.D. Pa. 2017)................9, 11, 15, 16

*In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777 (M.D. Pa. 2014),
   *aff'd*, 801 F.3d 383 (3d Cir. 2015) .......................................................................11, 16

*In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999).................................................10

*In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175 (E.D. Pa. 2016)............16

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004)........................ 7, 8, 12-15

*In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404
   (E.D. Pa. 2018).......................................................................7, 11, 13, 16, 17

*In re Generic Pharm. Pricing Antitrust Litig.*, 386 F. Supp. 3d 477 (E.D. Pa. 2019) ..................14

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).........................15, 19

*In re Processed Egg Prods. Antitrust Litig.*, 2011 WL 5980001 (E.D. Pa. Nov. 30, 2011)..........19

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) .......................7

*Lifewatch Servs., Inc. v. Highmark, Inc.*, 902 F.3d 323 (3d Cir. 2018)...........................................7

*Long v. Spalding Auto. Inc.*, 337 F. Supp. 3d 485 (E.D. Pa. 2018) .................................................3

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993) ............3

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).......12

*Resco Prods., Inc. v. Bosai Minerals Grp. Co., Ltd.*, 158 F. Supp. 3d 406
   (W.D. Pa. 2016) ..........................................................................12, 14

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) ...........................20

*St. Clair v. Citizens Fin. Grp.*, 340 Fed. App'x 62 (3d Cir. 2009) ................................................20

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008) ...................7

*Valspar Corp. v. E.I. Du Pont De Nemours and Co.*, 873 F.3d 185 (3d Cir. 2017).....................14

*Venture Tech, Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41 (2d Cir. 1982)........................................16

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010).................................7

Statutes

15 U.S.C. § 15b............................................................................................................................19

Rules

Federal Rule of Civil Procedure 12(b)(6) .....................................................................................1

iii

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

## INTRODUCTION

The Court should dismiss Defendant Konstantin Ostaficiuk from this litigation.  Plaintiffs fail to plausibly allege that Mr. Ostaficiuk entered into an illegal agreement with any generic drug manufacturer or employee in violation of the Sherman Act.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Plaintiffs rely heavily on allegations that, on one occasion, Mr. Ostaficiuk informed his colleagues at Camber Pharmaceuticals that Teva Pharmaceuticals was "upset" about Camber targeting a large Teva customer and that attempts to take more customers could "antagonize" Teva and "start a war."  Amended Complaint ("AC") ¶ 1103.  These allegations raise no inference of illegal collusion.

In fact, Plaintiffs concede that Camber "remained one of the lowest ranked of all of Teva's competitors," scoring an abysmal "negative 2" in Teva's system for rating the "quality" of possible collusion partners.  AC ¶¶ 578, 1085.  Camber's negative 2 rating meant that Teva assessed Camber to be disinclined to "play nice in the sandbox" with competitors (*e.g.*, to respect "fair shares" and match price increases) and instead viewed Camber as likely to try to "steal Teva's market share" if Teva raised prices.  AC ¶¶ 116, 138, 579.  Consistent with this assessment, the scant factual allegations involving Mr. Ostaficiuk demonstrate Camber's dogged competition for Teva's customers – *i.e.*, the opposite of an unlawful agreement.  The plausibility standard under Federal Rule of Civil Procedure 12(b)(6) "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  With respect to Mr. Ostaficiuk, Plaintiffs do not clear this bar.[1]

---

[1] Mr. Ostaficiuk also joins, adopts, and incorporates by reference the three motions to dismiss and memoranda of law in support thereof filed by Defendants on the grounds that (1) the Plaintiff States lack standing to bring their federal law claims, (2) the state law claims fail for a variety of reasons, and (3) the Plaintiff States have engaged in impermissible claim splitting.

1

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

## RELEVANT FACTUAL ALLEGATIONS

The substantive allegations against Mr. Ostaficiuk are confined to 14 paragraphs of the 1726-paragraph Amended Complaint and focus on limited interactions he allegedly had with one Defendant, Teva Pharmaceuticals, and one Teva executive, David Rekenthaler, concerning one drug, Raloxifene, over the course of two weeks in September 2014. AC ¶¶ 1093-1106.[2]  Plaintiffs concede that Camber was not part of the "core group of competitors" with which Teva allegedly "had very profitable collusive relationships" and that Teva designated Camber "one of the lowest ranked of all of [its] competitors." AC ¶¶ 2, 1085.  This low ranking meant that, in Teva's estimation, Camber employees were poor candidates for collusion and that Camber "might not follow Teva's price increase and instead [would] use the opportunity to steal Teva's market share." AC ¶ 579; *see also* AC ¶ 820 (a "low quality" competitor "would likely compete for market share if Teva increased its price").

