**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  GENERIC PHARMACEUTICALS | : | MDL NO. 2724 |
| PRICING ANTITRUST LITIGATION | : | 16-MD-2724 |
| | : | |
| _____ | : | HON. CYNTHIA M. RUFE |
| | : | |
| THIS DOCUMENT RELATES TO | : | |
| | : | |
| *State of Connecticut et al. v. Teva Pharmaceuticals* | : | 2:19-cv-02407-CMR |
| *USA, Inc., et al.* | : | |
| _____ | : | |

**Plaintiff States' Memorandum of Law in Opposition
to Defendant Lannett Company, Inc.'s Individual
<u>Motion to Dismiss the State Plaintiffs' Overarching Conspiracy Claims</u>**

## I.      INTRODUCTION

Plaintiff States hereby respond to Defendant Lannett Company, Inc.'s ("Lannett") Individual Motion to Dismiss the State Plaintiffs' Overarching Conspiracy Claims set forth in Count Fourteen in State Plaintiffs' November 1, 2019 Amended Complaint ("Amended Complaint"), Dkt. 106. Lannett contends that "Plaintiff States have failed to allege sufficient facts demonstrating that Lannett was aware of, and consciously committed to participate in, any such conspiracy." Doc. 189-1. The Amended Complaint more than adequately pleads sufficient facts to support the overarching conspiracy claims against Lannett, and Lannett misstates both those facts and the applicable law in its memorandum. Accordingly, its motion to dismiss must be denied.

1

II.     **PLAINTIFF STATES HAVE MET THE** *TWOMBLY* **STANDARD IN ITS OVERARCHING CONSPIRACY ALLEGATIONS AGAINST LANNETT**

### A.   Applicable Law

While Lannett is correct that Plaintiff States should be held to the requisite pleading standards, Lannett misstates and exaggerates what is actually required to survive a motion to dismiss. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Id.*

To state a claim for overarching conspiracy, a plaintiff must show (1) the existence of a "common goal among conspirators." (2) whether the agreement between conspirators required "continuous cooperation," and (3) whether the conspiracies' participants overlap. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989). The "absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy." *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992) (quotation marks and citation omitted).

When evaluating the sufficiency of an overarching conspiracy claim, the courts look at the overall picture when assessing whether a set of agreements are part of a larger conspiracy among a set of defendants. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore. Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962); *see also In re: Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d. Cir. 1982) ("a seriatim examination of [] claims

2

against each [] conspiracy defendant [] as if they were separate lawsuits…overlook[s] the conspiracy itself").

This Court has followed this approach in its prior rulings in this multidistrict litigation, rejecting Defendants' previous motions to dismiss Plaintiff States' overarching conspiracy claims in its Heritage-centric case (in which, notably, Lannett is also a Defendant). In doing so, this Court held that:

> The connective tissue Plaintiffs have alleged in their Overarching Complaints gives credence to a claim that Defendants engaged in behavior that would probably not result from chance, coincidence, independent response to common stimuli, or mere interdependence unaided by an advance understanding among the parties. Plaintiffs make plausible claims that the alleged individual drug conspiracies were connected by common goals, methods, or actors so as to form a broader overarching conspiracy. Defendants' arguments that there are plausible alternative explanations for the overarching conspiracy should be tested by discovery. They are not a matter for decision at this stage of the proceedings.

*In re Generic Pharmaceuticals Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 527 (E.D. Pa. 2019) (internal citations and quotations omitted).

## B.  PLAINTIFF STATES HAVE PLED SUFFICIENT FACTS AGAINST LANNETT TO ALLEGE ITS PARTICIPATION IN THE OVERARCHING CONSPIRACY

### 1.  The Allegations Against Lannett

In an attempt to transform Plaintiff States' detailed factual allegations against Lannett into conclusory ones, Lannett improperly condenses the allegations into five (5) discrete categories. Each fails to mention any of the particularities contained in the actual Amended Complaint showing that Lannett willingly engaged in the overarching conspiracy. (Lannett Mem., pp. 6-7). The actual alleged facts against Lannett are the following:

**Industry Dinners and "Girls Nights Out"**

- High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives (including individual Defendants Berthold, Falkin and Ostaficiuk) from Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's and Lannett, among many other generic manufacturers, attended this particular dinner. *Am. Compl.* at ¶ 108.

- Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, for example, high-level executives from Defendants Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus and others were invited to a gathering at a country club in Bowling Green, Kentucky where they would play golf all day and socialize at night. Defendant Rekenthaler was in attendance with high-level executives from Defendants Lannett, Amneal, Apotex, Wockhardt and other generic manufacturers. *Id.* at ¶ 110.

- Defendant Tracy Sullivan DiValerio ("Sullivan") was, at all times relevant to the Complaint, a Director of National Accounts at Defendant Lannett Company, Inc. *Id.* at ¶ 38. Sullivan participated in a group of generic pharmaceutical sales representatives who get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meeting or dinner. During these events, the sales representatives meet with their competitors and discuss competitively sensitive information. *Id.* at ¶ 111-13.

- In November 2014, Defendant Sullivan of Defendant Lannett sent A.S. [an employee of Heritage Pharmaceuticals] a text message asking "[w]hen is your next industry women event? I'm due for a trip out there [Minnesota] and I'd love to plan for it if possible. .." A.S. responded: "There is an XMas [sic] party at Tanya's house on Dec 6th." *Id.* at ¶ 112.

- Several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving Defendants Dr. Reddy's, Greenstone, Lannett, Teva, UpsherSmith and Zydus, among others – including individual Defendants Nailor and Sullivan). *Id.* at ¶ 114.

**Baclofen Allegations**

- Lannett decided to enter this [Baclofen] market in June 2014. When a Lannett senior sales executive asked for market intelligence on Baclofen at that time, Sullivan immediately thereafter, on June 12, 2014, texted Defendant Nisha Patel at Teva, a

competitor for Baclofen, to "touch base…about some industry news". In that text, Sullivan asked Patel to give her a call when she had a minute. Patel called Sullivan approximately fourteen (14) minutes later, and they spoke for seven (7) minutes. During the call, Sullivan told Patel that Lannett would be entering the Baclofen market shortly, as confirmed in a Facebook Messenger message Sullivan sent Patel later that afternoon, which stated "[d]efinitely Mid July.. (sic) I'll touch base with you in a few weeks." This was the first phone call between Sullivan and Patel since Patel joined Teva in 2013. *Id.* at ¶¶ 496-498.

- On July 1, 2014, Sullivan called Patel and left a voicemail. Patel promptly returned the call, and the two spoke for almost seven (7) minutes. *Id.* at ¶ 499.

- On July 11, 2014, Patel and her staff at Teva were evaluating their Baclofen business and evaluating whether to try and take on additional Baclofen business with a large wholesaler Patel told a Teva colleague, "not sure if this helps with your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably soon." To gather more information about Lannett's intentions, Patel immediately sent a text message to Sullivan, asking if she was "around". Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than (3) minutes. After speaking, Patel sent another text message to Sullivan, stating "Thank you!!", and Sullivan responded "No prob!" *Id.* at ¶ 500.

- Eleven (11) days later, on July 22, 2014, Teva was approached by a customer stating that it was contacted by another manufacturer that was going to be launching Baclofen in the coming weeks. The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower price to maintain the account). Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid. Patel specifically agreed with the decision to concede this account, stating, "I believe this is Lannett." To corroborate this, Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant." This was all in the shadows of Teva's significant price increase for Baclofen in April 2014. When Lannett entered the Baclofen market in July 2014, it entered at the exact same WAC price as Teva. *Id.* at 501.

**Levothyroxine Allegations**

- In the years 2013 and 2014, the three competitors [Lannett, Sandoz, and Mylan] coordinated to significantly raise the price of Levothyroxine. Defendant Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz. In addition to communicating directly with CW-4 on this drug, Defendant Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Defendant Green of Teva. Notably, Levothyroxine was not a drug that Teva sold. *Id.* at ¶ 1015.

- Mylan was the first to raise the price of Levothyroxine on January 4, 2013. The day before the price increase, Mylan's Nesta had phone conversations with both a Sandoz employee and Lannett's employee K.S. Nesta spoke on the phone once more with K.S. on January 10, 2013. On January 14, 2013, Lannett raised its price for Levothyroxine to match Mylan. Nesta and K.S. would not speak again until August 6, 2013, right before Mylan increased its price for Levothyroxine for a second time. *Id.* at ¶¶ 1016-1019.

