# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL No. 2724<br>Civil Action No.: 16-md-2724-CMR<br><br>HON. CYNTHIA M. RUFE |
| **THIS DOCUMENT RELATES TO:**<br><br>*State of Connecticut, et al., v.*<br>*Teva Pharmaceuticals USA Inc., et al.* | Civil Action No.: 19-cv-2407-CMR |

**PLAINTIFFS STATES' OPPOSITION TO CERTAIN DEFENDANTS'
MOTION TO DISMISS THE PLAINTIFF STATES' OCTOBER 31, 2019 AMENDED
COMPLAINT FOR VIOLATING THE DOCTRINE AGAINST CLAIM-SPLITTING**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      The States' Second Action Does Not Improperly Split Claims. . . . . . . . . . . . . . 4

      A.      The "Overarching Conspiracy" Discussed In The States' First And Second Complaints Is Not A Standalone Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.      The Second Action Involves New And Different Drugs, And Combinations Of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

      C.      The Factual Allegations In The First Complaint Are Distinct From The Second Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

II.     The Court Should Deny Defendants' Motion To Dismiss The Second Complaint In Its Entirety Or, At Most, Dismiss Only Overlapping "Overarching Conspiracy" Allegations In The Second Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.      The Court Should Reject Defendants' Motion To Dismiss Because The Claim-Splitting Doctrine Does Not Apply To The States' Actions. . . . . . . . . . . . 12

            1.      Plaintiffs May Bring Separate Actions For Different Claims, And The States Chose To Do So. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

            2.      The Defendants and The Court Knew That The States Would Bring Additional Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

            3.      The Defendants Would Not Be Prejudiced By Maintaining Both Actions Given The MDL Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

      B.      At Most, The Court Should Dismiss Only The "Overarching Conspiracy" Allegations In The Second Complaint That Overlap With The First Complaint. . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Edward Wisner Donation v. BP Expl. & Prod. (In re Oil Spill)*,
No. 14–cv–1525, 2014 U.S. Dist. LEXIS 132567 (E.D. La. Sept. 5, 2014) ........................ 14, 15

*Horia v. Nationwide Credit & Collection, Inc.*,
944 F.3d 970 (7th Cir. 2019) ........................................................................................ 9

*In re Generic Pharm. Pricing Antitrust Litig.*,
394 F. Supp. 3d 509 (E.D. Pa. 2019) ……………………………………………………….. 15

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955) ............................................................................................ 4, 7

*Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*,
No. 18–cv–1718, 2019 WL 398938 (E.D. Pa. Jan. 31, 2019) ............................................ 4, 7, 13

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ............................................................................................ 9

*Prewitt v. Walgreens Co.*,
No. 12-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013) ................................................. 4, 14, 15

*Stark v. Starr*,
94 U.S. 477 (1876) ............................................................................................ 1

*Walton v. Eaton Corp.*,
563 F.2d 66 (3d Cir. 1977) ................................................................................. 4

**Other Authorities**

Fed. R. Civ. P. 18(a) ............................................................................................ 12

Fed. R. Evid. 404(b)(2) ........................................................................................ 7

Restatement (Second) of Judgments § 24 ............................................................... 13

## INTRODUCTION

The claims in the States' Heritage Complaint[1] and Teva Complaint[2] do not overlap.  They are fundamentally different, and the lines between them are clear.  Although both have similar allegations relating to the existence of an "overarching conspiracy," each Complaint asserts – and is expressly limited to – price fixing and/or market allocation claims with respect to a specific set of *different* drugs and time periods.  The States do not seek to hold the Defendants in the Teva Complaint liable for damages relating to any drugs identified in the Heritage Complaint, or vice versa.  The Heritage Complaint seeks to hold certain Defendants liable for damages relating to 15 specific drugs.  The Teva Complaint, on the other hand, seeks to hold a different combination of Defendants liable for damages relating to up to 114 *different* drugs.  At most, Defendants might be able to say that the States are "evidence splitting" because some facts relating to the existence of an "overarching conspiracy" may overlap – but that does not amount to "claim-splitting" and is no reason to grant a Motion to Dismiss.

