**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  | : |  |
|---|---|---|
| IN RE:  GENERIC PHARMACEUTICALS | : | MDL NO. 2724 |
| PRICING ANTITRUST LITIGATION | : | 16-MD-2724 |
|  | : |  |
| _____ | : | HON. CYNTHIA M. RUFE |
|  | : |  |
| THIS DOCUMENT RELATES TO | : |  |
|  | : | 2:19-cv-02407-CMR |
| *Connecticut, et al. v. Teva Pharmaceuticals* | : |  |
| *USA, Inc. et al.* | : |  |
| _____ | : |  |

**States' Memorandum of Law in Opposition to
Defendants' Joint Motion to Dismiss
States' State-Law Claims**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ..............................................................................1

   A.  State Law Disgorgement Claims Should Not be Addressed, Let Alone Dismissed......3

   B.  The state law arguments, alphabetical by State, are: ....................................5

   Alaska ................................................................................................5
   Arizona.............................................................................................. 5-6
   Arkansas..............................................................................................6
   Connecticut ..................................................................................... 6-9
   Delaware ......................................................................................... 8-9
   Florida ........................................................................................... 9-10
   Indiana.......................................................................................... 10-12
   Kentucky ..................................................................................... 13-14
   Louisiana ..................................................................................... 14-16
   Maine .............................................................................................16
   Maryland ..........................................................................................17
   Michigan ...........................................................................................17
   Mississippi ................................................................................... 17-20
   Missouri ....................................................................................... 20-21
   Nevada ......................................................................................... 21-23
   New Jersey .......................................................................................23
   New Mexico ................................................................................. 23-24
   New York ..................................................................................... 24-26
   North Carolina ............................................................................. 26-27
   Ohio.............................................................................................. 27-28
   Oklahoma..........................................................................................28
   Oregon.......................................................................................... 43-44
   Pennsylvania ............................................................................... 28-32
   Puerto Rico ................................................................................... 32-34
   Rhode Island ............................................................................... 35-36
   Tennessee ..................................................................................... 36-38
   Virginia ......................................................................................... 38-40
   Washington ................................................................................... 38-40
   Wyoming....................................................................................... 39-41

 II. CONCLUSION ..............................................................................42

EXHIBIT A – Oregon ..................................................................... 43-44

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Abex Corp. v. Maryland Casualty Co.*,
   790 F.2d 119 (D.C. Cir. 1986) ...............................................................................33, 38

*Anadarko Petroleum Corp. v. Commonwealth*,
   206 A.3d 51 (Pa. Commw. 2019) ...........................................................................28, 29

*Andújar v. Commonwealth*,
   122 P.R. Dec. 817 (1988).................................................................................................34

*Ash v. Cont'l Ins. Co.*,
   932 A.2d 877 (Pa. 2007) ..................................................................................................30

*Berghausen v. Microsoft*,
   765 N.E.2d 592 (Ind. Ct. App. 2020)..............................................................................12

*Bd of Comm'rs of Howard City v. Kokomo City Plan Comm'n*,
   263 Ind. 282 (1975).........................................................................................................11

*Bd. of Comm'rs of Union City v. McGuinness*,
   80 N.E.2d 164 (Ind. 2017) ..............................................................................................11

*Bunker's Glass Co. v. Pilkington PLC*,
   75 P.3d 99 (Ariz. 2003)......................................................................................................3

*California v. ARC America Corp.*,
   490 U.S. 93 (1989)...........................................................................................................32

*California v. eBay, Inc.*,
   No. 5:12-CV-05874-EJD,
   2015 WL 5168666 (N.D. Cal. Sept. 3, 2015) .................................................................36

*California v. Frito-Lay, Inc.*,
   474 F.2d 774 (9th Cir. 1973) ........................................................................................2, 16

*California v. Infineon Techs.*,
   531 F. Supp. 2d 1124 (N.D. Calif. 2007).............................................................23, 37, 38

*Carnegie-Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988)......................................................................................................5, 35

*Carter-Jones Lumber Co. v. Dixie Distrib. Co.*,
   166 F.3d 840 (6th Cir. 1999) ...........................................................................................27

*Cheramie Services, Inc. v. Shell Deepwater Production*,
   35 So.3d 1058 (La. 2010) ...........................................................................................15, 16

*Com. Acting by Kane v. Flick*,
   382 A.2d 762 (Pa. Commw 1978) ...................................................................................31

*Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.*,
   895 A.2d 683 (Pa. Commw. 2006) .............................................................29, 30, 31, 32

*Com., by Creamer v. Monumental Properties, Inc.*,
   329 A.2d 812, (Pa. 1974).................................................................................................29

*Com. ex rel. Zimmerman v. Nickel*,
   26 Pa. D & C 3d. 115 (Pa. Com. Pl. 1983) .....................................................................30

*Commonwealth of Pennsylvania v. Think Fin., Inc.*,
   No. 14-CV-7139,
   2016 WL 183289 (E.D. Pa. Jan. 14, 2016) ....................................................................32

ii

Cases (cont'd)                                                           **Page**

*Danganan v. Guardian Prot. Servs.*,
    645 Pa. 181 (2018)............................................................................................30
*Doerr v. Mobil Oil Corp.*,
    00-0947 (La. 12/19/00) ..................................................................................15
*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938).............................................................................................2
*Fed. Trade Comm'n v. Cement Inst.*,
    333 U.S. 683 (1948)..........................................................................................31
*FTC v. Ind. Fed. of Dentists*,
    476 U.S. 447 (1986)..........................................................................12, 31, 41
*FTC v. Mylan Labs., Inc.*,
    99 F. Supp. 2d 1 (D.D.C. 1999) ....................................................9, 16, 27
*FTC v. Vyera Pharm., LLC*,
    No. 20cv706 (DLC),
    2020 WL 4891311 (S.D.N.Y. Aug. 18, 2020)..........................................9, 27
*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 425 (3d Cir. 1993)............................................................................10
*Harris Assoc. v. Clark County School Dist.*,
    119 Nev. 638, 81 P.3d 532 (2003) .................................................................21
*Hatton v. Mun. de Ponce*,
    134 D.P.R. 1001,
    1994 WL 909605 (P.R. 1994) ........................................................................34
*Heath v. Cornelius*,
    511 S.W.2d 683 (Tenn. 1974)........................................................................38
*Herrig v. Herrig*,
    844 P.2d 487 (Wyo. 1992)........................................................................40, 41
*Hood v. AU Optronics*,
    701 F.3d 796 (5th Cir. 2012)
    571 U.S. 161 (2014)....................................................................................17,18
*Hood ex rel. State v. BASF Corp.*,
    No. 56863, 2006 WL 308378
    (Miss. Ch. Jan. 17, 2006) ...............................................................................18
*Houghton v. Franscell*,
    870 P.2d 1050 (Wyo.1994)............................................................................40
*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................................................. *passim*
*In re Cardizem CD Antitrust Litig.*,
    391 F.3d 812 (6th Cir. 2004)..........................................................................37
*In re EpiPen Marketing, Sales Practices, and Antitrust Litig.*,
    336 F. Supp. 1256 (D. Kan. 2018).................................................................6
*In re Flonase Antitrust Litig.*,
    284 F.R.D. 207 (E.D. Pa. 2012)......................................................................9
*In re Generic Pharmaceuticals Pricing Antitrust Litigation*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019) ...............................................13, 31, 42

Cases (cont'd)                                                                                          Page

*In re G-Fees Antitrust Litigation*,
    584 F. Supp. 2d 26 (D.D.C. 2018) ..................................................................................5
*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ...............................................................................10
*In re Lorazepam*,
    205 F.R.D. 369 (D.D.C. 2002)............................................................23, 24, 25, 37
*In re Lorazepam & Clorazepate Antitrust Litigation*,
    62 F. Supp. 2d 25 (D.D.C. 1999)................................................................5, 27, 36
*In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation*,
    190 So.3d 829 .................................................................................................................19
*In re Opana ER Antitrust  Litig.*,
    162 F. Supp. 3d (N.D. Ill. 2016) ...................................................................................32
*In re Packaged Seafood Products Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017)..........................................................................6
*In re Processed Egg Prods. Antitrust Litig.*,
    851 F. Supp. 2d 867 (E.D. Pa. 2012) ...........................................................12, 31, 41
*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ........................................................................40
*In re Suboxone Antitrust Litig.*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ...............................................................................9
*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    787 F. Supp. 2d 1036 (N.D. Cal. 2011) ..........................................................10, 38, 44
*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009)........................................................................................9
*Jones Truck Lines v. Transport Ins. Co.*,
    Civ. A. No. 88-5723,
    1989 WL 49517 (E.D. Pa. May 10, 1989) ..............................................................33, 38
*Kerr v Miller*,
    159 Or. App. 613
    P.2d 438 (1999)...............................................................................................................44
*Leven v. Frey*,
    123 Nev. 399,168 P.3d 712 (2007) ..............................................................................21
*Liu v. SEC*,
    140 S. Ct. 1936 (2020)..........................................................................................4, 5, 44
*Lund ex rel. Wilbur v. Pratt*,
    308 A.2d 554 (Me. 1973).................................................................................................16
*Mack v. Bristol-Myers Squibb Co.*,
    673 So.3d 100 (Fla. Dist. Ct. App. 1996) ......................................................................9
*Major v. Microsoft Corp.*,
    60 P.3d 511 (Okla. Civ. App. 2002) .............................................................................28
*Miller v. French*,
    530 U.S. 327 (2000)...........................................................................................................5
*Mississippi ex rel. Hood v. Entergy Mississippi, Inc.*
    2019 WL 1433772 (S.D. Miss. March 30, 2019) ...................................................18, 19

**Cases (cont'd)**                                                                    **Page**

*New Mexico v. Scott & Fetzer Co.*,
     No. 81-cv-054, 1981, WL 2167 (D.N.M. Dec. 22, 1981)
*New York v. Cedar Park Concrete Corp.*,
     665 F. Supp. 238 (S.D.N.Y.)..................................................................23
*New York v. Feldman*,
     210 F. Supp. 2d 294 (S.D.N.Y. 2002)..................................................24
*People v. Debt Reducers, Inc.*,
     5 Or. App. 322
     484 P.2d 869 (1971)...........................................................................44
*People v. Grasso*,
     836 N.Y.S.2d 40 (1st Dep't 2007),
     *aff'd*, 893 N.E.2d 105 (2008)............................................................26
*People v. Liberty Mutual. Ins. Co.*,
     861 N.Y.S.2d 294 (1st Dep't 2008).....................................................26
*Pool v. State*,
     2001 WY 8, 17 P.3d 1285 (Wyo. 2001) .............................................41
*Pressure Vessels R v. Empire Gas PR*,
     137 D.P.R. 497 (1994).......................................................................33
*P.R. Fuels, Inc. v. Empire Gas Co.*,
     149 D.P.R. 691 (1999).......................................................................33
*Rivera-Muniz v. Horizon Lines, Inc.*,
     737 F. Supp. 2d 57 (D.P.R. 2010).......................................................33
*Showpiece Homes Corp. v. Assurance Co. of America*,
     38 P.3d 47 (Colo. 2001).....................................................................40
*State ex rel. Inman v. Brock*,
      622 S.W.2d 36 (Tenn. 1981)..............................................................38
*State v Heath*,
     806 S.W.2d 535 (Tenn. Ct. App. 1990) ...............................................37
*State v. LG Electronics, Inc.*,
     186 Wash. 2d 1, 375 P.3d 636 (2014)..................................................40
*State ex rel. Leech v. Levi Strauss & Co.*,
     No. 79-722-III, 1980
     WL 4696 (Tenn. Ch. Sept. 25, 1980)...................................................37
*State v. Bauman*,
     7 Or. App. 489
     P.2d 869 (1971)..................................................................................44
*State v. Liberty Mutual Holding Co.*,
     No. X09CV064023087, 2009 WL 943094
     (Conn. Super. Ct. Mar. 20, 2009) ............................................7, 8, 26
*State v. Marsh & McLennan Cos., Inc.*,
     944 A.2d 315 (Conn. 2008) .......................................................6, 7
*State ex rel. Nixon v. Am. Tobacco Co., Inc.*,
     34 S.W.3d 122 (Mo. 2000) ...............................................................20

**Cases (cont'd)**                                        **Page**

*United States v. St. Regis Paper Co.*,
     285 F.2d 607 (2d Cir. 1960) ....................................... 17
*West v. American Tel. & Tel. Co.*,
     311 U.S. 223 (1940) .............................................. 2
*Westfield Group v. Campisi*,
     2006 WL 328415 (W.D. Pa. 2006) ............................... 30