Plaintiffs allege that in September 2014, Mr. Rekenthaler gathered information about the upcoming entry of Activis and Camber into the market for Raloxifene. AC ¶¶ 1091-93.  On September 17, 2014, Mr. Rekenthaler allegedly told his Teva colleagues, "I know Activis will be late. Camber is talking but [they're] being somewhat unclear as well.  I'll know more about them after my trip this week." AC ¶ 1093.  That same day, Plaintiffs allege that Camber was competing vigorously with Teva by sending an offer to sell Raloxifene to a "large Teva customer, Econdisc." *Id.*  Camber thus was acting true to form for a "low quality" competitor inclined to "steal Teva's market share." *See* AC ¶ 579.

---

[2] The Amended Complaint provides a chart of phone calls that Mr. Ostaficiuk allegedly had with various other executives over more than a six-year period of time, but it contains no allegation as to the substance of any of these calls and no allegation that he had a close relationship with anyone on the chart or any specific Defendant.  AC ¶ 1075.

2

The "trip" to which Mr. Rekenthaler allegedly referred was a golfing event between September 17 and 19, 2014, attended by Mr. Ostafciuk and numerous other pharmaceutical executives. AC ¶¶ 110, 1094. Plaintiffs allege that on September 21, 2014, Mr. Ostafciuk called Mr. Rekenthaler once and that on September 22, 2014, Mr. Rekenthaler called Mr. Ostafciuk four times. AC ¶ 1095. Allegedly, "these are the first identified phone calls *ever* between the two competitors." *Id.* (emphasis added). Plaintiffs do not allege the content of any of these calls, which totaled 32 minutes. *Id.* Whatever their content, Plaintiffs' allegations make clear that Camber did not back down from challenging Teva's customer. Camber continued to compete for Econdisc by allegedly sending it a revised offer for Raloxifene. *Id.*

Plaintiffs allege that on September 24, 2014, Mr. Ostafciuk had three more calls with Mr. Rekenthaler. AC ¶¶ 1097-98. Plaintiffs do not allege the substance of these calls other than to allege that Mr. Rekenthaler was "working on verifying the Camber price" and that "some" of the calls "also related to Camber's entry into the market for generic Combivir." *Id.* That same day, a Teva employee allegedly emailed Teva colleagues and stated: "Camber indicated that they are targeting Econdisc and a small retailer . . . and then they would be 'done.'" AC ¶ 1096. Plaintiffs allege that this information was obtained from "conversations with Ostafciuk[.]" *Id.* ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆[3] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[3] It is appropriate for the Court to consider this document – which Plaintiffs selectively quote in the Amended Complaint – in connection with this motion. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); *see also Long v. Spalding Auto. Inc.*, 337 F. Supp. 3d 485, 490 (E.D. Pa. 2018) (Rufe, J.) (same).

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

[REDACTED]

[REDACTED]

[REDACTED]

Plaintiffs allege that the next day, September 25, 2014, Teva decided to "concede additional smaller customer challenges" to Camber.  AC ¶ 1099.  Plaintiffs allege that this concession occurred because Teva was "armed with the information" that Mr. Rekenthaler "had gathered from" Mr. Ostaficiuk. *Id.* [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Plaintiffs allege that on the same day, September 25, a Camber employee discussed competing for more of Teva's customers.  AC ¶ 1100.  The employee allegedly "instructed a colleague to gather market intelligence" on potential Raloxifene customers but to hold off on targeting additional Teva accounts "until we know how we do with Econ[disc]." *Id.*[4]  Mr. Rekenthaler allegedly continued to worry about further competition from Camber.  Plaintiffs allege that Mr. Rekenthaler "expressed to [Mr.] Ostaficiuk that Teva did not want Camber challenging

---

[4]  This allegation that on September 25, Camber continued to gather information on customers to steal from Teva belies Plaintiffs' conclusory allegation that the September 24 telephone calls resulted in any sort of agreement between Teva and Camber.  *See* AC ¶ 1096.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for any more of its customers, on Raloxifene or generic Combivir." AC ¶ 1102. Plaintiffs cite no support for this conclusory allegation other than alleging that the two had "a short one (1) minute call" on September 26. AC ¶ 1101.