- After deciding it would increase the price of Levothyroxine a second time, Mylan's Nesta called both Sandoz and Lannett's K.S. on August 6, 2013. Mylan then instituted a 300% increase on the drug on August 10, 2013. Pursuant to their ongoing understanding, Lannett matched this price increase on August 14, 2013. Sandoz characterized Lannett's price increase as "rationalizing the market", paving the way for Sandoz to do the same. *Id.* at ¶¶ 1021-24.

- On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M., a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us …." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time." *Id.* at ¶ 1025.

- There was an additional coordinated price increase on Levothyroxine between these three companies in April/May 2014. Again, there were multiple phone calls between the same employees of the companies immediately prior to the increase. *Id.* at ¶¶ 1028-1031.

**Additional Communications between Lannett and competitors**

- Lannett's Sullivan regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants. For example, between March 2011 and August 2016, Defendant Sullivan exchanged at least 495 phone calls and text messages with her contacts at Defendants Zydus, Wockhardt, Teva, Greenstone, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge. Notably, 67 of those calls were between Sullivan and Teva employees, occurring between March 26, 2014 and April 6, 2016. *Id.* at ¶ 1079.

- Other Lannett executives also communicated with competitors throughout the relevant time period, including with the following individual Defendants:
  - A.B. (Lannett) with Ara Aprahamian (Taro). *Id.* at ¶ 1061;
  - K.S. (Lannett) with David Berthold (Lupin), Jim Brown (Glemark), Marc Falkin (Actavis), Jill Nailor (Greenstone). Kon Ostaficiuk (Camber), David Rekenthaler (Teva). *Id.* at ¶¶ 1062, 1063, 1072, 1074, 1076;

      ○  R.M. (Lannett) with Kon Ostaficiuk (Camber). *Id*. at ¶ 1074; and

      ○  J.M. (Lannett) with David Rekenthaler (Teva) and Rick Rogerson (Actavis). *Id*. at ¶¶ 1076, 1077.

2.  **The Allegations Easily Satisfy the *Twombly* Standard and State a Claim for Overarching Conspiracy.**

     a.  **The Plaintiff States sufficiently allege that Lannett adhered to the "common goal" of keeping prices high and avoiding price erosion.**

The facts alleged in Plaintiff States' Amended Complaint show that Lannett shared a common goal with the other named generic pharmaceutical Defendants. As stated in this Court's previous ruling, Defendants' "overarching goal" was "to avoid price erosion and maintain inflated pricing within and across their respective broad product portfolios and, at times, increase pricing for targeted products without triggering a 'fight to the bottom' among existing competitors." *In re Generic Pharmaceuticals*, 394 F. Supp, 3d. at 529. In addition, "a defendant need not be accused of having engaged in all activities alleged to have advanced the [Heritage]conspiracy....... That is what Plaintiffs have alleged in their [Heritage] Overarching Complaints: a single conspiracy with a common goal, facilitated by multiple schemes specific to various individual generic drugs." *Id.*

While Lannett is only alleged in Plaintiff States' complaint to have actively participated in schemes to allocate markets and to increase prices of two (2) generic drugs, its actions were entirely consistent with the overarching conspiracy. The allegations that Lannett reached out to its competitors when it was entering the market for Baclofen or declined to bid on new business so as not to take advantage of a competitor's price increase on Levothyroxine, for example, demonstrate Lannett's commitment to the overarching conspiracy. Indeed, Lannett did not hesitate to reach out to its competitors on those products to coordinate their actions precisely because Lannett understood that its competitors would be receptive to the communications and

act in accordance with the common goal to keep prices high. *See, e.g. Am. Compl.* ¶¶ 501, 1021-24, 1028-1031. These facts are pled with specificity and are more than enough to satisfy the first *Kelly* factor at this stage of the proceedings.

> **b. Lannett's interdependence with other co-conspirators establishes continuous cooperation between the conspirators.**

As this Court has previously stated, "[t]o evaluate interdependence, the court engages in an inquiry focused on the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other. Courts consider how helpful one individual's contribution is to another's goals. Interdependence helps establish whether the alleged co-conspirators are all committed to the same set of objectives in a single conspiracy." *Id.* at 529.

Despite Lannett's claims to the contrary, Plaintiff States have pled Lannett's participation in the "fair share" understanding adequately at this stage. Apart from the explanation of the "fair share" concept at the beginning of the Amended Complaint, there are specific allegations that Lannett acted consistently with "fair share" principles.