It is well-settled that a claimant may recover for each claim against a defendant.  While "[i]t is undoubtedly a settled principle that a party seeking to enforce a claim . . . must present to the court . . . all the grounds upon which he expects a judgment in his favor," the Supreme Court recognized that "this principle does not require distinct causes of action, – that is to say, distinct matters, – each of which would authorize by itself independent relief, to be presented in a single suit, though they exist[ed] at the same time and might be considered together."  *Stark v. Starr*, 94 U.S. 477, 485 (1876).  The States have acted in accordance with this basic legal principle by filing actions that assert distinct claims.

---

[1] *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 2:17–cv–03768 (E.D. Pa.) (ECF Nos. 14, 15) (hereafter "Heritage Complaint," "First Complaint," or "First Action").
[2] *See State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19–cv–02407 (E.D. Pa.) (ECF No. 106) (hereafter "Teva Complaint," "Second Complaint," or "Second Action").

Defendants, on the other hand, seem to fundamentally misunderstand the States' legal actions and claims therein, given Defendants' improper invocation of the claim-splitting doctrine in their Motion to Dismiss. The States' First and Second Actions not only involve different claims, parties, drugs and factual allegations, but Defendants also ignore other important realities of this litigation, including their own awareness – from the time that the First Complaint was filed – that the States would bring additional actions. Defendants now howl an array of spurious accusations in attempting to convince the Court to dismiss (in its entirety) the Second Action. As Marcus Tullius Cicero once quipped, "When you have no basis for an argument, abuse the plaintiff." The Court must not allow Defendants' protestations to cloud the facts and proper application of legal principles in this matter.

The Defendants' Motion to Dismiss should be denied.

## BACKGROUND

On December 15, 2016, the States filed a two-drug complaint, related to doxycycline hyclate delayed release and glyburide, in the District of Connecticut. *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 3:16−cv−02056 (D. Conn.) (ECF No. 1). The case was transferred to MDL 2724 in August 2017. *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 3:16−cv−02056 (D. Conn.) (ECF No. 343). The States then made a motion to expand that complaint to include all the drugs on which defendant Heritage Pharmaceuticals, Inc. ("Heritage") allegedly colluded, and the complaint was amended to include 15 total drugs and an "overarching conspiracy" as the *framework* in which the collusion on those drugs occurred. *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 2:17−cv−03768 (E.D. Pa.)_(ECF Nos. 14, 15). The States made clear that "[this] Complaint describes conspiracies regarding the sale of **specific drugs**, and how these **specific conspiracies** are also

part of the larger overarching conspiracy.  The Plaintiff States continue to investigate **additional conspiracies**, involving these and other generic manufacturers, **regarding the sale of other drugs not identified in this Complaint**, and **will likely bring additional actions based on those conspiracies** at the appropriate time in the future."  First Complaint ¶ 3 (emphasis added).

The States thus went into court, asserted specific claims about conspiracies related to the Heritage drugs in the context of a broader "overarching conspiracy" framework, and noted ongoing investigations into other conspiracies.  Though Defendants made a motion alleging the States were improperly using investigatory authority to gather discovery in the litigation, *see In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16–md–02724 (E.D. Pa.) (ECF No. 593), the Court stated it "[would] not prevent the [States] from continuing to investigate pursuant to the authority granted them under the relevant state laws, **particularly with regard to the possibility of claims concerning additional drugs and additional parties**."  Order (ECF No. 758) at 10 (emphasis added).