**Federal Statutes**                                   **Page**

Fed. R. Civ. Proc. 12(b)(6) ........................................ 1
15 U.S.C. § 15c .................................................... 24
15 U.S.C. § 45 (a)(1) .............................................. 41
15 U.S.C. § 57(a)(1) ............................................... 45

**State Statutes**                                       **Page**

A.R.S.
     § 44-1407 ..................................................... 6
     §44-1408(A) ................................................... 6
Ark. Code Ann.
     § 4-75-212(b) ................................................. 6
Cal. Bus. and Prof. Code §16760 (a)(i) ............................ 36
Conn. Gen. Stat.
     § 35-32(c) ................................................. 7, 8
Del. Code tit 6
     § 2101 ....................................................... 9
     § 2107 ....................................................... 9
     § 2108(a) .................................................... 9
     § 2108(b) .................................................... 9
Fla. Stat.
     § 501.201 ................................................... 10
Ind. Code
     § 24-1-1-5.1 ................................................ 11
     § 24-1-2-5.1 ................................................ 11
     § 24-1-2-7(a) and (b) .................................... 11, 12
     § 24-5-0.5-3(a) ............................................. 12
     § 24-5-0.5-3(b) ............................................. 12
     § 24-5-0.5-4(c) ............................................. 11
     § 24-5-0.5-4(c)(2) .......................................... 11
Ky. Rev. Stat. Ann.
     § 367.200 ................................................... 14
     § 367.990 ................................................... 14
     § 367.990(2) ............................................. 13, 14

**State Statutes (cont'd)**                            **Page**

Louisiana Civil Code
>      Art. 1 ................................................................................................................15
>      Art. 3 ................................................................................................................16
>      Art. 9 ................................................................................................................15
>      Art. 13 ..............................................................................................................16

La. R.S.
>      51:137 ..............................................................................................................15
>      51:1407 and 1408 ............................................................................................14

Louisiana Unfair Trade Practices Act (LUPTA) ........................................................15

Maine Unfair Trade Practices Act
>      5 M.R.S.A. § 209 ............................................................................................17
>      10 M.R.S.A. § 1104 ........................................................................................16

Md. Com. Law Code Ann.
>      § 11-209 ...........................................................................................................17

Md. Health-Gen. Code Ann.
>      § 21-1114 .........................................................................................................17

Mich. Comp. Laws
>      § 445.910(1)(c). ...............................................................................................17

Miss. Code Ann.
>      § 75-21-1 ..........................................................................................................19
>      § 75-21-7 ..........................................................................................................19
>      § 75-21-75-21-19 .............................................................................................19
>      § 75-24-9 ..........................................................................................................19
>      § 75-24-11 ........................................................................................................19
>      § 75-24-19(1)(b). .............................................................................................19
>      §75-24-19(1)(b) ................................................................................................19
>      § 75-24-23 ........................................................................................................19

Mo. Rev. Stat.
>      § 407.100.4 .......................................................................................................21
>      § 416.011 ..........................................................................................................21

N.M. Stat. Ann.
>      § 8-5-2 ..............................................................................................................23
>      § 8-5-2(J) .........................................................................................................23
>      § 57-1-1.2. ........................................................................................................24
>      57-1-2 ...............................................................................................................24
>      § 57-1-3(B) .......................................................................................................24
>      § 57-1-14 ..........................................................................................................24
>      § 57-12-8(B) .....................................................................................................24

Nev. Rev. Stat.
>      § 598.0953 ........................................................................................................22
>      § 598.0963(3) ............................................................................................21, 22
>      § 598.0975(1)(a) ..............................................................................................22
>      § 598.0975(3)(b) ..............................................................................................22
>      § 598.099(3) .....................................................................................................22

**State Statutes (cont'd)** **Page**

New York New York Executive Law
 § 63(1) ...................................................................................25
 § 63(12) ..............................................................................24, 25
New York General Business Law
 § 342-a ................................................................................25
 §3 42-b ................................................................................25
N.C.G.S.
 § 75-15 ................................................................................27
 §114-2(8)(a) .........................................................................27
ORS
 § 646.760 .............................................................................44
 § 646.775 .............................................................................44
 § 646.775(6) .........................................................................44
 § 646.775 (1) ........................................................................44
 § 646.780 .............................................................................44
Ohio Rev. Code
 § 109.81 ...............................................................................27
 § 1331.01 .............................................................................27
 § 1331.03 .............................................................................27
Pa. Unfair Trade Practices
 & Consumer Protection Law ("UTPCPL") ...................28, 29, 30, 31
P.R. Laws Ann.
 §§ 257 et seq.[to 274] ..............................................................34
 § 259(a) ...............................................................................34
 § 268(a) ...............................................................................32
 § 3341 .................................................................................34
10 L.P.R.A. § 259(c) (i) ................................................................34
R.I. Gen. Laws
 § 6-13.1 ............................................................................... 35
 § 6-36-10 .............................................................................35
 § 6-36-10 (c) .........................................................................35
 § 6-36-11(a) ..........................................................................35
 § 6–36–11(b) .....................................................................35, 36
 § 6-36-12 .............................................................................35
 § 6-36-12 (a) .........................................................................36
S.C. Code Ann.
 § 39-5-50 .............................................................................13
 § 39-5-110 ...........................................................................13
Tenn. Code Ann.
 § 8-6-109 .............................................................................37
 § 47-25-101 ..........................................................................36
Virginia Code
 59.1-9.11 .............................................................................38
 59.1-9.15 .............................................................................38

**State Statutes (cont'd)**                                                      **Page**

Rev. Code Wash. (RCW)
     19.86,030 ........................................................................................................39
     19.86.080 ........................................................................................................39
     19.86.080(3) ...................................................................................................39
Wyo. Stat. Ann.
     § 26-1-101 .....................................................................................................41
     § 40-4-105 .....................................................................................................41
     § 40-12-105(a)(x) ..........................................................................................41
     § 40-12-105(a)(xv) ........................................................................................41
     § 40-12-114(a) ...............................................................................................41

## INTRODUCTION

The States seek to remedy the antitrust violations specified in the States' Teva-centric complaint, which this Court has designated a bellwether action.  In this opposition to Defendants' motion to dismiss state law claims of various States, those States specify the claims on which relief is sought, while rebutting Defendants' arguments in Defendants' Memorandum of Law in Support of Their Joint Motion to Dismiss Plaintiffs' State-Law Claims, ECF 192-1, 2:19-cv-02407 ("Def. Jt. Mem.").  Defendants largely repeat arguments that the States addressed in States' Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss States' State-Law Claims, ECF 169, 2:17-cv-03768 (July 25, 2019) ("States' 2019 Opposition").

The States present the state law arguments alphabetically by State, rather than in the framework presented in Def. Jt. Mem.  Listing the States alphabetically focuses on what matters: whether the State's claims within the bellwether action "state a claim on which relief can be granted." Fed. R. Civ. Proc. 12(b)(6).  With this alphabetical listing, the States show when Defendants' arguments are academic or immaterial.   An academic might care if a State could have sought alternative relief, but a court need not address a path not taken or a potential alternative path.  Similarly and despite Defendants' framework, the Court need not address whether the authority asserted by the State should have a specific label.  The right to seek the relief, not the label attached to that right, is what matters.

Presenting the States alphabetically also illuminates why various of Defendants' arguments are inapplicable or misleading.  State attorneys general possess broad and deep authority as the legal representative of States in our federal system.  State law that applies generally or to private parties is often not what applies to claims asserted by the State through the state attorney general.  Probably the most egregious illustration of an argument forwarded by

Defendants in this category addresses Arkansas state law.  In a footnote to support the argument

that the state law claim should be dismissed, Defendants cite two cases that hold that private

parties cannot assert the claim ___**because**___ Arkansas law provides that the claim can be asserted only

by the Arkansas Attorney General.  *See* Def. Jt. Mem. at 12, n.23.  Obviously, the limitations on

those claims when asserted by private parties do not apply when the Arkansas Attorney General

is asserting the claim.

Next, the States emphasize that state law applies.  Federal courts are required to adhere to

the controlling authority of state courts on questions of substantive state law.  *Erie R. Co. v.*

*Tompkins*, 304 U.S. 64, 78 (1938) ("The law to be applied in any case is the law of the state.").

When interpreting state law, a federal court must rely upon the common law precedent of the

state's appellate courts. *West v. American Tel. & Tel. Co*., 311 U.S. at 237 (1940).

Moreover, state law to address competitive issues is not limited by federal antitrust law.

As phrased by a unanimous Supreme Court:

> Congress intended the federal antitrust laws to supplement, not displace, state antitrust
> remedies. . . . And on several prior occasions, the Court has recognized that the federal
> antitrust laws do not pre-empt state law.

*California v. ARC America Corp*., 490 U.S. 93, 101-02 (1989).

Despite this clear contrary authority, Defendants argue that "explicit statutory authority"

is required for authority to recover damages for individuals, relying on *California v. Frito-Lay,*

*Inc*., 474 F.2d 774 (9th Cir. 1973).  Def. Jt. Mem. at 5-6.[1]  As Defendants note, Congress rejected

*Frito-Lay'*s interpretation of federal law by enacting statutory *parens patriae* for states to recover

damages for consumers.  Def. Jt. Mem. at 6 n.6.

*ARC America* illustrates why *Frito-Lay* is not authoritative or persuasive for relief under

state law either.  Sixteen years after that Ninth Circuit decision, the Supreme Court in *ARC*

---

[1]  States easily meet the inappropriate *Frito-Lay* standard, as illustrated by Oregon state law.  *See* Exhibit A.

*America* considered how and whether state law could differ from the Supreme Court case that requires for certain damage claims privity between the plaintiff and the party alleged to have violated antitrust laws. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  A unanimous Court held that state antitrust law is not preempted or otherwise limited by this federal "indirect" purchaser rule. *ARC America,* 490 U.S. at 101-02.  The Court considered four different state antitrust statutes and determined that none of them were preempted or limited by the requirement of privity under federal law. *Id.* at 105-06.

The *ARC America* holding for Arizona clearly illustrates that the "express statutory authority" suggested in *Frito-Lay* is not required for state law to provide relief, when federal law does not.  Arizona's statute was modeled on federal law and the Court still held that the statute had to be interpreted independently under state law. *ARC America*, 490 U.S. at 98 n.3.  Fourteen years later, Arizona's Supreme Court construed that Arizona statute to permit recovery by "indirect" purchasers, contrary to the federal law on which it was modeled. *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99 (Ariz. 2003).

### ***State Law Disgorgement Claims Should Not be Addressed, Let Alone Dismissed***

One argument made by the Defendants is not state-specific  and thus is not included within the alphabetical listing of States.  Based on a recent Supreme Court decision construing a specific SEC statute, Defendants seek an opinion from this Court on the appropriate scope of State claims for disgorgement under state law.  Def. Jt. Mem. at 9-11 (discussing *Liu v. SEC*, 140 S. Ct. 1936 (2020)).  The Defendants do not assert what is required in a motion to dismiss: that States do not have a claim upon which relief can be granted.  Indeed, the section's introductory paragraph and the first paragraph on page 11, is limited "to the extent" States make arguments

that States have not yet made.  *E.g.,* Def. Jt. Mem. at 9 ("To the extent the States seek disgorgement as a form of equitable relief under state law").

The Court should not even consider Defendants' half-baked argument, which is speculative and an improper request for an advisory opinion.  Moreover, any disputes about the scope of the States' state law claims for disgorgement are not yet ripe.  And that there may be an adequate remedy at law is not a basis for a motion to dismiss an equitable claim.

Moreover, Defendants' half-baked argument is wrong.  Defendants state a categorical rule in their favor when the language from the Court that Defendants cite is nuanced and favors the States.  Defendants assert that the States are "prohibited" from seeking to apply disgorgement jointly and severally, while the language quoted by from the Defendants use (and the Court's actual analysis) provides that applying disgorgement jointly and severally only "***could*** transform" the remedy into a penalty.  Def. Jt. Mem. at 11 (emphasis added).  The Court applied and this Court may ultimately apply an appropriately nuanced standard reflecting that in conspiracy cases, applying disgorgement jointly and severally may not transform the remedy into a penalty.  As explained by the Court, "The historic profits remedy thus allows some flexibility to impose collective liability" when "***concerted*** wrongdoing" is at issue.  *Liu*, 140 S. Ct. at 149 (emphasis added).