Plaintiffs allege that, in a subsequent internal email, Mr. Ostaficiuk told Camber employees: "We do not offer anything to any Teva customers... Not even a 'bad price'! . . . . We do not want to upset them more!" AC ¶ 1102. After a Camber employee stated that Camber was "also not seeking any Lupin business [for generic Combivir]," Ostaficiuk allegedly wrote: "We don't want to antagonize either of them and start a war . . .." AC ¶ 1103.[5] Thus, according to Plaintiffs' allegations, Camber had "upset" Teva. The surrounding allegations show why: Camber vigorously competed with Teva by stealing a large customer and threatening others. This defiance is consistent with Plaintiffs' allegation that Camber was "one of the lowest ranked of all of Teva's competitors" in Teva's internal rankings. AC ¶ 1085.

A week later, Teva allegedly heard that Camber had targeted another Teva customer with an unsolicited bid for Raloxifene. AC ¶ 1104. According to Plaintiffs, Mr. Rekenthaler "doubted" the rumor and responded, "You're positive they sent them an offer?" *Id.* Far from raising an inference of an agreement between Camber and Teva, Mr. Rekenthaler's statement reflects his continuing concern that Teva's business was under threat from Camber. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

---

[5]   The only other allegation involving Mr. Ostaficiuk that relates to generic Combivir is that "some" of his calls on September 24, 2014, "related to Camber's entry into the market for generic Combivir." AC ¶ 1098. The Amended Complaint contains no allegations regarding the substance of any of Mr. Ostaficiuk's September 24 calls.

5

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Camber allegedly continued to compete for Teva's business in December 2014, when it "learned of supply problems at Teva on Raloxifene." AC ¶ 1106. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ One employee stated, "Fair share only applies when there is not supply constraints" – language that Plaintiffs allege to be a reference to "the conspiracy." AC ¶ 1106. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Plaintiffs concede that Mr. Ostaficiuk was "optimistic" about the potential opportunity to poach more Teva business. AC ¶ 1106. Mr. Ostaficiuk instructed his employees to confirm the opportunity, *i.e.*, "Good luck guys but go fishing and gather information before we commit . . .." *Id.*

Based on these limited factual allegations,[6] Plaintiffs allege that "as early as 2014, [Mr.] Ostaficiuk took active steps to facilitate market allocation and price fixing agreements between Camber Pharmaceuticals, Inc. and its competitors" for Raloxifene and generic Combivir in violation of the Sherman Act. AC ¶ 1373. Plaintiffs also bring supplemental state law claims against all Defendants. AC ¶¶ 1417-1726. The allegations in the Amended Complaint involving Mr. Ostaficiuk and Camber's vigorous competition with Teva are completely inconsistent with the legal assertions in Counts 30 and 35. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Because

---

[6]   While the allegations involving Mr. Ostaficiuk are limited, the body of documents on which they are based is not. To date, Plaintiffs have produced 292,923 documents, totaling 638,500 pages, collected from Camber in the course of their multi-year investigation. Mr. Ostaficiuk was the custodian for more than 70% (212,497) of those documents.

6

Plaintiffs fail to allege a plausible Sherman Act claim against Mr. Ostaficiuk, he should be dismissed from this action with prejudice.

ARGUMENT

I.   **Plaintiffs do not plausibly allege that Mr. Ostaficiuk entered into an unlawful agreement.**

To establish a claim under Section 1 of the Sherman Act, "the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,* 530 F.3d 204, 218 (3d Cir. 2008). Courts interpret "these three terms collectively simply to mean an agreement." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 332 (3d Cir. 2018) (citation omitted). "[A] plaintiff's pleading burden is to offer allegations that plausibly suggest that the defendant agreed to the conspiracy, which, in the antitrust context, is a conscious commitment to a common scheme designed to achieve an unlawful objective." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (citations omitted). *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) ("there must be a unity of purpose or a common design and understanding or a meeting of minds") (citations and internal quotation marks omitted)). Where a complaint alleges an "overarching conspiracy," a plaintiff must allege "particularized facts that ***each Defendant*** undertook certain acts, or engaged in certain conduct . . . that plausibly suggest that particular Defendant's embrace of that overarching conspiracy." *Processed Egg*, 821 F. Supp. 2d at 721 (emphasis added).

"A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010). In all cases, "a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy." *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 438 (E.D. Pa. 2018) (internal quotation marks and citations omitted). The

7

plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" and is not satisfied when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 567.  Plaintiffs have failed to "plead[] factual content that allows the court to draw the reasonable inference" that Mr. Ostaficiuk joined and participated in any agreement, let alone an unlawful conspiracy, with Teva or any other competitor. *Iqbal*, 556 U.S. at 678.