As stated above, there were coordinated efforts between Lannett and its competitors in the multiple price increases of both Baclofen and Levothyroxine. The price increases were accompanied by blatant acts of market allocation and by refusing to bid against a competitor. When Lannett entered the Baclofen market, carefully timed communications between Lannett and main competitor Teva illustrate that Lannett was able to seamlessly gain its share of the Baclofen market without eroding prices, with Teva declining to exercise its right of first refusal to thwart a close bid by Lannett. *See Am. Compl.*, ¶¶ 500-501.

Lannett's conduct relating to Levothyroxine was even more nefarious and paints an even stronger picture of interdependence. During the flurry of coordinated price increases between Lannett and its two main competitors in 2013 and 2014, Lannett was approached by a customer

to fill a small amount of Levothyroxine after Mylan increased its price. A Lannett employee pointed out that the small quantity would not raise concerns among the industry, but Lannett ultimately decided not to bid, demonstrating its unwavering fidelity to the fair share program, no matter how insignificant a requested deviation would be. *See Am. Compl.* at ¶ 1025.

While Lannett would like this court to focus on the fact that it is only named in two of the individual drug conspiracies alleged in the Complaint, it conveniently ignores the nearly 500 phone calls placed by Lannett executive Sullivan to at least eleven different Defendant industry competitors, many of which sell generic drugs that Lannett does not sell. *Id.* at ¶ 1079. These communications corroborate Plaintiff States' allegations that, in addition to observed price hikes on some generic drugs, the "fair share" conspiracy also encompassed customer and/or market allocations across multiple generic drugs, including on generic drugs that a given conspiracy member may not sell. *Id.* at ¶ 154. These well-pled, distinct examples support the States' allegation that Lannett was part of the overall scheme, and undeniably shows its participation in this overarching conspiracy, satisfying the second *Kelly* factor.

### c. There Was Overlap Between Lannett and the Other Participants

This factor is the easiest to satisfy at this stage of the litigation. The Court's earlier opinion recognized that there was overlap where there was (1) trade association leadership and membership, (2) participation in trade association and other industry meetings and events, (3) communications and alleged collusion between defendants on multiple drugs, and (4) similar price trends across the market for generic drugs. *In re Generic Pharmaceuticals*, 394 F. Supp. 3d at 531-32. Moreover, this factor does not require "that every defendant participate in every transaction." *Id.*

As demonstrated above, Lannett was an active participant in industry dinners, golf outings, and "Girls Night Out" events involving numerous competitors in the generic pharmaceutical industry. As alleged, this participation was most active during the 2013-2015 time period, when there were many coordinated price increases, including those involving Lannett. The Amended Complaint is also replete with allegations of strategically-timed communications between Lannett employees and other competitors when each raised prices on specific drugs. In most cases, as alleged, Lannett raised its prices to match the increase made by its competitors, hardly a competitive move. Accordingly, the third *Kelly* factor has been met.

Lannett has not moved to dismiss the claims against it as to the two individual drug conspiracies alleged in the Plaintiff States' Complaint. Given the detail of those allegations, it is reasonable to conclude that Lannett's anticompetitive agreement extended beyond those drugs to firmly enmesh it in the overarching conspiracy. Moreover, this Court has already denied Defendants' earlier motion to dismiss Plaintiffs' overarching conspiracy claims in the Heritage-centric cases, in which Lannett is also a defendant. Lannett has proffered nothing in its current motion to cause this Court to reach a different result here. Consequently, Plaintiff States should be afforded discovery to ascertain the full extent of Lannett's participation and culpability.

**CONCLUSION**

Accordingly, Lannett's Motion to Dismiss should be denied in its entirety.

Dated: January 15, 2021                    Respectfully submitted,

                                          PLAINTIFF STATE OF ILLINOIS
                                          KWAME RAOUL
                                          ATTORNEY GENERAL

                                  By:     /s/ *Joseph B. Chervin*
                                          Joseph B. Chervin
                                          Assistant Attorney General
                                          Office of the Illinois Attorney General
                                          100 W. Randolph Street, 11th Floor
                                          Chicago, Illinois 60601
                                          Tel: (312) 814-3722
                                          jchervin@atg.state.il.us