While continuing to investigate additional conspiracies, new claims regarding the sale of different drugs indeed arose.  The States therefore filed a second action that asserted these new claims and provided a more expansive description of how the "overarching conspiracy" framework was applied throughout the industry.  As with the First Complaint, the Second Complaint was filed in the District of Connecticut, transferred, and amended.  Much like how the First Complaint focused on particular conduct by Heritage within the "overarching conspiracy" context, the Second Complaint describes collusion by Teva and other Defendants related to specific drugs as implemented through the broader "overarching conspiracy" across the industry.  *See State of*

*Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19–cv–02407 (E.D. Pa.) (ECF No. 106).[3]

## ARGUMENT

### I.    The States' Second Action Does Not Improperly Split Claims.

Defendants correctly note that claim-splitting is recognized as a "rule against duplicative litigation," *see Prewitt v. Walgreens Co.*, No. 12–cv–6967, 2013 WL 6284166, at *5 (E.D. Pa. Dec. 2, 2013) (citation omitted), and plaintiffs have "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (citations omitted). Defendants incorrectly apply these principles to the States' First and Second Actions. The States do not dispute that both actions refer to an "overarching conspiracy" in the industry. But, as the Supreme Court determined over sixty-five years ago in a *res judicata* analysis: "That both suits involved 'essentially the same course of wrongful conduct' is not decisive. *Such a course of conduct . . . may frequently give rise to more than a single cause of action*," particularly where different violations, defendants, and facts are involved. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-30 (1955) (emphasis added). The States' First and Second Actions have asserted distinct claims relating to different drugs, against different combinations of defendants, and "Defendants brush over the factual differences in each case." *See Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*, No. 18–cv–1718, 2019 WL 398938, at *6 (E.D. Pa. Jan. 31, 2019). "Taken together," this Court should "not [be] persuaded that the claims in the two cases involve

---

[3] Though not at issue here, it is worth noting, given note 1 in Defendants' memorandum in support of the motion to dismiss, that, as with the First Complaint, the Second Action clearly stated the States "continue to investigate additional conspiracies" and "will likely bring additional actions based on those conspiracies . . . ." Second Complaint ¶ 7. It therefore should, again, have come as no surprise to Defendants when the States filed another complaint in June 2020.

the same subject matter," and "[t]hus . . . not find that [the States' second] case is barred by the doctrine against claim splitting." *Id.* (quotation marks and citation omitted).

### A.      The "Overarching Conspiracy" Discussed In The States' First And Second Complaints Is Not A Standalone Claim.

A grave misconception of the "overarching conspiracy" appears to be at the heart of Defendants' confusion over the distinct claims in the States' First and Second Actions.  The States find this puzzling, given that Defendants cite portions of the Complaints which explain the "overarching conspiracy," how it is applied by industry participants, and how the specific claims arise out of it.  For example, the fifth page of Defendants' memorandum quotes the following from the First Complaint:

> Defendants here understood and acted upon an *underlying code of conduct that is widespread in the generics industry*: an expectation that any time a company is entering a particular generic drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. . . . **[T]his background understanding remains constant and is an important component of the Defendants' ability to reach agreements for specific drugs**.

First Complaint ¶ 14 (emphasis added).

As is clear from that text, the "overarching conspiracy" is not the claim.  Rather, it is an underlying understanding upon which Defendants acted in relation to particular instances for different drugs.  The "overarching conspiracy" makes up the contours of the industry's conduct, and the separate claims arose when Defendants used that framework to collude on specific drugs.

In and of itself, the "overarching conspiracy" does not spring into action, as it has not been brought as its own standalone claim.  Using pure logic, it only makes sense when that background understanding is applied to Defendants' specific acts.  The "overarching conspiracy" is a tool among industry participants, and the States' First and Second Actions detail the collusion and how

the Defendants took advantage of this tool in the Complaints.  Indeed, Defendants' memorandum again cites, on the seventh page, parts of the Complaints that explain this basic theory:

> The overarching conspiracy was **effectuated by a series of conspiracies** that affected and continue to affect the market **for a number of generic drugs identified** in this [] Complaint. . . . The Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy."

First Complaint ¶¶ 2-3; *see also* Second Complaint ¶¶ 6-7 (emphasis added).