The States will address the appropriate equitable relief at the appropriate at the appropriate time--if and when States seek specific equitable relief following a finding of liability.  In addition to being premature and as explained more fully in the State Opposition to Defendants' Joint Motion to Dismiss the States' Federal Law Claims For Lack of Standing, federal cases construing the scope of a court's equitable authority hold that "federal statutes should not be construed to displace a court's traditional equitable jurisdiction absent 'the clearest

command or an inescapable inference to the contrary.'" *In re G-Fees Antitrust Litigation*, 584 F. Supp. 2d 26, 46 (D.D.C. 2018) (quoting *Miller v. French*, 530 U.S. 327, 336 (2000) (internal quotations and citation omitted)).  Thus, limiting the scope of equitable relief under federal law depends on the specific statute.  The statute in *Liu v. SEC* allowed "any equitable relief that may be appropriate or necessary for the benefit of investors."  140 S. Ct. at 1940, 1948.  Defendants fail to cite (let alone analyze) any state law, nor explain why the language of the SEC statute that impacted the Supreme Court's analysis ("for the benefit of investors"), *id*. at 1948, should apply to the States' state law claims.  Moreover, Defendants' argument erroneously assumes that federal law, not state law, applies to state law disgorgement claims.

**<u>The state law arguments, alphabetical by State, are:</u>**

*Alaska*:  In the 2019 briefing, defendants cited an inapplicable statute to challenge the Alaska Attorney General's claims and in opposition, Alaska cited the appropriate statutes, which addressed the Attorney General's authority and claims.  States' 2019 Opposition at 7-8.  In the current motion to dismiss, Defendants now concede what those statutes say, but argue that the claim must be brought in Alaska Superior Court based on statutory language that the claim may be brought in superior court.  Def. Jt. Mem. at 6, n.4.  Language that specifies the state court in which to bring the claim does not negate federal supplemental jurisdiction over state law claims when the facts underlying the federal and state claims are similar enough to create a "common nucleus of operative facts."  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).  That is clearly the case here.  *See In re Lorazepam & Clorazepate Antitrust Litigation*, 62 F. Supp. 2d 25, 49-50 (D.D.C. 1999) (applying these principles to a New York statute).

*Arizona*:  Pursuant to Arizona Revised Statutes § 44-1407 and § 44-1408(A), Arizona seeks "injunctive relief, civil penalties, other equitable relief (including but not limited to

disgorgement), fees and costs, and such other relief as this Court deems just and equitable." Teva Amended Complaint, 19-CV-2407, ECF No. 106 ¶ 1436.   Contrary to Def. Jt. Mem. at 7, Arizona is not seeking damages on behalf of any entity or as *parens patriae* on behalf of individual consumers.

*Arkansas*: The Arkansas Attorney General seeks monetary relief for natural persons residing in the state pursuant to Ark. Code Ann. § 4-75-212(b), which provides:  "The Attorney General may also bring a civil action in the name of the state, as parens patriae on behalf of natural persons residing in the state, to secure monetary relief as provided under this section for injury, directly or indirectly sustained."  Defendants' argument to the contrary, Def. Jt. Mem. at 12, n.23, cites cases addressing claims asserted by private parties, not the Attorney General. Indeed, the courts in those cases note that unlike private parties the Arkansas Attorney General, "in her official discretion . . . may seek relief for harms indirect purchasers have suffered."  *In re Packaged Seafood Products Antitrust Litig.*, 242 F. Supp. 3d 1033, 1069 (S.D. Cal. 2017); *accord, In re EpiPen Marketing, Sales Practices, and Antitrust Litig.*, 336 F. Supp. 1256, 1312 n.19 (D. Kan. 2018) (noting that the Arkansas "statute authorizes the Attorney General to sue on behalf of persons injured 'directly or indirectly.'").

*Connecticut:*  Regarding Connecticut, Defendants' Motion does not differ from the one filed May 31, 2019 in any material respect.  Defendants have provided two additional sentences to what is now footnote 9, to reiterate their argument that *State v. Marsh & McLennan Cos., Inc.*, 944 A.2d 315 (Conn. 2008) requires Connecticut to specifically detail how the alleged conspiracy impacted the flow of money in the state, and posit how the money would have benefitted Connecticut.  Def. Jt. Mem. at 7, n.9.  No such specificity is required under Connecticut law.  No other new argument appears.  Connecticut therefore reprises the

Connecticut entry in the States' 2019 Opposition, with updated references to the current motion and to the Teva-Centric complaint, to wit:

Defendants argue that Connecticut does not have the right to seek damages as *parens patriae,* claiming, in summary, that Connecticut has not adequately distinguished the injuries to its general economy from those to its citizens, and that in consequence all *parens patriae* damages should be dismissed. *See* Def. Jt. Mem. at 7, n.9. This is incorrect.

Connecticut has authority to pursue a *parens patriae* claim for damages to its general economy under Conn. Gen. Stat. § 35-32(c)(2). *State v. Marsh & McLennan Cos., Inc.*, 944 A.2d 315, 317 (Conn. 2008). The language of § 35-32(c) is clear:

The Attorney General may… bring an action in the name of the state as (1) parens patriae for persons residing in the state with respect to damages sustained by such persons… or (2) parens patriae with respect to damages to the general economy of the state or any political subdivision thereof.

Defendants erroneously cite *Marsh & McLennan* to argue that Connecticut must differentiate which allegations support general economy injuries and which allegations support injuries to persons. There is no such requirement in the statute, nor did the Connecticut court in *Marsh & McLennan* define such a requirement for all *parens patriae* claims. *See also State v. Liberty Mutual Holding Co.*, No. X09CV064023087, 2009 WL 943094, at *3 (Conn. Super. Ct. Mar. 20, 2009) (denying motion to strike general economy claim where state "alleged damage to the state's general economy and harm to the Connecticut citizenry from the alleged conspiracy").

Insofar as *Marsh & McLennan* differentiates between injuries to the general economy and injuries to persons, the court was clear that such differentiation was not an issue at the pleading stage, but only potentially implicated for damages. *Marsh & McLennan*, 944 A.2d 315 at 329 ("In our view, the defendants' arguments with respect to the potentially duplicative nature of the damages and injuries pleaded in the state's complaint implicate potential problems of proof rather

than pleading… it…would be premature for us to make that determination on the pleadings alone before any discovery has been conducted.").

Connecticut has alleged harm to the State's *parens patriae* interests as required by Conn. Gen. Stat. § 35-32(c). *See* Sec. Am. Complaint ¶¶ 464-467 (harm to competition; artificially high prices; harm to the general economy), ¶¶ 1152 (Teva), 1159 (Mylan), 1166 (Sandoz), 1173 (Actavis), 1180 (Taro), 1187 (Glenmark), 1194 (Lupin), 1201 (Amneal), 1208 (Apotex), 1215 (Aurobindo), 1222 (Breckinridge), 1229 (Dr. Reddy's), 1236 (Pfizer and Greenstone), 1243 (Lannett), 1250 (Par), 1257 (Upsher-Smith), 1264 (Wockhardt), 1271 (Zydus), 1280 (Aprahamian), 1289 (Berthold), 1298 (Brown), 1307 (Cavanaugh), 1316 (Falkin), 1325 (Grauso), 1334 (Green), 1352 Kellum), 1361 (Nailor), 1370 (Nesta), 1379 (Ostaficiuk), 1388 (Patel), 1397 (Rekenthaler), and 1406 (Rogerson) (injury to governmental entities and/or consumers).[2] This is the classic model of a *parens patriae* complaint, in that it seeks to remedy injury to the general populace of Connecticut from the allegedly anticompetitive conduct of the Defendants. *Liberty Mutual Holding* at *3 n.13 ("[T]he very model of a *parens patriae* complaint…seeks to remedy injury to the general populace of Connecticut from the allegedly anticompetitive conduct of [Defendant].")

**Delaware**:  Defendants seek to dismiss claims for monetary recovery on behalf of "indirect" purchasers brought by the State of Delaware.  Defendants do not accurately describe the type of action and claims the Attorney General is bringing under the Delaware Antitrust Act ("DAA"), Del. Code tit. 6, § 2101 *et. seq.*  Defendants suggest the Delaware Attorney General is

---

[2] Each of these paragraphs concludes the allegations regarding each Defendant, and alleges that as a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and the named Defendant has personally enjoyed ill-gotten gains from the sales of these generic drugs.

bringing an action for proprietary purchases under the DAA pursuant to Del. Code tit. 6, §

2108(a), or a statutory *parens patriae* action on behalf of natural persons pursuant to Del. Code

tit. 6, § 2108(b).  The Attorney General is not.  Here, the Attorney General is bringing a law

enforcement action seeking civil penalties, disgorgement, and to enjoin the defendants' conduct

pursuant to Del. Code tit. 6, § 2107.  Section 2107 specifically authorizes the Attorney General

to bring an action for violations of the DAA and seek civil penalties, equitable relief, or "a

combination of civil penalty and equitable relief."  *Illinois Brick* has no application to this law

enforcement action and the remedies the Attorney General is seeking.  *See FTC v. Vyera Pharm.,*

*LLC*, No. 20cv706 (DLC), 2020 WL 4891311, at *13 (S.D.N.Y. Aug. 18, 2020)(distinguishing

New York and Ohio's claims for disgorgement from claims for damages for purposes of

applying *Illinois Brick*); *FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 5-6 (D.D.C. 1999) (*Illinois*

*Brick* does not apply to state statues specifically authorizing equitable relief).

    *Florida*:  Despite Defendants' assertions to the contrary, Plaintiff State of Florida has

standing to sue Defendants based on its Minnesota Multistate Contracting Alliance for Pharmacy

("MMCAP") purchases as a direct purchaser pursuant to federal antitrust law and, in any event,

as an indirect purchaser under the Florida Unfair and Deceptive Trade Practices Act

("FDUTPA").[3]

---

[3] Fla. Stat. § 501.201, *et seq*.; *Mack v. Bristol-Myers Squibb Co.*, 673 So.3d 100, 108 (Fla. Dist. Ct. App. 1996) ("we read subsections 501.202(2), 501.211(2) and 501.204(1) of the [FDUTPA] as a clear statement of legislative policy to protect consumers through the authorization of such indirect purchaser actions."). This Court has regularly cited *Mack* for the proposition that a plaintiff may bring indirect purchaser claims under FDUTPA. *See In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 699 (E.D. Pa. 2014); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 235 (E.D. Pa. 2012); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 160–61 (E.D. Pa. 2009)

Florida has pled detailed facts that it holds a valid assignment of antitrust claims from MMCAP, which itself has been assigned antitrust claims from Cardinal Health. *See* Sec. Am. Compl. ¶¶ 1135-1139, 1451. Defendants' own cited authority merely holds that "it is appropriate to require [plaintiffs] to identify the assignors" from which plaintiffs have acquired direct-purchaser antitrust claims. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036, 1041 (N.D. Cal. 2011). Florida has met this burden by identifying its assignor as MMCAP. Indeed, the court in *TFT-LCD* concluded that "the balance of the information sought by defendants, such as information about the contracts, is not required as a pleading matter and can be explored in discovery." *Id.* Furthermore, the Third Circuit has held that courts will not dismiss a complaint when "the pleadings do not on their face show defective assignments" and that "details supporting the validity of assignments can be left for later factual determination." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 540 (D.N.J. 2004). Here, Florida's allegations "suffice to give Defendants fair notice of the nature of their claims." *Id.* at 541. [4]

**Indiana**:  Defendants' arguments regarding Indiana are found in Def. Jt. Mem. at 7 n.10, 12 n.26.  Contrary to Defendants' assertion, the Indiana Attorney General can and does seek damages for Indiana consumers. Defendants only partially cite the Indiana Deceptive Consumer Sales Act ("IDCSA") leaving out the last sentence of Indiana Code § 24-5-0.5-4(c), which provides that in addition to enjoining deceptive acts in a case brought by the Attorney General, the court may also "order the supplier to make payment of the money unlawfully received from

---

[4] Defendants also cite *TFT-LCD* in combination with *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993) seemingly to argue that assignments of antitrust claims must be pled with particularity as being express assignments. However, *Gulfstream* merely holds that assignments of antitrust claims must be express assignments. Citing *TFT-LCD* (which required a plaintiff to identify its assignors) in tandem with *Gulfstream* does not, as Defendants would have it, create a pleading requirement to use the magic word "express" when pleading assignments in antitrust matters.

the aggrieved consumers to be held in escrow for distribution to aggrieved consumers" or,

damages. Ind. Code § 24-5-0.5-4(c)(2). Moreover, settled Indiana law provides that "a state may

act as *parens patriae* on behalf of its citizens." *Bd of Comm'rs of Howard City v. Kokomo City

Plan Comm'n*, 263 Ind. 282, 295 (1975); *see Bd. of Comm'rs of Union City v. McGuinness*, 080

N.E.2d 164, 170 (Ind. 2017) ("[I]t has long been settled that a state may act as *parens patriae* on

behalf of its citizens.") (emphasis omitted) (internal citations omitted).