> **A.     Plaintiffs allege no direct evidence that Mr. Ostaficiuk conspired to fix prices or allocate markets.**

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).  Plaintiffs allege no direct evidence that Mr. Ostaficiuk joined an illegal conspiracy relating to Raloxifene or generic Combivir.  Far from it.  The allegations involving Mr. Ostaficiuk demonstrate strategic efforts by Camber to challenge its much larger competitor Teva in the Raloxifene market.  As to Combivir, Plaintiffs allege virtually nothing at all.

With respect to Raloxifene, Plaintiffs allege that Mr. Ostaficiuk attended an industry event and spoke with Mr. Rekenthaler by telephone a few times thereafter.  AC ¶¶ 1093-95.  These innocuous allegations are not direct evidence of a "meeting of minds" or a "conscious commitment to a common scheme" necessary to allege a conspiratorial agreement.  *See Flat Glass*, 385 F.3d at 357.  Plaintiffs further allege that on September 25, 2014 – one day after the telephone calls between Mr. Ostaficiuk and Mr. Rekenthaler – a Camber executive instructed a colleague to research new Raloxifene customers but refrain from targeting additional Teva customers "until we know how we do with Econ[disc]."  AC ¶ 1100.  These comments demonstrate that Camber's business strategy was to try to pick off Teva's Raloxifene customers one by one – beginning with Econdisc – *and not to collude with Teva.*

8

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

Reinforcing this inference, Plaintiffs concede that Teva perceived Camber's actions as an unwelcome incursion on its customers. Plaintiffs allege that "[Mr.] Rekenthaler expressed to [Mr.] Ostaficiuk that Teva did not want Camber *challenging* for any more of its customers, on Raloxifene or generic Combivir." AC ¶ 1102 (emphasis added). Assuming the truth of this allegation, it was a warning from Teva, Camber's much larger competitor, that Camber would face backlash if it continued to poach Teva's clients. A few days later, Mr. Ostaficiuk allegedly told Camber employees: "We do not offer anything to any Teva customers . . . Not even a 'bad price'! . . . We do not want to upset them more!" *Id.* After an employee stated that Camber was "also not seeking any Lupin business" for generic Combivir, Mr. Ostaficiuk confirmed that he had made a business decision to temper Camber's poaching efforts with respect to both drugs to serve its overall business interests: "We don't want to antagonize either of them and start a war . . .." AC ¶ 1103.

Mr. Ostaficiuk's alleged references to not further "upsetting" or "antagonizing" Teva and/or Lupin is not evidence of collusion. *See, e.g.*, *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 783 (E.D. Pa. 2017) (defendant's expressed reservations about "upsetting" a competitor and "[r]eferences to averting price wars" were "not evidence of collusion" and "do not raise an inference of collusion"). To the contrary, a strategic decision concerning when to battle a major competitor and when to wait in the trenches demonstrates, "[j]ust as in *Twombly*, . . . no more than a natural and independent desire to avoid a turf war[.]" *Erie County, Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 871 (6th Cir. 2012) (affirming judgment granting motion to dismiss). This is especially true here, because other allegations show that Camber had repeatedly "upset" Teva by refusing to be a "good competitor" and poaching Teva's customers. *See* AC ¶¶ 1085, 1102.

"Courts have recognized that firms must have broad discretion to make decisions based on their judgments of what is best for them and that business judgments should not be second-

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

guessed[.]"  *In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999).  In *Baby Food*, the Third

Circuit considered a manager's decision not to market to a competitor's customer because "with

our 'truce' in effect, I knew our hands were tied."  166 F.3d at 120.  The court concluded that use

of the term "truce" was "as consistent with independent behavior as it [was] with price-fixing" and

reflected "strategic planning as to whether and when to pursue particular business opportunities."

*Id.* at 127.  The Third Circuit was "unwilling to question such business judgment."  *Id.*  Plaintiffs

plausibly allege no more than that Mr. Ostaficiuk exercised permissible business judgment under

similar circumstances.  Mr. Ostaficiuk's alleged concern that Teva was "upset" and his judgment

that Camber should avoid further "antagoniz[ing]" larger competitors, AC ¶¶ 1102-03, are even

more innocuous than the "truce" expression in *Baby Food* that the court deemed "not sufficiently

probative of unlawful concerted action."  166 F.3d at 127.  *See Erie County*, 702 F.3d at 871

(allegation about "desire to avoid a turf war" did not save complaint from dismissal).