The States have alleged that the "overarching conspiracy" framework is applied by the manufacturers to specific drugs, and it is the application of that framework to those drugs that comprises the distinct claims in the States' First and Second Actions.  For example, in the States' First Action, Defendant Teva is alleged to have colluded with Heritage and others with regard to 7 different drugs (Acetazolamide (Count 9), Glipizide-Metformin (Count 11), Glyburide (Count 12), Glyburide-Metformin (Count 13), Leflunomide (Count 14), Nystatin (Count 15), and Theophylline (Count 17)).  The States also seek to hold Teva jointly and severally liable with regard to 8 additional drugs under the principles of the "overarching conspiracy."  (*See* Counts 1-8, 10, 16, and 18).  In the States' Second Action, however, the States seek to hold Teva responsible for conduct relating to 114 *entirely different drugs*, involving different combinations of defendants.[4]  While the bones of the Complaints may have similarities, the meat of the First and Second Actions – the claims – are not the same.

Defendants' argument that the States' Teva Complaint incorporates and refers to the Heritage Complaint (and therefore must be asserting the same claims) is simply a red herring.  Although the Teva Complaint does incorporate the allegations from the Heritage Complaint to

---

[4] This same analysis can be applied with equal force to any of the defendants in the States' First and Second Actions. None face duplicative exposure.

provide context regarding Teva's motivation for communicating with numerous competitors prior to its April 4, 2014 price increase, and to show that Teva's ranking of "Quality Competitors" was equivalent to a list of which competitors Teva had the strongest collusive agreements with, *see, e.g.*, Teva Complaint ¶¶ 935-937,[5] that Complaint also makes clear that "Heritage is not named as a defendant in this Complaint, and the Plaintiff States do not seek relief relating to Nystatin or Theophylline [the drugs at issue in the Heritage Complaint] herein. . . ."  Teva Complaint ¶ 740 n.5.  Instead, the Teva Complaint makes clear that "the collusive relationship between Heritage and Teva is part of a *larger pattern of conduct involving Teva* and provides further support for the allegations herein."  *Id.* (emphasis added).  As stated above, this "larger pattern of conduct" can give rise to multiple different causes of action and different complaints.  *See Lawlor*, 349 U.S. at 327-30.

### B.   The Second Action Involves New And Different Drugs, And Combinations Of Parties.

Defendants argue it is problematic that the States' two Complaints include common parties. In doing so, Defendants ignore recent Eastern District of Pennsylvania case law where the court found the claim-splitting doctrine did not bar two ongoing lawsuits against "several of the same defendants."  *Live Face on Web*, 2019 WL 398938, at *6.

Moreover, Defendants disregard the extent to which the States' First and Second Actions involve different parties.  While there is some overlap, the two Complaints do not name the same set of defendants.  Listed below are the defendants in the First and Second Actions.  The Second Action names *twenty-five* new defendants, and it does not include eight defendants named in the

---

[5] Federal Rule of Evidence 404(b) contemplates that such evidence would be admissible for "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *See* FED. R. EVID. 404(b)(2).

First Complaint. New defendants in the Second Action are in red, and defendants not included in the Second Action are ~~stricken~~.

- Defendants in the First Action: Actavis Holdco, U.S., Inc.; Actavis Pharma, Inc.; Ascend Laboratories, LLC; Apotex Corp.; Aurobindo Pharma USA, Inc.; Citron Pharma, LLC; Dr. Reddy's Laboratories, Inc.; Emcure Pharmaceuticals, Ltd.; Glenmark Pharmaceuticals, Inc.; Heritage Pharmaceuticals, Inc.; Lannett Company, Inc.; Rajiv Malik; Mayne Pharma Inc.; Satish Mehta; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Teva Pharmaceuticals USA, Inc.; and Zydus Pharmaceuticals (USA), Inc.