In addition, Indiana seeks damages for the State and its political subdivisions under

authority to recover for "indirect" purchasers. The Indiana Antitrust Act explicitly provides for

"indirect" damages on behalf of the State and its political subdivisions. Ind. Code §§ 24-1-1-5.1,

24-1-2-5.1, 24-1-2-7(b) ("The attorney general may bring an action on behalf of the state or a

political subdivision . . . for injuries or damages sustained directly or indirectly as a result of the

violation of this chapter."). Defendants inappropriately rely on *Berghausen v. Microsoft*, 765

N.E.2d 592 (Ind. Ct. App. 2020), in which the plaintiff was an individual seeking relief in a

private right of action under Ind. Code § 24-1-2-7(a), which does not provide for "indirect"

damages. Indiana does not, as Defendants suggest, seek "indirect" purchaser damages under Ind.

Code § 24-1-2-7(a).

Finally, Indiana's allegations easily fit within what violates Indiana consumer protection

law. The IDCSA broadly prohibits a supplier from committing any "unfair, abusive, or deceptive

acts, omissions, or practices in connection with a consumer transaction." Ind. Code § 24-5-0.5-

3(a). This prohibition includes both implicit and explicit misrepresentations. Ind. Code § 24-5-

0.5-3(a).  The list of prohibited practices under Ind. Code § 24-5-0.5-3 is not intended to be an

exhaustive recitation of all potentially unlawful acts under the statute. Ind. Code § 24-5-0.5-3(b)

("Without limiting the scope of subsection (a), the following acts . . . are deceptive acts").

Further, Defendants' reliance on *Berghausen*, 765 N.E.2d 592 (Ind. Ct. App. 2002), is again misplaced. In *Berghausen*, the court rejected Plaintiff's "implicit representations" argument because prior interpretations of the IDSCA required an express misrepresentation to violate the statute. Ind. Code § 24-5-0.5-3(a) (2013). The Indiana legislature expanded the law in 2014 to include implicit misrepresentations and omissions. *See* Ind. Code § 24-5-0.5-3(a) (2014). Thus, Indiana has property asserted a consumer protection claim under the IDCSA.

Moreover, while Indiana courts have not addressed whether the IDSCA encompasses anticompetitive behavior, Indiana courts would look to federal courts interpreting the Federal Trade Commission Act, which like the IDCSA declares unlawful "unfair or deceptive acts or practices." Those federal courts have consistently applied the Federal Trade Commission Act to encompass price-fixing and other antitrust-type violations. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig*., 851 F. Supp. 2d 867, 900 (E.D. Pa. 2012) (citing *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 454 (1986)). Accordingly, if considered, Indiana courts would likely hold that the Act's prohibition on "unfair or deceptive acts or practices" encompasses the same anticompetitive conduct violating antitrust laws. Given the absence of direct authority from Indiana courts and binding authority from the Third Circuit, this Court should apply the same reasoning it has applied to other state consumer protection claims where no direct and contrary state authority exists. Specifically, Indiana's IDSCA should survive because "[w]hether [Indiana] can ultimately prove a consumer protection claim separate and apart from [its] antitrust claim is not a question for resolution at this stage of litigation." *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 368 F. Supp. 3d 814, 842 (E.D. Pa. 2019).

*Kentucky:*  Defendants claim that the Commonwealth of Kentucky is not entitled to damages and instead only entitled to injunctive relief.[5]  To be clear, Kentucky does not seek damages for purchases of generic drugs by the Commonwealth.  As the Defendants have been informed multiple times, Kentucky seeks civil penalties and disgorgement (as well as fees and costs).  *See* Plaintiff States' Responses and Objections to Defendants' First Set of Interrogatories Propounded to the Plaintiff States served to Defendants on December 2, 2019, Kentucky's First Supplement to Plaintiff States Responses and Objections to Defendants' First Set of Interrogatories propounded to the Plaintiff States served to Defendants on January 30, 2020, and the Commonwealth of Kentucky's Answers to Questions informally recommended by Special Master Marion for Connecticut served to Defendants on November 16, 2020.  The Kentucky Consumer Protection Act expressly authorizes both civil penalties and disgorgement.  The Kentucky Attorney General is entitled to seek civil penalties for the Commonwealth, Ky. Rev. Stat. Ann. § 367.990(2).  Ky. Rev. Stat. § 367.990 specifically allows the Kentucky Attorney General to seek and recover civil penalties of not more than two-thousand dollars ($2,000) for each willful violation, or ten-thousand ($10,000) for each such violation directed at a person over 60.  The Kentucky Attorney General also may seek disgorgement of all revenues, profits, and gains achieved in whole or in part by reason of Defendants' illegal conduct.  Ky. Rev. Stat. Ann. § 367.200 (Attorney General may seek "orders or judgments . . . to restore to any person in interest any moneys . . . which may have been paid out as a result of any practice declared unlawful by KRS 367.130 to 367.300.").   Defendants cite only the provision of the Kentucky

---

[5] In their arguments against Kentucky, Mississippi and Nevada, the Defendants noted that South Carolina withdrew its claims for ascertainable loss under S.C. Code Ann. § 39-5-50 by letter dated Nov. 22, 2019. South Carolina has not withdrawn any of its other claims, including its monetary claim for civil penalties. South Carolina is entitled to civil penalties under S.C. Code Ann. § 39-5-110 (Attorney General may seek a civil penalty not to exceed $5,000 for each willful violation).

Consumer Protection Act that provides for injunctive relief, ignoring the sections that authorize the additional remedies the Attorney General seeks.

*Louisiana*:   Louisiana seeks injunctive relief, including disgorgement, and civil penalties, which are plainly allowed under the clear language of Louisiana law. *See* La. R.S. 51:1407 and 1408.  In response, however, Defendants have chosen to defend the case they *want* to defend instead of the case actually before them by challenging Louisiana's ability to recover for indirect purchasers.  These arguments have no merit.  Not only do they fail to address the claims actually brought by Louisiana, but also they improperly assume that indirect purchasers— who are the actual victim consumers—have no standing under Louisiana law. Notwithstanding the inapplicability of Defendants' argument, the State will address the issue of indirect purchaser standing in Louisiana.

No Louisiana appellate court has directly addressed the standing of "indirect" purchasers under the Louisiana Monopolies Act.  The state's antitrust laws, which date back to the 19th century, historically provide broad standing to all injured purchasers.  Indeed, the Monopolies Act plainly states that "[any] person who is injured . . . may sue in any court of competent jurisdiction and shall recover threefold damages sustained by him . . . ."  La. R.S. 51:137. Louisiana law further requires that, when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.  La. C.C. Art. 9.  The Monopolies Act clearly allows "[any] person who is injured" to sue, not just "direct" purchasers, and Defendants cannot assert that allowing "indirect" purchasers to bring suit under state antitrust laws – a practice that has occurred in many other states for decades – would suddenly lead to absurd consequences. Moreover, under Louisiana Civil Code Article 13, the Monopolies Act must be

read *in pari materia* with the Louisiana Unfair Trade Practices Act  (LUTPA) as both deal with

unfair methods of competition. In 2010, the Louisiana Supreme Court unambiguously ruled that

"any person" under LUTPA means just that—**any** person.  Relying on the clear language of the

statutes, which did not limit or exclude the term "person" in any way, this ruling was a departure

from earlier lower court decisions restricting standing under LUTPA to business consumers and

competitors, and erased any doubt as to the interpretation of "any person" or "person" under

Louisiana law.  *See Cheramie Services, Inc. v. Shell Deepwater Production*, 35 So.3d 1058 (La.

2010).  Without explicit statutory limitation of the word person, no judicial limitation is

permissible.

To support their contention, Defendants cite a single decision that held Louisiana would

likely not allow "indirect" purchaser to recover damages.  *Free v. Abbott Labs. Inc.*, 176 F.3d

298, 299-301 (5th Cir. 1990).  This decision is neither binding on this Court nor did it properly

evaluate Louisiana's antitrust laws using Louisiana's own rules of statutory interpretation. *Free

v. Abbott Labs. Inc.* is not a source of law in Louisiana.    The Louisiana Civil Code defines only

two sources of law: legislation and custom. La. CC. Art. 1. "Custom results from practice

repeated for a long time and generally accepted as having acquired the force of law." La. CC.

Art. 3. Thus, custom is established by a long line of cases, not a single case. "In Louisiana, courts

are not bound by the doctrine of stare decisis, but there is a recognition in this State of the

doctrine of jurisprudence constante. Unlike stare decisis, this latter doctrine does not contemplate

adherence to a principle of law announced and applied on a single occasion in the past." *Doerr v.

Mobil Oil Corp.,* 00-0947 (La. 12/19/00); 774 So. 2d 119,128. Moreover, the *Free* case was an

instance of a federal court engaging in guesswork to apply a Louisiana law, and thus holds no

probative value on interpretation of Louisiana law. This Court should not further entrench such a

flawed decision (particularly in *this* case where no "indirect purchaser" claim has been made) and should instead look to how "person" was interpreted by the Louisiana Supreme Court in *Cheramie* to answer whether Louisiana law allows damages for indirect purchaser victims.

*Maine*:  Under Maine's antitrust law, "the Attorney General may institute proceedings in equity to prevent and restrain violations of" the state's antitrust statutes, as well as pursue damages on behalf of the State and recover civil penalties.  10 M.R.S.A. § 1104.  Additionally, "[t]he powers of the Maine Attorney General are sufficiently broad to encompass a *parens patriae* action on behalf of indirect purchasers" for damages under state antitrust law.  *FTC v. Mylan Labs., Inc.,* 99 F. Supp. 2d 1, 7 (D.D.C. 1999) (citing *Lund ex rel. Wilbur v. Pratt,* 308 A.2d 554, 558 (Me. 1973)).   The case Defendants rely on, *California v. Frito-Lay, Inc.,* 474 F.2d 774, 777 (9th Cir. 1973), is of very questionable authority for the reasons explained in the introduction at 2-3.  Moreover, Maine law provides that,"[a]s the chief law enforcement officer of the State, [the Maine Attorney General] may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may, from time to time require, and may institute, conduct, and maintain all such actions and proceedings as he deems necessary for the enforcement of the laws of the State, the preservation of order, and the protection of public rights."  *Lund ex rel. Wilbur v. Pratt,* 308 A.2d at 558.

Defendants ignore this established precedent and rely in part on an inapplicable section of an inapplicable statute, namely the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 209, in arguing that the Attorney General may not seek *parens patriae* damages on behalf of consumers. The Attorney General does not seek damages or any other remedy under the Maine Unfair Trade Practices Act, instead bringing state claims only under Maine's antitrust statute, as the Defendants themselves point out in their memorandum.  Def. Mem. at 1, n.3.[3]

*Maryland*:  Maryland is not seeking damages.  Accordingly, Maryland's alleged status as an indirect purchaser is irrelevant.  To the extent, however, that Maryland's purchaser status is at all relevant, Maryland law is clear: "In any action brought by the Attorney General under § 11-209 of the Commercial Law Article, a person that sells, (or) distributes . . . any drug, (or) medicine . . . (1) May not assert as a defense that the person did not deal directly with the person on whose behalf the action is brought . . ." Md. Health General Code § 21-1114.  Accordingly, Defendants' motion to dismiss Maryland claims on grounds that the State of Maryland is an indirect purchaser is irrelevant and alternatively must be denied.

*Michigan*:  In support of their claim that their actions do not fall within the Michigan Consumer Protection Act ("MICPA"), Defendants once again cite the wrong section of the statute and rely upon case law that treats that wrong section of the statute. MICPA grants the Attorney General the ability to bring suit for damages caused by "a method, act, or practice in trade or commerce" that has been deemed unfair or deceptive within the meaning of Section 5(a)(1) of the FTC Act by either a circuit court of appeals or the Supreme Court more than 30 days before the alleged unlawful conduct occurs.  Mich. Comp. Laws § 445.910(1)(c).  Both of these conditions have certainly been met.  *See, e.g.*, *United States v. St. Regis Paper Co.*, 285 F.2d 607 (2d Cir. 1960) ("[A]ny violation of the Sherman and Clayton Acts [is] also a violation of § 5 of the Federal Trade Commission Act.").  Therefore, Defendants' argument, premised on the notion that their alleged conduct does not fall within MICPA, is incorrect.

*Mississippi*:  Defendants inexplicably cite the reversed decision in *Hood v. AU Optronics,* 701 F.3d 796 (5th Cir. 2012) as authority for their argument that the State of Mississippi has no authority to seek damages for injured citizens as *parens patriae.* Def. Jt.

Mem. at 7 n.11.  The United States Supreme Court already shut down this argument when it was

attempted in another case, *Mississippi ex rel. Hood v. Entergy Mississippi, Inc.*:

> This is a curious choice of cases in which to anchor an argument. In *AU Optronics,* the
> Fifth Circuit took a particularly idiosyncratic view of consumer protection lawsuits brought
> by state Attorneys General. The decision was so unusual – containing reasoning rejected
> by every other Court of Appeals to consider the issue – that the United States Supreme
> Court unanimously reversed in its next term. *See* 571 U.S. 161 (2014).