       The allegation that Camber planned to hold off on courting additional Teva customers until

it knew how it fared with Econdisc reinforces the point that Plaintiffs allege nothing more than

rational business decision-making as to Mr. Ostaficiuk.  *See* AC ¶ 1100.  Camber's sequenced

approach to competing with Teva shows that Mr. Ostaficiuk implemented "strategic planning as

to whether and when to pursue particular business opportunities."  *Baby Food*, 166 F.3d at 127.

Teva has yearly revenue around 45 times that of Camber.[7]  Camber nonetheless took one large

customer from Teva.  Having done so, Camber sensibly paused before deciding whether and when

to strike again.  Mr. Ostaficiuk's strategic decision to pick his battles against Teva – *i.e.*, to poach

one customer and then lay low – is common sense business judgment of a smaller competitor.

---

[7]  For fiscal year 2014, Camber's sales were $204 million.  Teva's reportedly exceeded $9 billion.
*See* https://www.fiercepharma.com/special-report/1-teva (last visited November 2, 2020).

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

Plaintiffs' allegation that two months later, one Camber employee used the phrase "fair share" in a single stray email does not improve the allegations against Mr. Ostaficiuk. *See* AC ¶ 1106 ████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Mr. Ostaficiuk's alleged response to "go fishing and gather information before we commit" was a far cry from a directive to stand down – which one would have expected if an agreement to divide the market was in place. *See* AC ¶ 1106. It was an instruction ██████████████████████████████████████████████████████ In this context, use of the phrase "fair share" is, at most, an allegation that a non-party made a statement that exhibited some "awareness" of the market. *See Blood Reagents*, 266 F. Supp. 3d at 783 (internal communications referencing "'upsetting the apple cart'" "merely reflect[ed] an awareness of the duopolistic nature of the [] market"). Such statements are insufficient to support a plausible collusion claim. *See id.* (*citing Baby Food*, 166 F.3d at 120-21).

**B.    Plaintiffs allege no circumstantial evidence that Mr. Ostaficiuk conspired to fix prices or allocate markets.**

Without direct evidence of a Section 1 violation, "Plaintiffs may withstand dismissal by relying on allegations of circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy." *Generic Pharm. Pricing*, 338 F. Supp. 3d at 440 (citations and internal quotation marks omitted). A plaintiff must allege "not only that the defendants' behavior was 'consciously parallel'—that is, that each was aware of the others' conduct and this awareness was an element in their decision-making process—but also 'certain 'plus' factors.'" *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 786 (M.D. Pa. 2014) (citations omitted), *aff'd*, 801 F.3d 383 (3d Cir. 2015). The plus factors include: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant

11

acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Flat Glass*, 385

F.3d at 360 (internal quotations marks and citation omitted).   Plaintiffs' allegations fail this

standard as well.

                1.    <u>Plaintiffs have not alleged parallel conduct.</u>

The Amended Complaint contains no allegation of any price discussion, price information

exchange, coordinated price action, or parallel conduct between Mr. Ostaficiuk and Teva or any

other competitor.  *See Resco Prods., Inc. v. Bosai Minerals Grp. Co., Ltd.*, 158 F. Supp. 3d 406,

424 (W.D. Pa. 2016) ("Plaintiff presented no evidence of the amount or timing of any of the pricing

increases it claims were the product of collusion.").   The only allegations that relate to pricing

involve Camber's successful capture of Teva's large customer account, Econdisc.  AC ¶¶ 1093-

95.  Camber's efforts to obtain that business reflect aggressive competition, not parallel conduct,

████████████████████████████████████████████████████████

████████████████████████████████

Plaintiffs also have failed to allege parallel market allocation involving Mr. Ostaficiuk with

respect to Raloxifene and/or generic Combivir.  With respect to Raloxifene, Plaintiffs allege only

that Camber poached a significant Teva client and that Mr. Ostaficiuk made a strategic decision as

to whether and when to pursue additional business opportunities.  AC ¶ 1102.  With respect to

generic Combivir, the only allegation is that Mr. Ostaficiuk did not want to "antagonize" Lupin.

AC ¶ 1103.  None of these allegations demonstrates plausible parallel conduct, because Plaintiffs

do not allege that another defendant "acted similarly by refraining from competing" for a customer

as a result of Mr. Ostaficiuk's independent decisions.  *See Petruzzi's IGA Supermarkets, Inc. v.*

*Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993).