- Defendants in the Second Action: Actavis Holdco, U.S., Inc.; Actavis Pharma, Inc.; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals, LLC; ~~Ascend Laboratories, LLC~~; Apotex Corp.; Ara Aprahamian; Aurobindo Pharma USA, Inc.; David Berthold; Breckenridge Pharmaceutical, Inc.; James (Jim) Brown; ~~Citron Pharma, LLC~~; Maureen Cavanaugh; Tracy Sullivan Divalerio; Dr. Reddy's Laboratories, Inc.; ~~Emcure Pharmaceuticals, Ltd.~~; Marc Falkin; Glenmark Pharmaceuticals, Inc.; James (Jim) Grauso; Kevin Green; Greenstone LLC; Robin Hatosy; ~~Heritage Pharmaceuticals, Inc.~~; Armando Kellum; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; ~~Rajiv Malik~~; ~~Mayne Pharma Inc.~~; ~~Satish Mehta~~; Mylan Pharmaceuticals, Inc.; Jill Nailor; James (Jim) Nesta; Par Pharmaceutical Companies, Inc.; Nisha Patel; Pfizer, Inc.; Konstantin Ostaficiuk; David Rekenthaler; Richard (Rick) Rogerson; Sandoz, Inc.; ~~Sun Pharmaceutical Industries, Inc.~~; Taro Pharmaceuticals USA, Inc.; Teva Pharmaceuticals USA, Inc.; Upsher-Smith Laboratories, LLC; Wockhardt USA LLC; and Zydus Pharmaceuticals (USA), Inc.

The States did not have to bring all their claims against the defendants in one action, because they are distinct claims. The States have separate causes of action against the defendants named in each lawsuit. Coupling the different claims, based on different drugs, with the different defendants in each action further illustrates that the States' Second Action did not improperly split claims.

### C.    The Factual Allegations In The First Complaint Are Distinct From The Second Complaint.

Defendants' argument that the factual allegations in the First and Second Actions are all simply part of a single cause of action and had to be included in one complaint flies in the face of reality. On any common-sense understanding, the States brought separate actions because the

States had different claims, which are directly supported by the distinct factual allegations asserted in the two Complaints.

Most obvious to the separate claims, or "transactions," in the States' separate Complaints is that the specific products and related allegations in the two Complaints do not overlap.[6]  As discussed in this memorandum, the "overarching conspiracy" framework is merely the tool that allowed the many single-drug conspiracies to transpire, and the two Complaints assert distinct claims related to the different drugs.  Like the Supreme Court held in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), an employment discrimination case involving the statute of limitations, "each discrete discriminatory act produces one claim[,]" and "[d]iscrete and independently wrongful acts produce different claims, even if the same wrongdoer commits both offenses and the second wrong is similar to the first."  *Horia v. Nationwide Credit & Collection, Inc.*, 944 F.3d 970, 974 (7th Cir. 2019).  *Morgan* has been applied in the claim preclusion context, including in a recent case where the appellate court reversed a dismissal by the trial court which had ruled that a plaintiff's second case "split his claims impermissibly."  *Id.* at 973-74 ("Likewise with discrete violations of § 1692e(8).  Each time a debt collector fails to give a credit agency the required notice for a debt is a stand-alone wrong.  Disputes that have an independent existence may be litigated separately.  *Joinder in federal practice is permissive, . . . not mandatory*."  *Id.* at 974 (emphasis added).

The unique factual allegations and claims in the States' separate actions are evident from the beginning of the Complaints.  Defendants need only to look at the first few paragraphs of both documents to see these distinctions.  For example, while the First Complaint starts by referencing

---

[6] Fifteen generic drugs are identified the First Action (acetazolamide, doxycycline hyclate delayed release, doxycycline monohydrate, fosinopril-HCTZ, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid).  The Second Action accounts for more than 100 *different* generic drugs, with specific allegations related to these drugs.

the 15 separate drug conspiracies that emerged from the "overarching conspiracy," the Second Complaint begins with a discussion about how Teva and its co-conspirators participated in similar conduct but "to the next level" with 100+ different drugs.  *See* First Complaint ¶¶ 1-2; Second Complaint ¶¶ 1-6.  The factual allegations in the First and Second Complaints center on different drugs and companies and different instances, or "claims," related to same general course of wrongful conduct, and the precedent is clear that the States had every right to bring these separate claims in separate actions.