2019 WL 1433772.[6] Further, Mississippi state courts have unambiguously affirmed the power of

the Attorney General to recover *parens patriae* damages on behalf of Mississippi citizens.

*Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *3 (Miss. Ch. Jan. 17, 2006)).

Defendants assert, without argument, that the Mississippi Attorney General's authority to

seek a temporary or permanent injunction somehow limits her remedies to injunctive relief .

Def. Jt. Mem. at 13, n.36. Contrary to Defendants' assertion, the Mississippi Legislature has

explicitly conferred statutory authority under the Mississippi Consumer Protection Act

("MCPA") to seek any and all forms of relief including but not limited to: temporary or

permanent injunction, restitution, additional orders or judgments necessary to restore monies or

property, revocation of license to do business in Mississippi, monetary penalties, investigative

fees, attorneys' fees, and remedies otherwise available under federal, state, or local laws. See

Miss. Code Ann. §§ 75-24-9; 75-24-11; 75-24-19(1)(b); 75-24-23; see also *State ex rel. Fitch v.*

*Yazaki North America, Inc.*, 294 So. 3d 1178, 1184 (¶ 17) (Miss. 2020) (as long as the action

pleads injunctive relief, civil penalties may also be pleaded and recovered); *Hood ex rel. State v.*

*BASF Corp.*, 2006 WL 308379 *12 (Chanc. Ct. MS Jan. 17, 2006).  The Mississippi Legislature

has also specifically provided for all forms of relief in the Mississippi antitrust statutes including

---

[6] Even in AU Optronics, the Fifth Circuit assumed that the State of Mississippi had parens patriae
standing to bring claims and expressly stated that the parens patriae authority was not an issue the Fifth
Circuit was deciding in the opinion. *Hood v. AU Optronics*, 701 F.3d 796, 801 (5th Cir. 2012).

but not limited to: monetary penalties, injunctions, forfeiture, "all damages of every kind sustained by him," forfeiture of charter, and forfeiture of the right to do business in Mississippi. See Miss. Code Ann. §§ 75-21-1; 75-21-7; 75-21-9; 75-21-19; see also *Mississippi ex rel. Hood v. Entergy Mississippi, Inc.*, 2019 WL 1433772 *1 (S.D. Miss. March 30, 2019).

If the Mississippi Attorney General seeks an injunction using Miss. Code Ann. § 75-24-9, she may also seek a civil penalty of up to ten thousand dollars ($10,000) per violation under Miss. Code Ann. § 75-24-19(1)(b). In addition, "The court may make such additional orders or judgments, including restitution." Miss. Code Ann. § 75-24-11. The availability of all possible remedies is underscored in Miss. Code Ann. § 75-24-23 which states, "The remedies in this chapter are in addition to and not in derogation of remedies otherwise available under federal, state or local law to the attorney general." Secondly, Miss. Code Ann. § 75-21-1 specifically states that those who violate Mississippi antitrust law is subject to additional penalties along with "all damages of every kind" (emphasis added) in addition to a five hundred dollar ($500) penalty. Miss. Code Ann. § 75-21-9;  See also Miss. Code Ann. § 75-21-19.

Defendants also erroneously and without authority claim that no conduct similar to that alleged in our complaint has been found by a Mississippi court to be a violation of the MCPA. Def. Jt. Mem. at 17. Similar to the price-fixing allegations in the present case, pharmaceutical defendants' practice of reporting inaccurate prices knowingly relied on by the State in determining Medicaid payments was held by the Mississippi Supreme Court to be an unfair and deceptive practice under the MCPA. *In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation*, 190 So.3d 829, 841-42 (¶ 24).  Both cases involve overcharging for drugs.  The Defendants here conspired and worked together to allocate markets, stifle

competition, and raise prices for their entire industry, thus violating not only the MCPA but also the Mississippi antitrust laws.

*Missouri*:  In a footnote, Defendants contend that the Missouri Attorney General does not have authority under the Missouri Merchandising Practices Act ("MMPA") to seek relief on behalf of its injured citizens. Def. Jt. Mem. 6-7, n.13. Defendants' argument is frivolous and is contradicted by the clear terms of the very statutory section they cite.  The fourth subsection of the same statute they quote expressly provides that the Attorney General can obtain "an order of restitution, payable to the state . . . to restore . . . any person who has suffered any ascertainable loss" as a result of any violation of the MMPA. Mo. Rev. Stat. § 407.100.4. The Attorney General's authority to pursue monetary claims on behalf of citizens is likewise supported by a mountain of case law. *See, e.g.*, *State ex rel. Nixon v. Am. Tobacco Co., Inc.*, 34 S.W.3d 122, 130 (Mo. 2000) (*en banc*) ("By the terms of the statute, it is entirely within the discretion of the attorney general whether to seek injunctive relief or restitution on behalf of the citizens of Missouri."); *State ex rel. Nixon v. Consumer Auto. Res., Inc.*, 882 S.W.2d 717, 721 (Mo. Ct. App. 1994) ("[MMPA] Section 407.100 sets forth several remedies available to the attorney general. Among the remedies authorized is restitution."); *State v. Polley*, 2 S.W.3d 887, 891–92 (Mo. Ct. App. 1999); *State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633, 637 (Mo. Ct. App. 1988).

Further, Defendants fundamentally misunderstand Missouri's claims when they contend that Missouri is precluded from seeking monetary relief for indirect purchasers because "Missouri's antitrust laws follow *Illinois Brick*."  Def. Jt. Mem. at 12-13, n.29. The Missouri Attorney General is seeking restitution for Missourians as allowed under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.100.4, not under the Missouri

Antitrust Law, Mo. Rev. Stat. § 416.011 *et seq*.  As explained in the very cases Defendants cited, *Illinois Brick* has no application to claims under the MMPA.

*Nevada*:  Defendants' motion seeking to bar Nevada from any monetary recovery should be denied.  Defendants argue that because one of the statutes asserted by Nevada - Nev. Rev. Stat. § 598.0963(3) - specifies only injunctive relief, that Nevada is not entitled to monetary recovery under any statute.  But Nevada has not limited its claim for monetary recovery to Nev. Rev. Stat. § 598.0963(3), or to the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §598, et seq. ("Nevada DTPA") as a whole. Rather, Nevada seeks monetary recovery under several provisions of the Nevada DTPA and the Nevada Unfair Practices Act, Nev. Rev. Stat. §598A, et seq. ("Nevada UTPA").

Defendants' interpretation of Nev. Rev. Stat. § 598.0963(3) is inconsistent with long-standing rules of statutory construction. Nev. Rev. Stat. § 598.0963(3) provides that when there is reason to believe a person is engaging in a deceptive trade practice, "the Attorney General may bring an action in the name of the State of Nevada. . . to obtain a temporary restraining order, a preliminary or permanent injunction, *or other appropriate relief*." Def. Jt. Mem., Sec. III(B) (emphasis added).  The quoted language is permissive concerning remedies available to the Attorney General.  Defendants urge this Court to render the words "or other appropriate relief" meaningless.  Such statutory construction would be inconsistent with the Nevada Supreme Court's instruction that, "…statutory interpretation should not render any part of a statute meaningless." *Leven v. Frey*, 123 Nev. 399, 405, 168 P.3d 712, 716 (2007), citing *Harris Assoc. v. Clark County School Dist.*, 119 Nev. 638, 642, 81 P.3d 532, 534 (2003).

Defendants' motion to dismiss all monetary recovery relies on a strained reading of Nev. Rev. Stat. § 598.0963(3) and ignores all other claims for monetary recovery under Nevada law.

For example, Nev. Rev. Stat. § 598.0953 provides that evidence that a person has engaged in a deceptive trade practice is prima facie evidence of intent to injure competitors and destroy or substantially lessen competition.  Thus, there is a nexus between the consumer protection laws in NRS Chapter 598 and antitrust laws in the Nevada UTPA.  Yet, Defendants ignore several sections of NRS 598 and NRS 598A that allow the State of Nevada to recover damages, restitution and disgorgement.

Under the Nevada DTPA, Nev. Rev. Stat. § 598.0975(1)(a) provides a framework for the deposit of monies collected in "an action brought by the Attorney General," and Nev. Rev. Stat. § 598.075(3)(b) details the deposit of monies collected as restitution "in an action brought by the Attorney General."  To determine that the Attorney General may not collect any monetary recovery, then, renders these two subsections of NRS 598.0975 superfluous, in conflict with Nevada law.  Nev. Rev. Stat. § 598.0999(3) provides that when a firm knowingly and willfully engages in a deceptive trade practice, in addition to criminal penalties, the court may also require that the firm pay damages and disgorgement, i.e., "damages on all profits derived from the knowing and willful engagement in a deceptive trade practice and treble damages on all damages suffered by reason of the deceptive trade practice."

Defendants also request that the court completely disregard Nevada's claims for monetary recovery under the Nevada UTPA.  Nev. Rev. Stat. § 598A.200 expressly allows the State of Nevada and its agencies to recover treble damages for violations of the Nevada UTPA, and those monies must be deposited pursuant to Nev. Rev. Stat. § 598A.260.

Finally, both the Nevada DTPA and Nevada UTPA allow private plaintiffs to recover actual, punitive and/or treble damages.  Nev. Rev. Stat. §§ 598.0977 and 598A.210(2).  Even

under the Defendants' strained analysis, all aforementioned provisions confirm that appropriate relief to the State includes damages.

*New Jersey*:  New Jersey does not seek to recover damages for "indirect" purchasers.

*New Mexico*:  The New Mexico Attorney General has broad authority "to represent and to be heard on behalf of the state when, in his judgment, the public interest of the state requires such action." N.M. Stat. Ann. § 8-5-2(J). This statutory authority has been interpreted to allow the Attorney General to bring *parens patriae* actions to enforce antitrust laws on behalf of the State's citizens. *New Mexico v. Scott & Fetzer Co.*, No. 81-cv-054, 1981 WL 2167, at *1–2 (D.N.M. Dec. 22, 1981); *see also In re Lorazepam*, 205 F.R.D. at 386 (citing *Scott & Fetzer* to recognize Attorney General's authority to bring *parens* claim on behalf of consumers).

Def. Jt. Mem. at 8 n.15, relies on *California v. Infineon Techs.*, 531 F. Supp. 2d 1124, 1168 (N.D. Calif. 2007), which overlooks the suite of statutory provisions that give the New Mexico Attorney General the power to seek damages on behalf of the State's residents. In addition to the broad authority allowing *parens* actions conferred by § 8-5-2, both New Mexico's Antitrust Act and Unfair Practices Act grant specific powers to the Attorney General to seek damages for violations of the statutes. The Antitrust Act specifies that the Attorney General may use his authority to bring actions on behalf of the State to seek damages for violations of the Antitrust Act, N.M. Stat. Ann. § 57-1-3(B), which are cumulative with other remedies available to the State. N.M. Stat. Ann. § 57-1-14.[7]

---

[7]Defendants cite to the definition of "person" in N.M. Stat. Ann. § 57-1-1.2 that excludes the State, presumably to suggest that this operates as a limitation to the State's authority to bring actions under the Antitrust Act. However, this carveout is better read as excepting the State from the "persons" subject to monopolization laws. *See* N.M. Stat. Ann. § 57-1-2 (1979). The Attorney General is expressly added to the "persons" who can bring damages actions under Subsection (A) of N.M. Stat. Ann. § 57-1-3 by Subsection (B).

This ability to seek damages for consumers under the Antitrust Act is confirmed by N.M. Stat. Ann. § 57-1-15, which provides that unless otherwise noted, the New Mexico Antitrust Act "shall be construed in harmony" with federal antitrust laws "to achieve uniform application." Because New Mexico has authority to seek damages on behalf of State residents under federal law, 15 U.S.C. § 15c, state law would be interpreted to extend the same capacity under state law. Similarly, New Mexico's Unfair Practices Act also allows the Attorney General to obtain restitution on behalf of consumers, in addition to the injunctive relief Defendants identify. N.M. Stat. Ann. § 57-12-8(B).

*New York*: The New York Attorney General is seeking monetary relief for New York consumers and New York public entities under N.Y. Exec. Law § 63(12).  Section 63(12) allows the Attorney General to recover "restitution and damages" from those who engage in "repeated fraudulent or illegal acts"  *Id.*  Section 63(12) does not limit those for whom the Attorney General can seek "restitution and damages."  Here, the Attorney General seeks "restitution and damages" for injured New York consumers and New York public entities.  Antitrust violations are "illegal" under section 62(12) and the Attorney General can seek "restitution and damages" for New Yorkers harmed by those "illegal" acts.  *In re Lorazepam*, 205 F.R.D. 369, 386 (D.D.C. 2002) (Section 63(12) provides the Attorney General "the functional equivalent of *parens patriae*" authority).  *See generally New York v. Feldman*, 210 F. Supp. 2d 294, 299-300, 302-03 (S.D.N.Y. 2002).