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

Plaintiffs' allegation that on September 25, 2014, Teva decided to "concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop" does not suffice. AC ¶ 1099. Plaintiffs do not identify what business was "conceded," to whom, or allege that the concession was part of an agreement. Moreover, the surrounding allegations demonstrate ongoing vigorous competition between Teva and Camber and preclude a reasonable inference that any "concession" by Teva was part of an unlawful agreement. Specifically, as of the day of this alleged "concession," ████████████████████████████████████████ ████████████████, and Camber was mulling a strategy to target additional Teva customers after Econdisc, AC ¶ 1100. The allegation that several days later, Mr. Rekenthaler warned Mr. Ostaficiuk not to "challeng[e] for any more of [Teva's] customers," AC ¶ 1102, underscores the inference that no agreement existed. A threat would not be needed if there was an agreement.[8] Plaintiffs allege no parallel conduct involving Mr. Ostaficiuk.

### 2. Plaintiffs have not alleged motive.

To allege that a "defendant had a motive to enter into a price fixing conspiracy," Plaintiffs must allege facts demonstrating that "the industry is conducive to oligopolistic price fixing[.]" *Flat Glass*, 385 F.3d at 360. This consideration focuses on whether "the structure of the market [is] such as to make secret price fixing feasible." *Id.* (internal quotation marks and citation omitted). Profit is not an improper business motive. "Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired

---

[8]   The generic Combivir allegations fare even worse, as Plaintiffs provide literally *no* allegations relating to the pricing of Combivir or its allocation across markets. *See Generic Pharm. Pricing*, 338 F. Supp. 3d at 442 (at a minimum, plaintiffs "must allege price increases that are 'reasonably proximate in time and value'") (citations omitted).

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

to fix pricing in violation of the Sherman Act." *Baby Food*, 166 F.3d at 134-35; *In re Generic Pharm. Pricing Antitrust Litig.*, 386 F. Supp. 3d 477, 485 (E.D. Pa. 2019) (same).

As to motive, Plaintiffs allege only that generic drug manufacturers have arrangements with large retail customers that incentivize the retailers to raise drug prices. *See* AC ¶¶ 96-100. This alleges nothing more than business acumen. Higher prices mean higher profits for manufacturers. Apportioning some profit to retailers incentivizes retailers to charge the prices necessary to achieve the profit. *See id.* Such profit seeking is lawful. Plaintiffs must allege that the *structure* of the generic drug manufacturer market itself "make[s] secret price fixing feasible." *Flat Glass*, 385 F.3d at 360. Plaintiffs fail to do so.

As to market structure, Plaintiffs allege that generic drug competitors "vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market." AC ¶ 88. These allegations fatally undercut an inference of collusion, because they depict a fluid market with a shifting slate of competitors rather than a market "dominated by a handful of firms[.]" *See Valspar Corp. v. E.I. Du Pont De Nemours and Co.*, 873 F.3d 185, 197 (3d Cir. 2017) (finding motive in a "highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry"). Such markets lack the oligopolistic structure that facilitates coordination. For example, in *Resco Products*, the court found allegations of motive insufficient when "between fifty-eight and eighty [commodity] exporters" participated in the market over a four-year period. 158 F. Supp. 3d at 424-25. Plaintiffs' allegations that generic drug competitors operate in a constantly "shifting pharmaceutical landscape," AC ¶ 88, are comparatively insufficient and do not allege motive.

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

3.     Plaintiffs have not alleged actions contrary to self-interest.

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *Flat Glass*, 385 F.3d at 360-61.  These actions "must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it." *Baby Food*, 166 F.3d at 135.  Plaintiffs focus on Mr. Ostaficiuk's alleged instruction that "We do not offer anything to any Teva customers.  Not even a 'bad price'! . . . We do not want to upset them more!" AC ¶ 1102.  On its face, this directive was hardly irrational.  It reflects pragmatic decision-making about whether and when to pursue particular business opportunities.  *See* Section I.A*., supra.*

The surrounding allegations prove the rationality of the decision.  Plaintiffs cast Teva as the unscrupulous mastermind of an illegal scheme involving close relationships with nearly two dozen companies.  Camber, by contrast, is ***45 times smaller*** than Teva and allegedly was not in Teva's "core group" of competitors.  Camber's size disadvantage and peripheral status reinforce the rationality of Mr. Ostaficiuk's alleged strategy to sometimes attack Teva's customers (*e.g.*, stealing Econdisc) and other times not.  As "one of the lowest ranked of all of Teva's competitors," Camber was a vulnerable outsider.  AC ¶ 1085.  Mr. Ostaficiuk's alleged actions reflect a self-interested mindset aware of that competitive reality.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) ("allegations of conspiracy are deficient if there are obvious alternative explanations for the facts alleged") (citation and internal quotation marks omitted).