The distinct claims in the First and Second Actions are further apparent in the different evidence, details, and allegations detailed throughout the remainder of the two Complaints.  The First Action, for example, focuses in large part on an incident in the spring and summer of 2014 when Heritage sought to increase prices on a specific list of products.  Heritage senior executives held a discussion with sales executives, and the company then set forth on a campaign to communicate and reach agreement with its competitors on as many of those drugs as possible. First Complaint ¶¶ 268-453.  The Complaint identifies a wealth of direct evidence establishing agreements between Heritage and its competitors, including statements and admissions by Heritage employees that they had colluded with numerous competitors and confirmed that those competitors had "similar like minding on the pricing strategies we discussed," *see, e.g.*, First Complaint ¶ 287, as well as text message communications directly between Heritage employees and competitors stating things such as: "We are raising the price [of Glyburide] right now – just letting you know.  Teva says they will follow. . . . Aurobindo agrees too," with a response from the competitor that "we are def[initely] in to raise pricing," *see id.* at ¶ 347; and a Heritage employee telling a different competitor that Actavis is "on board with" a price increase relating to the drugs Glyburide/Metformin and Verapamil.  *See id.* at ¶ 378.  To demonstrate that the

agreements relating to the price increases were part of a larger understanding or course of conduct in the industry, the First Complaint also describes a series of market allocation agreements involving Heritage and various competitors, relating to 4 different drugs, that were designed to maintain market share and avoid price erosion in the context of a common understanding among the Defendants in that case.  *Id.* at ¶¶ 115-148 (Nimodipine), 149-164 (Zoledronic Acid), 165-179 (Meprobamate), 180-242 (Doxy DR).  The "common understanding" prevalent in the industry was described by one of Heritage's competitors as follows: "If they [Dr. Reddy's] are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25% etc."  *Id.* at 153.

The Second Complaint, in contrast, tells a completely different story about Teva – a much larger company with a larger catalogue of products.  As of early 2013, Teva's generic drug business was struggling and the company was looking for new ways to increase its profitability.  *See* Second Complaint ¶¶ 565-566.  One thing Teva did was hire a new employee, individual Defendant Nisha Patel, who – due to her prior work in the industry for a large wholesaler – had contacts with nearly every major competitor of Teva.  Teva hired Defendant Patel to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate price increases.  Patel immediately began communicating with competitors to secure agreements to lead and follow each other's price increases.  *Id.* at ¶¶ 567-577.  Patel also codified the strength of Teva's agreements with various competitors into what she referred to as a "Quality of Competition" ranking, where the competitors with which Teva had the strongest agreements to lead and follow each other's price increases received the highest rankings, and the competitors' rankings were directly affected by the success of their collusion with Teva.  *See, e.g.*, *id.* at ¶¶ 578-601, 915-972.  Over the course of the ensuing months and years, Teva successfully raised prices on nearly 100

11

different drugs.  The Second Complaint describes in great detail the way that Teva systematically communicated with its competitors as it was identifying candidates for price increases and then again at or around the time of price increases, resulting in significant, often multi-drug price increase events on July 3, 2013, July 19, 2013, August 9, 2013, March 7, 2014, April 4, 2014, April 15, 2014, July 1, 2014, August 28, 2014, and January 28, 2015.  *Id.* at ¶¶ 536-914.  The allegations in the Second Complaint are supported and corroborated by a number of cooperating witnesses who were directly involved in the collusive conduct.  *Id.* at ¶ 68.

Like the First Complaint, in order to demonstrate that the agreements relating to the price increases were part of a larger understanding or course of conduct in the industry, the Second Complaint describes a series of market allocation agreements involving Teva and various competitors, relating to more than 40 *different* drugs, involving *different* combinations of competitors and *different* time periods, that were designed to maintain market share and avoid price erosion in the context of a common understanding among the Defendants in that case.  *Id.* at ¶¶ 166-535.  As stated above, the claims in the Second Complaint do not relate to any of the drugs specifically identified in the First Complaint, and none of the Defendants in either case are at risk of duplicative judgments.