Section 63(12) does not require the New York Attorney General to individually identify in the pleadings the victims of the illegal acts.  Defendants cite *New York v. Cedar Park Concrete Corp.*, 665 F. Supp. 238, 241 (S.D.N.Y.) and N.Y. Gen. Law § 342-b to argue the contrary.  Def. Mem. at 2-3 & n.5.  In *Cedar Park*, New York did not act under section 63(12).

Moreover, the public victims of the construction bid-rigging at issue were public authorities, which are quasi-independent under New York law. One indication of how different public authorities are under New York law is that New York law has an entire separate chapter titled Public Authorities. The request requirement of section 342-b recognizes the significant independence possessed by public authorities, as is illustrated by the court in *Cedar Park* referring to "state-affiliated purchasers." 665 F. Supp. at 242 (quoted at Def. Jt. Mem. at 3 n.4.).

Similarly, section 63(12) does not require the victims to request that the Attorney General seek "restitution and damages" for them. Defendants argue that the New York Attorney General needs a request from "any political subdivision or public authority of the state" to the Attorney General under N.Y. Gen. Bus. Law section 342-a. Def. Jt. Mem. at 3-4. But section 63(12) is not limited by section 342-a, as is expressly stated in the introductory language of that section: "In addition to existing statutory authority." Moreover, the transactions by public entities identified here are by the State and the Attorney General represents the state under N.Y. Exec Law § 63(1). Medicaid is a state purchaser. The platform provided by the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) is for states, with the state defining and controlling what entities can purchase on the platform.

All of this is quite manageable. In *Lorazepam* and other cases, New York distributed settlement proceeds to New York consumers through a notice and claims process. In *Feldman* and other cases, New York contacted and distributed settlement proceeds to the victims identified within the investigatory and discovery record. Here, New York expects to distribute money to New York consumers through a notice and claims process built on the investigatory and discovery record and to New York public entities by contacting the entities identified in the investigatory and discovery record. New York has already identified New York public entities

to the Defendants in discovery.  The States, including New York, have provided detailed

transactional data for Medicaid.  The States, including New York, have provided detailed

transactional data from MMCAP.  The MMCAP transactional data includes a field for the state.

As New York long ago conveyed to Defendants, you can identify the specific New York entities

by sorting on that field and scrolling down the alphabetical listing to New York.

The Court need not address any New York law other than section 63(12) here, but the

Defendants are wrong about the New York Attorney General lacking *parens patriae* authority.

Def. Jt. Mem. at 7 & n.16.  When a quasi-sovereign interest is present, as here, the New York

Attorney General can seek damages for New York consumers under the common law in a *parens*

*patriae* capacity.  *People v. Grasso*, 836 N.Y.S.2d 40 (1st Dep't 2007), *aff'd*, 893 N.E.2d 105

(2008).  Securing an honest market place is the quasi-sovereign interest asserted here, which is

recognized under New York (and federal) law.  *People v. Liberty Mutual. Ins. Co.*, 861 N.Y.S.2d

294, 296 (1st Dep't 2008) ("injury to [New York's] quasi-sovereign interest in securing an

honest marketplace for all consumers" authorizes Attorney General to pursue damage claims in a

*parens patriae* capacity).

**North Carolina**:  Defendants challenge the North Carolina Attorney General's authority

to seek *parens patriae* damages under the Unfair or Deceptive Practices Act.  As the Attorney

General has informed the Defendants multiple times, North Carolina is not seeking damages in

this case, either directly or as *parens patriae* on behalf of another entity; its requested relief is

limited to penalties, disgorgement, and attorneys' fees and costs.  To be clear, however, the

North Carolina Attorney General does have the express authority to seek damages as *parens*

*patriae*.  The Attorney General has statutory authority to bring actions "in the name of the State

on relation of the Attorney General."  N.C.G.S. § 75-15; *see also* N.C.G.S. § 114-2(8)(a)

(authorizing the Attorney General to bring actions "for and on behalf of the using and consuming public of this State"). That statute constitutes "express statutory authority" for the Attorney General to represent consumers in a *parens patriae* fashion. *See In re Lorazepam and Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002).

*Ohio:* Defendants challenge the Ohio Attorney General's ability to seek equitable relief, by recasting Ohio's equitable disgorgement claims that ask the Court to not allow Defendants' to unjustly retain their ill-gotten gains, into allegedly improper indirect purchaser claims. Def. Jt. Mem. at 10-11, n.31, 35. Defendants' argument fails for the simple reason that Ohio does not seek claims on behalf of any purchaser; but instead seeks equitable monetary relief. As is stated in the complaint Ohio seeks "an injunction, disgorgement and civil forfeiture pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq, including Section 1331.03." Teva Amended Complaint, 19-CV-2407, ECF No. 106 ¶ 1609. Ohio is authorized to seek equitable monetary relief. *FTC v. Vyera Pharm., LLC*, No. 20cv706 (DLC), 2020 U.S. Dist. LEXIS 149542, at *38 (S.D.N.Y. Aug. 18, 2020) (confirming that Ohio is "allowed to" seek equitable monetary relief under the Valentine Act). Moreover, the Ohio Attorney General is bringing this law enforcement case because the Ohio Attorney General has an affirmative duty to "do all things necessary" to enforce the antitrust laws, by bringing suits for "equitable relief," O.R.C. § 109.81. There are no limitations on the kinds of equitable relief that Ohio may seek or that this Court can grant. *See generally* O.R.C. § 1331; O.R.C. § 109.81."Federal courts are courts in law and in equity, and a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999); *see also FTC v. Mylan Labs., Inc.*, 99 F.

Supp. 2d 1, 8 (D.D.C. 1999) (confirming Ohio's right to seek an equitable remedy in an antitrust action).

*Oklahoma:* Defendants erroneously assert that Oklahoma is seeking relief as an indirect purchaser of drugs at issue, and that Oklahoma cannot recover as an indirect purchaser, citing *Major v. Microsoft Corp.*, 60 P.3d 511 (Okla. Civ. App. 2002).   Def. Jt. Mem. at 12–13. Defendants then claim that because Oklahoma cannot claim compensatory damages as an indirect purchaser, "their antitrust claims for monetary relief...are therefore barred."  Def. Jt. Mem at 12.  This is a non-sequitur.  That Oklahoma does not claim indirect purchaser compensatory damages only means that Oklahoma cannot recover monetary relief based on indirect purchaser compensatory damages claims and has no effect on whether Oklahoma is entitled to other monetary remedies.  Oklahoma has, on numerous occasions, informed the Defendants that it is not seeking monetary compensatory damages or any such relief which could, in any way, posture Oklahoma as an indirect purchaser in this case. As Oklahoma has stated in its earlier disclosures to the Defendants, Oklahoma seeks equitable relief, notably, disgorgement, pursuant to state and federal law, and a reasonable attorney fee, pursuant to state law, should Oklahoma prevail.

*Pennsylvania*:  The conduct alleged by Pennsylvania is a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").[8] Contrary to Def. Jt. Mem. at 15-17, a UTPCPL claim under *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51 (Pa. Commw. 2019) ("*Anadarko*"), can allege anticompetitive conduct[9] within any of the 21

---

[8] 73 P.S. §201-1 *et seq.*

[9] The Defendants would have this Court believe that the Commonwealth merely alleged anticompetitive conduct in the absence of other qualifying conduct. In *Anadarko*, the

definitions of unfair methods of competition under the UTPCPL, including its catchall[10]

provision. *Anadarko*, 206 A.3d at 61. The anticompetitive conduct[11] alleged here includes market

allocation, price-fixing, bid-rigging and an overarching conspiracy, that is built on the foundation

of misrepresentation, misleading omissions and substantial unfairness, comprising conduct,

alleged as a whole, which is both deceptive and fraudulent under the UTPCPL's catchall.

*Anadarko*, 206 A.3d at 61.

　　Defendants' anticompetitive conduct is both (1) "deceptive"[12] and (2) "fraudulent"[13]

under the UTPCPL. Price-fixing, market allocation, and bid rigging, as alleged, are frauds on the

marketplace᷍ which the UTPCPL, as a general anti-fraud statute, is designed to prevent and

restrain. To achieve its objective, the "UTPCPL must be liberally construed to cover generally

*all* unfair and deceptive acts or practices in the conduct of trade or commerce." *Com. ex rel.

Corbett v. Peoples Benefit Servs., Inc.*, 895 A.2d 683, 696 (Pa. Commw. 2006) (emphasis in

original) (citing *Com., by Creamer v. Monumental Properties, Inc.*, 329 A.2d 812, 820 and 826

(Pa. 1974). "In accordance with this directive, Pennsylvania courts have held that even where the

---

Commonwealth Court stated that the anticompetitive conduct allegation *alone*, in Count III, does
not violate the UTPCPL. However, when the anticompetitive conduct allegation also includes
conduct that comes within one of the 21 definitions of unfair methods of competition under the
UTPCPL, as it does in Count IV, a legally viable claim has been articulated. *Anadarko*, 206
A.3d. at 61 (differentiation of the counts in *Anadarko* examined to state a viable claim). That is
the case here.

[10] 73 P.S. §201-2(4)(xxi).

[11] In *Anadarko*, the Commonwealth did not specifically plead or argue under the dismissed Count III of
the *Anadarko* complaint, on which Defendants appear to rely, that the market allocation was fraudulent
through violating another consumer-related law within the meaning of the catchall of the UTPCPL. The
Commonwealth, however, has done so here.

[12] Sec. Am. Compl., ¶¶ 1632-1645.
[13] Sec. Am. Compl., ¶¶ 1617-1631.

unlawful practice is directly addressed by another consumer-related statute, a plaintiff may nevertheless pursue his action under the UTPCPL since that statute is broad enough to encompass all claims of unfair and deceptive acts or practices in the conduct of any trade or commerce." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881–82 (Pa. 2007) ("*Ash*").

Here, as in *Anadarko*, the Commonwealth alleges deceptive conduct, as a separate violation of the UTPCPL's catchall, through misrepresentation and misleading omissions by Defendants that led consumers to believe that they were buying pharmaceuticals borne of a free and open market in which Defendants were holding themselves out as competing against one another and not artificially setting prices.[14] The alleged deceptive conduct denied consumers a range of price-competitive options from which they could meaningfully choose.[15]

Additionally, Defendants' violation of the Sherman Act and Pennsylvania antitrust common law is substantially unfair and fraudulent in violation of the UTPCPL's catchall provision.[16] An act or practice need not be deceptive to be declared "unfair." *Westfield Group v. Campisi*, 2006 WL 328415 at *18 (W.D. Pa. 2006); *Com. ex rel. Zimmerman v. Nickel*, 26 Pa. D & C 3d. 115, 120-21 (Pa. Com. Pl. 1983). The Pennsylvania Supreme Court has held that an unlawful practice addressed by another consumer-related statute may be pursued under the UTPCPL's catchall. *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881–82 (Pa. 2007); *see also Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 895 A.2d 683, 696 (Pa. Commw. 2006). The UTPCPL and the antitrust laws both prevent unfair advantage in the marketplace, in accord with the broad goals of the UTPCPL to "ensur[e] competitive fairness" through "ensuring the fairness

---

[14] Sec. Am. Compl., ¶¶ 118, 139, 158, 548, 648, 1118, and 1123 (examples, as alleged, of behavior to conceal and avoid detection of the alleged unlawful conduct).

[15] Sec. Am. Compl., ¶ 1639.

[16] Though overlooked by Defendants, the Commonwealth pled these violations of other consumer-related laws as UTPCPL violations through Sec. Am. Compl., ¶¶ 1625(g) and 1628.

of market transactions." *Danganan v. Guardian Prot. Servs.*, 645 Pa. 181, 194 (2018). Moreover,

the UTPCPL's federal precursor—Federal Trade Commission Act ("FTC Act")—deems a

violation of the Sherman Act to be a violation of the unfair and deceptive practices provisions of

the FTC Act[17] and Pennsylvania courts may look to decisions under the FTC Act for guidance

and interpretation.[18] Federal courts have consistently applied the FTC Act to encompass price-

fixing and other antitrust violations. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 851 F.

Supp. 2d 867, 900 (E.D. Pa. 2012) (citing *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 454

(1986)).  Moreover, this Court should apply the reasoning it applied to other state consumer

protection claims if it concludes that no direct and contrary state authority exists: "[w]hether

[Pennsylvania] can ultimately prove a consumer protection claim separate and apart from [its]

antitrust claim is not a question for resolution at this stage of litigation." *In re Generic*

*Pharmaceuticals Pricing Antitrust Litigation*, 368 F. Supp. 3d 814, 842 (E.D. Pa. 2019).