4.     Plaintiffs have not alleged traditional evidence of a conspiracy.

Because the other "plus" factors may simply reflect an oligopolistic market, the "most important evidence will generally be non-economic evidence that there was an actual, manifest agreement not to compete."—*Blood Reagents*, 266 F. Supp. 3d at 775  (internal quotations marks

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

and citation omitted). This "may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Generic Pharm. Pricing*, 338 F. Supp. 3d at 449. Plaintiffs' allegations regarding Mr. Ostaficiuk do not remotely clear this hurdle.

      a.   *The trade group and phone call allegations are insufficient to support an inference of collusion against Mr. Ostaficiuk.*

Membership in trade organizations or attendance at industry events, standing alone, does not imply the existence of a collusive agreement. *See Chocolate Confectionary*, 999 F. Supp. 2d at 804. Similarly, close relations or frequent meetings between alleged conspirators lack inferential value. *See Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 45 (2d Cir. 1982). Therefore, "evidence of competitors meeting together, without more, is insufficient to raise inferences of conspiracy without additional evidence." *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 197 (E.D. Pa. 2016).

Plaintiffs' do not allege the "additional evidence" necessary to support a plausible inference of conspiracy as to Mr. Ostaficiuk. Plaintiffs allege that Mr. Ostaficiuk attended one industry event attended by Mr. Rekenthaler and that the two men exchanged phone calls over a five-day period thereafter. Attendance at the same industry events – let alone just one event – is insufficient to support a plausible inference of conspiracy. *See Baby Food,* 166 F.3d at 133 ("[E]vidence of social contacts and telephone calls among representatives of the defendants [is] insufficient to exclude the possibility that the defendants acted independently.").

The insufficiency of the inference of conspiracy as to Mr. Ostaficiuk is especially glaring, because Plaintiffs plead no facts regarding the substance of the phone calls that they allege to be so relevant. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) ("Conversations between the [Defendants] do not alone raise an inference of an agreement."). Plaintiffs' list of

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

phone calls Mr. Ostaficiuk allegedly exchanged with various individuals between 2011 to 2017 suffers from this shortcoming in spades.  AC ¶ 1075.  A catalog of calls over a period of six years is inferentially useless when neither the date nor the substance of any particular call is alleged.

The sparse and unspecific allegations against Mr. Ostaficiuk stand in stark contrast to other allegations of the Amended Complaint.  Plaintiffs allege that Defendants' "business and social events occur[red] with such great frequency that there [was] an almost constant ability for Defendants" to collude and include intricate graphics demonstrating an "interlocking web of communications and relationships." AC ¶¶ 118, 124.  But Camber does not appear in these graphics, and Mr. Ostaficiuk is not alleged to have participated in this world of frequent meetings. Mr. Ostaficiuk appears nowhere in the trade group allegations and has a paltry history with the alleged high-quality competitors.[9]

In the context of the DDP Complaint, this Court held that social contact allegations failed to plausibly suggest Teligent's participation in a conspiracy.  *Generic Pharm. Pricing*, 338 F. Supp. 3d at 451.  The Court reasoned that the plaintiffs did not allege that Teligent representatives held board membership in key trade organizations or frequently attended industry-sponsored social gatherings.  *Id*.  This Court should make the same finding as to Mr. Ostaficiuk.  One event and sporadic phone calls of unspecified content occurring over five days do not plausibly show agreement to a conspiracy.

---

[9]   The paucity of allegations involving Mr. Ostaficiuk is particularly notable in light of Plaintiffs' representations that they have conducted a years-long investigation involving (1) "review of many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry" and (2) analysis of "an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals[.]" AC ¶ 4.  These resources include 292,923 documents (638,500 pages) from Camber.  If there were any evidence plausibly supporting a conspiracy claim involving Mr. Ostaficiuk, Plaintiffs already would have uncovered and alleged it.

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

b.    *An inference of collusion against Mr. Ostaficiuk is logically inconsistent with Plaintiffs' case theory.*

The theory of Plaintiffs' case is that Teva created a system in which its "highest quality competitors . . . had agreements to lead and follow each others' price increases." AC ¶ 581. "Conversely," the "low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share." AC ¶ 579. Plaintiffs repeatedly rely on Teva's ranking system as a reliable indicator of collusion potential and concede that Camber was "one of the lowest ranked of all of Teva's competitors." AC ¶ 1085. Thus, under Plaintiffs' own theory, Camber was an outsider likely to buck price increases and steal customers. AC ¶ 579. These allegations demonstrate the incoherence of Plaintiffs' claim that the limited communications between Mr. Ostaficiuk and Mr. Rekenthaler plausibly support the inference of an agreement. Those allegations overwhelmingly support the inference that Camber and Teva had a competitive relationship and nothing more.