**II.    The Court Should Deny Defendants' Motion To Dismiss The Second Complaint In Its Entirety Or, At Most, Dismiss Only Overlapping "Overarching Conspiracy" Allegations In The Second Complaint.**

**A.    The Court Should Reject Defendants' Motion To Dismiss Because The Claim-Splitting Doctrine Does Not Apply To The States' Actions.**

**1.    Plaintiffs May Bring Separate Actions For Different Claims, And The States Chose To Do So.**

Rule 18 of the Federal Rules of Civil Procedure (on "Joinder of Claims") states: "A party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party."  FED. R. CIV. P. 18(a).

While plaintiffs are "under some compulsion not to split a claim," it is well-understood that "[t]here is no like compulsion on a plaintiff who has a number of claims against a defendant to join them in a single action; he may join them if he wishes, but he is not obliged to do so . . . Joinder of multiple claims is permissive, not compulsory."   RESTATEMENT (SECOND) OF JUDGMENTS § 24(h) (1982).  The States' First and Second Actions are neither duplicative litigation, nor a means of duplicative recovery, against Defendants.

*Live Face on Web* provides a useful recent example of this Court rejecting claim-splitting arguments similar to those made by Defendants and following the basic principle that a plaintiff may file separate actions for distinct claims.  *See Live Face*, 2019 WL 398938, at *6.  As in *Live Face*, the States' First and Second Actions are being litigated against some of the same defendants, and the factual differences in each of the States' cases demonstrate how the claims are distinct. When such circumstances are present, the second case does not warrant dismissal under the claim-splitting doctrine.  *Id.*

### 2.     The Defendants And The Court Knew That The States Would Bring Additional Actions.

Not only are the claims distinct, the Defendants and the Court were aware that the States would bring additional actions.  The First Complaint expressly stated the States were continuing to investigate additional conspiracies and would file additional actions, putting both Defendants and the Court on notice.  *See* First Complaint ¶ 3.  And this Court held that it would not prevent the States from continuing to investigate, "particularly with regard to the possibility of claims concerning additional drugs and additional parties."  Order, *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16–md–02724 (E.D. Pa.) (ECF No. 758) at 10.  Indeed, the Second Complaint was filed after additional information was uncovered and the States discovered new claims.  Despite Defendants' accusations that the States filed the Second Complaint as some sort of tactic to extend

13

procedural rights or to avoid amending the First Complaint, the facts prove otherwise.  The States were upfront with both Defendants and the Court from the start that investigations were ongoing and new complaints would come out.  That is precisely what happened.

> **3.     The Defendants Would Not Be Prejudiced By Maintaining Both Actions Given The MDL Context.**

A foundational policy motivating the rule against claim-splitting is judicial economy by "protecting defendants" from duplicative litigation.  *See Prewitt*, 2013 WL 6284166, at *5.  In the multi-district litigation (MDL) context, separate actions that may overlap do not implicate the concerns underlying the claim-splitting doctrine, as the MDL court has the tools to manage such claims.  *See Edward Wisner Donation v. BP Expl. & Prod. (In re Oil Spill)*, No. 14–cv–1525, 2014 U.S. Dist. LEXIS 132567, at *14 (E.D. La. Sept. 5, 2014).

In *Edward Wisner Donation v. BP Exploration*, a landowner filed two separate lawsuits related to the BP Deepwater Horizon oil spill.  *See id*. at *5-*6.  The landowner's first lawsuit was similar to others within the MDL, alleging federal violations based on the oil spill.  *Id*. at *6.  The landowner's second lawsuit dealt with contractual violations that arose from BP's cleanup operations on the landowner's land.  *Id*.  The court held that, even though both claims "can be generically described as 'arising out of' the oil spill, this does not establish that [the plaintiff] has improperly split its claims," and permitted both causes of action to continue separately.  *Id*. at *13-*14.  The court found that "the two actions are <u>not</u> based on the same facts, do <u>not</u> involve the same subject matter and do <u>not</u> assert the same cause of action[,]" and concluded that "[t]he claim-splitting rule does not require dismissal of the instant action."  *Id*. at *14.  Despite those conclusions, the court separately barred application of the claim-splitting rule and explained:

> To the extent that some facts underlying plaintiff's separate complaints may overlap, . . . case management devices remain available to the court and the parties to manage [the plaintiff's] various claims.  The risks of "duplication, rulings that may trench

14

> upon the authority of sister courts, and piecemeal resolution of
> issues that call for a uniform result," which the rule against claim-
> splitting operates to prevent, are not implicated here.

*Id*. at \*14-\*15 (citation omitted).

In *Wisner*, the court did not apply the claim-splitting rule because, even though it concluded the two claims arose from dissimilar facts, the court had tools available to protect against the risks posed by the claim-splitting rule. Here, and as stated above, the States' Complaints also arise from unique facts and present distinct claims. And, much like in *Wisner*, the States' First and Second Actions are pending in the same court, before the same judge, and also in the MDL context. All these facts would protect the Defendants from the risks and concerns underlying the claim-splitting doctrine. Thus, the Court should find that the claim-splitting doctrine is inapplicable, and the States' separate actions should be maintained.

## B.   At Most, The Court Should Dismiss Only The "Overarching Conspiracy" Allegations In The Second Complaint That Overlap With The First Complaint.

As stated above, proceeding with the First and Second Actions as they stand is appropriate, but if the Court disagrees, it should only dismiss "overarching conspiracy" allegations in the Second Complaint that overlap with the First Complaint. Since the rule against claim-splitting is a "rule against duplicative litigation," *see Prewitt*, 2013 WL 6284166, at \*5, Defendants' request that this Court dismiss the States' Teva Complaint *in its entirety* would be inappropriate under any circumstance.

As acknowledged by Defendants, this Court previously denied their motion to dismiss the claims based on an overarching conspiracy theory from the States' First Complaint. *See In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 533 (E.D. Pa. 2019). As detailed in this memorandum, while the individual drug conspiracies alleged in the States' Second Action occurred within the same general "overarching conspiracy" framework as the First Action, the

Second Action involves entirely new claims related to different pharmaceuticals and none of the Defendants are at risk of duplicative judgments or liability.  While the States thus view the First and Second Actions as entirely separate, under any reading of the two Complaints, the "overarching conspiracy" allegations are the only elements that even remotely overlap.  If the Court is inclined to grant the Defendants' Motion to Dismiss at all, it should grant it only as to overlapping "overarching conspiracy" allegations in the Teva Complaint – not the remaining 114 individual drug conspiracies which do not overlap with the Heritage Complaint at all.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Defendants' motion to dismiss the States' Second Complaint in its entirety or, alternatively, only dismiss "overarching conspiracy" allegations in the Second Complaint which overlap with the First Complaint.

Respectfully submitted,

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

By:    /s/ W. Joseph Nielsen
        Assistant Attorney General
        55 Elm Street
        P.O. Box 120
        Hartford, CT 06141
        Tel: (860) 808-5040

*Liaison Counsel for the Plaintiff States*

STATE OF FLORIDA
ASHLEY MOODY
ATTORNEY GENERAL

By:    /s/ Timothy M. Fraser
        Lizabeth A. Brady
        Interim Co-Director, Antitrust Division

        Timothy M. Fraser
        Senior Assistant Attorney General

        Nicole A. Sarrine
        Assistant Attorney General

        PL-01 The Capitol
        Tallahassee, FL 32399
        Tel: (850) 414-3300

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 15th day of January, 2021, I caused Plaintiff States' Opposition to Certain Defendants' Motion to Dismiss the Plaintiff States' October 31, 2019 Amended Complaint for Violating the Doctrine Against Claim-Splitting to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

<u>/s/ Timothy M. Fraser</u>
Timothy M. Fraser
Senior Assistant Attorney General