Next, Defendants invent a rule that the Commonwealth must allege a victim aged 60 or

older to seek enhanced civil penalties that it is found nowhere in statute or law.[19] Instead, civil

penalties are determined once the contours of liability are established. The UTPCPL clearly

empowers the Attorney General to seek civil penalties and, in turn, vests discretion in the court

to award them. 73 P.S. § 201-8(b). At this stage of the litigation, the Commonwealth is not

required under the UTPCPL to allege anything more than the conduct at issue violates Section 3

of the UTPCPL and such violation was done willfully.  73 P.S. § 201-8(b); *see Commonwealth*

---

[17] *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 689-95 (1948).

[18] *Com. Acting by Kane v. Flick*, 382 A.2d 762, 765 (Pa. Commw. 1978).

[19] In squarely rebutting Defendants' contention in their brief at footnote 22, the Commonwealth is not required to identify victims for purposes of disgorgement or civil penalties under the UTPCPL, but rather to describe them.  *Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 895 A.2d 683, 689–90 (Pa. Commw. 2006). We have done so here. Moreover, Defendants have equal access to third parties from whom they can get the information.

*of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at \*22 (E.D. Pa. Jan. 14, 2016) (explaining on motion to dismiss, "it is not necessary to plea the precise identity of consumers harmed by the Defendants nor the precise harm") (citing *Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 895 A.2d 683, 689 (Pa. Commw. 2006) (internal quotations omitted)). The specifics behind the calculation of civil penalties, inclusive of the age-based enhanced civil penalties, demanded by Defendants are evidentiary, not a matter for a motion to dismiss. *See, Com. ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 895 A.2d at 690 (Pa. Commw. 2006).

**Puerto Rico**:  Contrary to Def. Jt. Mem. at 13, the Puerto Rico Antitrust Act ("PRAA") provides that "*any person* who shall be injured in his business or property by any other person, by reason of acts or intended acts, forbidden or declared to be unlawful by the provisions of this chapter . . . may sue therefore."  P.R. Laws Ann. tit. 10, § 268(a) (emphasis added).  The statute does not limit standing to those who were "directly" impacted by the illegal activity.

To argue otherwise, Defendants cite an out-of-district case (*In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d (N.D. Ill. 2016)) that misconstrues federal precedent on "indirect" purchasers by holding, "*Illinois Brick* applies and bars indirect-purchaser actions in Puerto Rico."  *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016).  *Illinois Brick* emphatically does *not* control the construction of Puerto Rican law.  The Supreme Court made abundantly clear in *ARC America* that "the congressional purposes on which *Illinois Brick* was based provide no support for finding that state indirect purchaser statutes are preempted by federal law."  *ARC America*, 490 U.S. at 105-06.  *Illinois Brick*'s holding is neither binding nor persuasive when interpreting Puerto Rico's antitrust statute.  *See generally supra* at 2-3.

The federal district court in Puerto Rico has held that "indirect" purchasers can recover. *Rivera-Muniz v. Horizon Lines, Inc*., 737 F. Supp. 2d 57, 61 (D.P.R. 2010) ("It is immaterial whether Plaintiffs are direct or indirect purchasers.").  The decision of the federal court for that jurisdiction is preferred.  *See Jones Truck Lines v. Transport Ins. Co.*, Civ. A. No. 88-5723, 1989 WL 49517 (E.D. Pa. May 10, 1989) (holding that federal court should defer to local circuit's interpretation of state law, unless the circuit "'ignored clear signals emanating from the state courts' or 'clearly misread state law'") (quoting *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119 (D.C. Cir. 1986)). The federal court in Puerto Rico noted that although not expressly addressing whether "indirect" purchasers can recover, the Puerto Rico Supreme Court has held that Puerto Rico liberally construes its standing requirements in antitrust cases and that a plaintiff need only provide a causal connection between the violation of the law and the damage suffered, citing *Pressure Vessels R v. Empire Gas PR*, 137 D.P.R. 497, 519-20 (1994).

Moreover, the Puerto Rico Supreme Court has stressed that local antitrust law should be interpreted in a way that accounts for local economic conditions and realities.  *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, 153 D.P.R. 861, 874 (2001) ("It must be borne in mind that the application of these federal statutes does not constitute an occupied field.  When what is being applied is local law, the courts of Puerto Rico can interpret it in a different way that effectively addresses our reality and economic particularity.").  Indeed, in *P.R. Fuels, Inc. v. Empire Gas Co.*, 149 D.P.R. 691 (1999), the Puerto Rico Supreme Court rejected federal antitrust jurisprudence on the right of action for contribution by interpreting the local law differently.

The precedent from the Supreme Court of Puerto Rico is controlling and the Puerto Rico federal district court's ruling is persuasive.  Puerto Rico's antitrust laws do not require plaintiffs to be direct purchasers to have a damage claim.

***Puerto Rico's Unjust Enrichment Claim is Not Prohibited.***

Defendants argue that Puerto Rico cannot seek the remedy of unjust enrichment because there is a statute that provides other remedies.  Def. Jt. Mem. at 14-15.  Defendants cite *Westernbank Puerto Rico v. Kachkar*, No. 07- 1606 (ADC/BJM), 2009 WL 6337949, at *29 [sic: *99] (D.P.R. Dec. 10, 2009), quoting that "an unjust enrichment claim may stand only where no other law applies to the case." *Id*.  The statement ignores the facts of *Westernbank* and in so doing misstates the rule.  *Westernbank* involved a contract; the parties' remedies were limited to the contract remedies.

The case relied on by Puerto Rico in the Complaint, *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1994 WL 909605 (P.R. 1994), and cases cited therein, state the correct rule.  In *Hatton* the final element is described as "absence of a legal precept excluding application of enrichment without cause." *Id*. at Section V.  Here, as alleged, the Defendants have been enriched without just cause.  What is meant by "cause" is that the party enriched had lawful cause to be enriched. See *Andújar v. Commonwealth*, 122 P.R. Dec. 817 (1988):

> *As* to . . . . absence of cause, jurist Guaroa Velázquez advises: "We must
> under-score the fact that the word 'cause' does not have the meaning here that it
> has in contractual matters, instead it is understood to be a legal act that explains
> and justifies the acquisition of a benefit. . . . . enrichment is not unjustified as
> long as there is an equivalent contractual obligation or title acquired by purchase
> or by gift, or is the result of a legal or natural obligation." (citations omitted)
> Andújar v. Commonwealth, at III (21-22).

The Puerto Rico code section on which Puerto Rico relies in the AC is 10 P.R. Laws Ann. §§ 257 et seq.[to 274], and 32 P.R. Laws Ann. § 3341; these laws do not foreclose the remedy of unjust enrichment.  Section 259(a) declares that unfair methods of competition and unfair or deceptive acts or practices in trade or commerce are unlawful.  Puerto Rico law allows the court to determine what remedy to require; Sections 259(c) and (i) allow the court to

prescribe "the most appropriate remedy." 10 L.P.R.A. § 259 (c) and (i).  The Court could surely determine that unjust enrichment is an appropriate remedy in this case.

***Rhode Island:***  Rhode Island is suing Defendants under both the federal antitrust laws and the Rhode Island Antitrust Law ("RIAL").  Because the facts underlying the federal and state claims are identical, they create a "common nucleus of operative facts" and the Court may appropriately exercise federal supplemental jurisdiction over Rhode Island's RIAL claims.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988). Pursuant to the RIAL, Rhode Island is seeking civil penalties, disgorgement, and attorney's fees.  As Defendants correctly point out, Rhode Island is no longer seeking compensatory damages on behalf of the state's economy or consumers under the RIAL, nor is the State pursuing its claims under Rhode Island Deceptive Trade Practices law, R.I. Gen. Laws § 6-13.1 *et seq.*

The Attorney General is authorized by the RIAL to bring suits to enforce the state and federal antitrust laws on behalf of Rhode Island.  *See* R.I. Gen. Laws § 6–36–11(b).  This includes the power to bring federal antitrust claims in federal court.  *Id.*  Further, in addition to monetary damages, the RIAL provides for: civil penalties and equitable relief "reasonably necessary to dissipate the ill effects of the violation" *id* at § 6-36-10; as well as the "reasonable costs of suit and any reasonable attorneys' fees that may be granted at the discretion of the court." *id* at § 6-36-11(a); *see also id at* § 6-36-12.  Despite Defendants' assertion to the contrary, *see* Def. Jt. Mem. at 6, n.18 (arguing that Rhode Island is limited to seeking damages under the RIAL), Rhode Island has clear statutory authority to pursue its requested relief.  *See id at* §6-36-10(c) ("any person who violates this chapter may be liable for a civil penalty of not more than fifty thousand dollars ($50,000) for each violation").

Furthermore, as they have argued with respect to other state antitrust statutes, Defendants

seek to twist the language of the RIAL granting the Attorney General the ability to bring claims

in state court to somehow strip Rhode Island of its ability to prosecute its state claims alongside

its federal claims. *Compare* R.I. Gen. Laws §6-36-11(b) ("The attorney general …***may*** institute

on behalf of the state of Rhode Island … an action in superior court seeking appropriate relief"

(emphasis added) and R.I. Gen. Laws §6-36-12(a) ("The attorney general ***may*** bring a civil

action in superior court …" (emphasis added)) *with* Def. Jt. Mem. at 6, n.18 (stating that the

"attorney general is authorized to bring a civil action as *parens patriae* ***only*** 'in superior court.'"

(emphasis added)).  They do so without citing any caselaw or precedent.  Nor do they assert that

this Court lacks supplemental jurisdiction over those RIAL claims.  Provisions, like those in the

RIAL, creating state court jurisdiction to hear claims or providing the Attorney General authority

to bring claim in state court are not read to limit federal court jurisdiction.  *See In re Lorazepam*

*& Clorazepate Antitrust Litigation*, 62 F. Supp. 2d 25, 49-50 (D.D.C. 1999) (applying these

principles to a New York statute).  Indeed, federal courts routinely hear claims brought by the

California Attorney General under the Cartwright Act, which contains substantially similar

language to the RIAL.  Cal. Bus. & Prof. Code § 16760(a)(1) ("The Attorney General ***may*** bring

a civil action in the name of the people of the State of California, as *parens patriae* on behalf of

natural persons residing in the state, in the superior court of any county which has jurisdiction of

a defendant . . ." (emphasis added)); *e.g.*, *California v. eBay, Inc.*, No. 5:12-CV-05874-EJD,

2015 WL 5168666, at *2 (N.D. Cal. Sept. 3, 2015) (approving settlement negotiated by

California pursuant to § 16760(a)(1)).

*Tennessee*:  Defendants mischaracterize Tennessee law to assert that the Tennessee

Attorney General lacks *parens patriae* authority to enforce the Tennessee Trade Practices Act,

Tenn. Code Ann. § 47-25-101, *et seq.* Defendants rely on two decisions that are not binding on

this court: an unpublished trial court decision from 1980 (which has not been followed by any

appellate court), *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696 (Tenn.

Ch. Sept. 25, 1980), and a U.S. District Court case from outside Tennessee's local circuit.

*Infineon Techs.*, 531 F. Supp. 2d at 1164-65.

Defendants ignore that other courts, including the Sixth Circuit Court of Appeals, have

held that the Tennessee Attorney General has *parens patriae* authority as to its citizens' antitrust

claims for damages as part of his broad general powers to litigate on the public's behalf, which

originated under common law and are codified at Tenn. Code Ann. § 8-6-109 (describing duties

of Attorney General, declaring authority "to utilize and refer to the common law in cases in

which the state is a party"). The Sixth Circuit Court of Appeals agreed that objections to the

Attorney General's *parens patriae* authority lacked merit. *In re Cardizem CD Antitrust Litig.*,

391 F.3d 812, 818 (6th Cir. 2004); *see also In re Lorazepam*, 205 F.R.D. at 386 (state of

Tennessee had *parens patriae* authority to litigate and settle antitrust claims on behalf of

consumers) (citing Tenn. Code Ann. § 8-6-109, *State ex rel. Inman v. Brock*, 622 S.W.2d 36, 42

(Tenn. 1981), and *State v Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990)).