Teva's uber-competitive efforts to investigate Camber's entry into the Raloxifene market and Camber's scrappy snatching of Teva's Econdisc business allegedly culminated in Mr. Rekenthaler "express[ing] to [Mr.] Ostaficiuk that Teva did not want Camber challenging for any more of its customers[.]" AC ¶ 1102. The only reasonable inference is that Mr. Rekenthaler and Mr. Ostaficiuk became business adversaries, with Mr. Rekenthaler asserting Teva's prowess and Mr. Ostaficiuk strategically gauging Camber's responses. This is the only interpretation that accounts for Mr. Ostaficiuk's alleged concern about further antagonizing Teva and the allegation that Camber "remained one of the lowest ranked of all of Teva's competitors." AC ¶ 1085. An inference of collusion between Camber and Teva is fundamentally implausible, as Mr. Ostaficiuk would have had no cause to fear reprisal from Teva if an agreement was in place. Likewise, Teva would not have judged Camber as "likely to steal Teva's market share" if it could have sealed a

18

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

collusion agreement with Camber through a few brief phone calls.  Mr. Ostaficiuk has provided

not only an "obvious alternative explanation" for Plaintiffs' allegations, but has set forth the far

more coherent explanation of the totality of the allegations.  *See Ins. Brokerage*, 618 F.3d at 322–

23 ("allegations of conspiracy are deficient if there are obvious alternative explanation[s] for the

facts alleged") (citation and internal quotations omitted).  Because Plaintiffs have failed to plead

facts that plausibly show that Mr. Ostaficiuk joined any conspiracy, he should be dismissed from

this action.

**II.     The Sherman Act claim against Mr. Ostaficiuk is untimely.**

     A suit under the Sherman Act must be "commenced within four years after the cause of

action accrued.'"  15 U.S.C. § 15b.  Plaintiffs allege that Mr. Ostaficiuk's unlawful conduct began

"as early as 2014," *i.e.*, in "September 2014 [when] Camber entered the market for two different

drugs that overlapped with Teva."  AC ¶¶ 1087, 1373.  Plaintiffs' latest factual allegation involving

Mr. Ostaficiuk is a solitary email exchange in "mid-December 2014."  AC ¶ 1106.  Plaintiffs filed

their Complaint on May 10, 2019, after expiration of the four-year statute of limitations, and assert

no plausible claim that Mr. Ostaficiuk ever joined the alleged conspiracy.

     Plaintiffs concede that they became aware of the alleged conduct in "July 2014, [when] the

State of Connecticut initiated a non-public investigation into suspicious price increases for certain

generic pharmaceuticals."  AC ¶ 4.  This admitted awareness of "*suspicious* price increases"

precludes an argument that the statute of limitations was equitably tolled.  Plaintiffs knew "or

should reasonably [have been] expected to know, in the exercise of due diligence, the concealed

facts supporting the cause of action."  *In re Processed Egg Prods. Antitrust Litig.*, 2011 WL

5980001 at *9 (E.D. Pa. Nov. 30, 2011).  The Sherman Act claim against Mr. Ostaficiuk should

be dismissed as untimely.

19

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

**III.**   **Plaintiffs' pendent state-law claims must be dismissed.**

Plaintiffs' failure to state a claim under federal law also requires dismissal of their derivative state antitrust and consumer protection claims.  *See, e.g., St. Clair v. Citizens Fin. Grp.,* 340 Fed. App'x 62, 65 n.2 (3d Cir. 2009); *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008).  Moreover, given the absence of allegations plausibly showing any wrongdoing by Mr. Ostaficiuk, all state law claims against Mr. Ostaficiuk must fail.

## CONCLUSION

For the reasons set forth above and any others that appear to the Court, Mr. Ostaficiuk should be dismissed from this litigation with prejudice.

November 2, 2020                                     Respectfully submitted,

*/s/ David Schertler*
David Schertler
Lisa Manning
Schertler Onorato Mead & Sears, LLP
901 New York Avenue, N.W.
Suite 500 West
Washington, DC 20001
(202) 628-4199
(202) 628-4177 (fax)
dschertler@schertlerlaw.com
lmanning@schertlerlaw.com

*Attorneys for Defendant Konstantin Ostaficiuk*

20

**PUBLIC VERSION – FILED WITH REDACTIONS**
**REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER**

# EXHIBIT 1

## (Filed Under Seal)

# EXHIBIT 2

**(Filed Under Seal)**