Because *Cardizem* was issued from the federal court of appeals most familiar with

Tennessee law, its conclusion that Tennessee's Attorney General is authorized to bring and settle

*parens* claims is instructive.[20] Accordingly, *Cardizem* certainly carries more weight than

---

[20] In *Infineon Techs.*, the Northern District of California rejected Tennessee's *parens patriae* claims in
error. 531 F. Supp. 2d at 1170-71. That court's holding contravenes the clear intent of the Tennessee
Supreme Court. Tennessee's Supreme Court and state appellate courts have consistently taken an
expansive view of the Attorney General's duty and authority to litigate, even where that authority is not
explicitly enumerated by statute. The Tennessee Attorney General "has all common law powers of office,
except insofar as they are restricted by statute, and the attorney general's duties are so numerous that the
legislature does not attempt to identify each by statute." *State v. Heath*, 806 S.W.2d at 537. "As the chief

*Infineon Techs.*, a district court decision from outside the Sixth Circuit. *Jones Truck Lines v. Transport Ins. Co.*, Civ. A. No. 88-5723, 1989 WL 49517 (E.D. Pa. May 10, 1989) (holding that federal court should defer to local circuit's interpretation of state law, unless the circuit "'ignored clear signals emanating from the state courts' or 'clearly misread state law'") (quoting *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119 (D.C. Cir. 1986)).

*Virginia*:  Defendants erroneously state that Virginia seeks relief as an indirect purchaser, and that Virginia's claims for monetary relief are barred.  Def. Jt. Mem. at 13 & n.34 citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1186 (N.D. Cal. 2009).  As counsel for the Commonwealth of Virginia has informed Defendants on multiple occasions, Virginia does not seek monetary damages or any relief as an indirect purchaser.  Virginia seeks civil penalties pursuant to Virginia Code  59.1-9.11, disgorgement pursuant to Virginia Code 59.1-9.15 and federal antitrust law, and reasonable attorney fees pursuant to Virginia Code  59.1-9.15 should Virginia prevail in the litigation.  Virginia does not seek compensatory damages for overcharges.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, holding that the Virginia Antitrust Act does not confer standing on indirect purchasers to recover damages for overcharges, is completely inapplicable, since Virginia does not seek to recover damages.  Defendants are

---

law enforcement officer of the state, the attorney general may exercise such authority as the public interest may require and may file suits necessary for the enforcement of state laws and public protection." *Id.*; *see also Brock*, 622 S.W.2d at 42 (rejecting challenge to Attorney General's authority to represent defendants *in quo warranto* action, holding that Tenn. Code Ann. § 8-6-109, "which describes the attorney general's duty to try cases…" is "very broad in both its specific language and intent"), citing with approval *Heath v. Cornelius*, 511 S.W.2d 683 (Tenn. 1974) ("A broad discretion is vested in this officer in determining what matters may, or may not, be of interest to the people generally. We must recognize the fact that the office of Attorney General is ancient in its origin in history, and it is generally held by the states of the Union that the Attorney General has a wide range of powers at common law. These are in addition to his statutory powers.").

confused or have not read either the case they rely on or the Commonwealth of Virginia's discovery responses.

*Washington*:  Defendants claim Washington may not pursue damages as *parens patriae*. Def. Jt. Mem. at 8 n.20.  Washington, in its *parens patriae* capacity, seeks restitution on behalf of persons residing in the state injured by Defendants' unlawful conduct.  *See id*. To the extent Defendants challenge Washington's *parens patriae* authority to seek monetary recovery on behalf of its injured citizens, Defendants are wrong.  Washington law is clear that restoring money to persons damaged as a result of Defendants unlawful acts is among the remedies a court may order when the Attorney General brings a *parens patriae* lawsuit under the Washington Consumer Protection Act ("CPA").  *See* RCW 19.86.080.  The CPA authorizes the Attorney General to "bring an action in the name of the state, or as *parens patriae* on behalf of persons residing in the state," and expressly provides that, in addition to injunctive relief and costs, "[t]he court may make such additional orders [for violations of RCW 19.86.030] as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired, regardless of whether such person purchased or transacted for goods or services directly with the defendant or indirectly through resellers."  RCW 19.86.080(3).  Indeed, the Attorney General has the exclusive authority to seek such monetary recovery on behalf of indirect purchasers.  *See id*.; *State v. LG Electronics, Inc*., 186 Wash. 2d 1, 10-11, 375 P.3d 636, 641 (2014).

To the extent Defendants are suggesting that Washington seeks damages for state agencies under its *parens patriae* authority, their argument is misguided; Washington has not asserted any such claim.  Washington can and does seek damages sustained by the State of Washington, including state agencies.  *See* RCW 19.86.090 (allowing the Attorney General to

recover damages for state agencies for violations of 19.86.030); Dkt. 106 at ¶ 1712 (Washington is seeking damages for "Washington state agencies that paid more for the generic drugs at issue than they would have paid but for the Defendants' unlawful conduct."). Washington identified these agencies in discovery. *See* Dkt. 106, at ¶ 1712. Finally, Washington seeks to obtain injunctive relief, equitable relief (including disgorgement), civil penalties, and attorneys' fees and costs. *Id.*

*Wyoming*: Defendants, and the out-of-district case invoked by Defendants, rely misguidedly on *Herrig v. Herrig* for the assertion that allegations of price fixing and market allocation do not state a claim under Wyo. Stat. Ann. § 40-12-105(a)(xv). Def. Mem. at 17, citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 909-910 (N.D. Cal. 2008); *Herrig v. Herrig*, 844 P.2d 487 (Wyo. 1992). Importantly, *Herrig* is a case about insurance claims, not consumer protection law. It stands only for the narrow proposition that the Wyoming Consumer Protection Act does not "create a private cause of action for third-party claimants to sue a tortfeasor's liability insurer over settlement disputes." *Id.* at 495.

Notably, of the eight-page *Herrig* opinion, only one paragraph discusses Wyoming's Consumer Protection Act. *Id.* at 495-496. In this single paragraph, one sentence of dicta suggests that the Act primarily addresses unscrupulous and fraudulent marketing practices. *Id.* However, the Wyoming Consumer Protection Act's plain language shows legislative intent that the Act extend beyond marketing. Notably, the Act contains no language limiting its scope to marketing. To the contrary, § 40-12-105(a) broadly prohibits unlawful and deceptive "trade practices," not just fraudulent marketing practices. What is more, the Act is remedial in purpose—designed to protect the public from unlawful trade practices. *See Showpiece Homes Corp. v. Assurance Co. of America*, 38 P.3d 47, 50-51 (Colo. 2001) (noting that punishing and deterring deceptive trade

practices is a remedial purpose). As such, the Act should be construed liberally to effectuate this purpose by finding that "unfair" or "deceptive" trade practices encompass Defendants' anti-competitive conduct. *See Houghton v. Franscell*, 870 P.2d 1050, 1052 (Wyo.1994).

Additionally, Wyoming's antitrust law expressly does not provide the exclusive mechanism for remedying anticompetitive conduct. *See* Wyo. Stat. Ann. § 40-4-105 ("Nothing in this act . . . shall be construed as repealing any other act or part of an act, but the remedies herein provided shall be cumulative to all other remedies, provided by law"). Wyoming's Consumer Protection Act contains a similar cumulative remedies provision. Wyo. Stat. Ann. § 40-12-114(a). As such, these public protection enforcement frameworks are meant to operate cumulatively and concurrently, not exclusively. These provisions are also significant in distinguishing *Herrig* because the Wyoming Insurance Code includes no such provision. *See* Wyo. Stat. Ann. § 26-1-101 *et seq.*

Finally, while the Wyoming Supreme Court has not addressed the exact issue, its decisions suggest that § 40-12-105(a)(x) encompasses anticompetitive behavior. When a Wyoming statute is similar to a federal statute, the Wyoming Supreme Court looks to federal case law interpreting the comparable federal statute. *See, e.g.*, *Pool v. State*, 2001 WY 8, ¶ 12, 17 P.3d 1285, 1288 (Wyo. 2001). Here, the Wyoming Supreme Court would look to federal courts interpreting the Federal Trade Commission Act, which like § 40-12-105(a)(xv) declares unlawful "unfair or deceptive acts or practices." *Compare* Wyo. Stat. Ann. § 40-12-105(a)(xv) *with* 15 U.S.C. § 45(a)(1). Those federal courts have consistently applied the Federal Trade Commission Act to encompass price-fixing and other antitrust-type violations. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 900 (E.D. Pa. 2012) (citing *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 454 (1986)). Accordingly, if considered, the Wyoming Supreme Court

would likely hold that the Act's prohibition on "unfair or deceptive acts or practices" encompasses the same anticompetitive conduct violating antitrust laws.

In short, given the absence of direct authority from the Wyoming Supreme Court and binding authority from the Third Circuit, this Court should apply the same reasoning it has applied to other state consumer protection claims where no direct and contrary state authority exists. Specifically, Wyoming's Consumer Protection Act claims should survive because "[w]hether [Wyoming] can ultimately prove a consumer protection claim separate and apart from [its] antitrust claim is not a question for resolution at this stage of litigation." *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 368 F. Supp. 3d 814, 842 (E.D. Pa. 2019).

### Conclusion

For the foregoing reasons, the States respectfully request that Defendants' Joint Motion to Dismiss State Law Claims be denied in its entirety.

Respectfully,

STATE OF CONNECTICUT
WILLIAM TONG
CONNECTICUT ATTORNEY GENERAL

*/s/ Joseph Nielsen*
Joseph Nielsen
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5040
Joseph.Nielsen@ct.gov

*/s/ Rachel Davis*
Rachel Davis
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5041
Rachel.Davis@ct.gov
Augusta, ME 04333

STATE OF NEW YORK
LETITIA JAMES
NEW YORK ATTORNEY GENERAL

*/s/ Robert L. Hubbard*
Robert L. Hubbard
Assistant Attorney General
Office of the Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-8267
Robert.Hubbard@ag.ny.gov

*/s/ Christina Moylan*
Christina Moylan
Assistant Attorney General
Office of the Attorney General of Maine
6 State House Station
(207) 626-8838
Christina.Moylan@maine.gov

EXHIBIT A

Oregon Antitrust Act

Defendants have brought a broad motion to dismiss all disgorgement claims based upon state law, without providing any analysis specific to any state's respective antitrust laws. As an an example, Oregon's Antitrust Act provides the Oregon Attorney General express authority to secure equitable relief, including disgorgement. Defendant's motion is without merit regarding Oregon's claims.  Oregon's antitrust act specifically provides the Oregon Attorney General ("Oregon AG") authority to bring a variety of enforcement and damages claims.  In this case the Oregon AG has brought claims as parens patriae on behalf of natural persons pursuant to ORS 646.775, agency damages claims under ORS 646.780 and civil penalties as provided for in ORS 646.760.

ORS 646.775 provides the Oregon AG with plenary power to secure equitable relief including the equitable claims of unjust enrichment and the disgorgement of profits. Defendant's incorrectly rely upon *Liu*, as the Oregon Legislature has been explicit that the statutory framework did and does not erase the Attorney General's authority to bring equitable claims under her *parens patriae* authority, stating:

> The powers granted in this section are in addition to and not in derogation of the common law powers of the Attorney General to act as parens patriae, or the powers of the Attorney General to sue as a representative party on behalf of a class pursuant to ORCP 32.  ORS 646.775(6).

More importantly, ORS 646.775(1) expressly allows the Oregon AG to bring a civil action to secure equitable relief including disgorgement:

> The Attorney General may bring a civil action in the name of the State of Oregon, on behalf of a political subdivision….or as parens patriae on behalf of a natural person…*to secure equitable and monetary relief a provided in this section for injury sustained…regardless of whether the natural person or political subdivision dealt directly or indirectly with the adverse party.*

Thus, the plain language of the statute authorizes equitable **and** monetary relief for injury sustained.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, C 10-4346 SI, 2011 WL 2790179, at *3 (ND Cal July 12, 2011). In *LCDs* the court confirmed the parens patriae power of the Oregon AG includes the right to seek injunctive relief, including unjust enrichment, disgorgement of profits, and restitution.

This result also is consistent with Oregon common law as "equitable relief" has consistently been construed to include restitution and disgorgement of profits.  See *Kerr v Miller*, 159 Or. App. 613, 630 977 P.2d 438 (1999) (determining that equitable remedy of unjust enrichment required not only making the plaintiff whole, but disgorgement of profits); *State v. Bauman*, 7 Or. App. 489, 492 P.2d 869 (1971) (in parens action to protect the general public, the Oregon Attorney General was authorized to "bring a suit such as the one here"); *People v. Debt Reducers, Inc.*, 5 Or. App. 322, 484 P.2d 869 (1971) (in parens action to protect the public interest "the state derives from the common law the power in general to bring a suit such as this").   This Court should deny Defendants motion to dismiss any portion of the Oregon AG's claims.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court by using the CM/ECF system, which will serve a copy on all interested parties registered for electronic filing.

<u>/s/ Arlene Leventhal</u>
Arlene Leventhal
Legal Assistant 2
New York State Office of Attorney General
Antitrust Bureau
28 Liberty Street
New York, NY  10005