**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724 16-MD-2724 <br><br> HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: <br><br> *Connecticut et al. v. Teva Pharmaceuticals USA Inc. Inc., et al.* | Civil Action No. 2:19-cv-2407-CMR |

**PLAINTIFF STATES' CONSOLIDATED MEMORANDUM
IN OPPOSITION TO VARIOUS INDIVIDUAL DEFENDANTS'
MOTIONS TO DISMISS THE PLAINTIFF STATES' AMENDED COMPLAINT[1]**

---

[1] This Consolidated Memorandum in Opposition responds to the separate motions to dismiss filed by the following individual defendants, with the court document number assigned to their motion to dismiss in Case No. 2407:  David Berthold [Doc. 184]; James Brown [Doc. 191]; Tracy Sullivan DiValerio [Doc. 187]; Marc Falkin [Doc. 190]; James Grauso [Doc. 182]; Konstantin Ostaficiuk [Doc. 185]; David Rekenthaler [Doc. 188]; Richard Rogerson [Doc. 183].

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STANDARD OF REVIEW .................................................................................................. 2

ARGUMENT ........................................................................................................................ 2

    I.      The States Adequately Plead a Sherman Act Section 1 Claim Against Each
           Individual Defendant. ....................................................................................... 2

          A.      David Berthold ........................................................................................ 4
          B.      James Brown ........................................................................................... 9
          C.      Tracy Sullivan DiValerio ("Sullivan") ................................................. 15
          D.      Actavis Executives:  Marc Falkin and Richard Rogerson ...................... 19
          E.      James Grauso ....................................................................................... 31
          F.      Konstantin Ostaficiuk ......................................................................... 36

    II.      The States' Claims Against the Individual Defendants Are Timely.................... 45

          A.      The States Have Alleged a Conspiracy Continuing into the Period that Is
               Within Four Years of the Filing of the Original Complaint. .................... 46
          B.      The Continuing Acts of Co-conspirators Are Attributed to Each of the
               Individual Defendants................................................................................ 46
          C.      No Individual Defendant Effectively Withdrew from the Conspiracy or
               Took Affirmative Acts to Limit His or Her Liability. .............................. 47
          D.      The Statute of Limitations Was Tolled by the Self-Concealing Conspiracy.
               ....................................................................................................... 48
          E.      The Statute of Limitations Arguments of Each Individual Defendant Fail
               to Show that the States' Claims Are Time-Barred................................... 52

               1.      David Berthold........................................................................... 52
               2.      James Brown ............................................................................. 53
               3.      Tracy Sullivan DiValerio ("Sullivan") ...................................... 54
               4.      Marc Falkin ............................................................................... 55
               5.      James Grauso ............................................................................ 56
               6.      Konstantin Ostaficiuk ............................................................... 58
               7.      David Rekenthaler ..................................................................... 59
               8.      Richard Rogerson....................................................................... 64

    III.     The State Law Claims Should Not Be Dismissed. ............................................... 65

CONCLUSION..................................................................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011).............................................................................. 40, 41

*Erie County, Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ........................................................................... 40, 41

*In re Aspartame Antitrust Litig.*,
    No. CIV.A.2:06-CV-1732, 2007 WL 5215231 (E.D. Pa. Jan. 18, 2007).............. 48, 49, 51, 52

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)..................................................................................... 40

*In re Blood Reagents Antitrust Litig.*,
    266 F. Supp. 3d 750 (E.D. Pa. 2017) ....................................................................... 40

*In re Chocolate Confectionary Antitrust Litig.*,
    999 F. Supp. 2d 777 (M.D. Pa. 2014) ...................................................................... 40

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................................. 40

*In re Domestic Drywall Antitrust Litig.*,
    163 F. Supp. 3d 175 (E.D. Pa. 2016) ....................................................................... 43

*In re Elevator Antitrust Litig.*,
    No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006)................... 12

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)....................................................................................... 12

*In re Fasteners Antitrust Litig.*,
    No. CIV.A. 08-MD-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011)......................... passim

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)..................................................................................... 40

*In re Generic Pharm. Pricing Antitrust Litig.*,
    315 F. Supp. 3d 848 (E.D. Pa. 2018) ................................................................... 3, 24

*In re Generic Pharm. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................ passim

*In re High Fructose Corn Syrup Antitrust Litig.*,
    293 F. Supp. 2d 854 (C.D. Ill. 2003) ....................................................................... 62

*In re OSB Antitrust Litig.*,
    No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ........................................... 3

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) ................................................................................. 33

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ................................................................................ 60, 61

*Krause v. Perryman*,
    827 F.2d 346 (8th Cir. 1987) .......................................................................... 62

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) ........................................................................ 62

*Pelletier v. Endo Int'l PLC*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) ............................................................. 30

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993) .......................................................................... 40

*Pope v. Bond*,
    641 F. Supp. 489 (D.D.C. 1986) .................................................................... 62

*Resco Prods., Inc. v. Bosai Minerals Group Co., Ltd.*,
    158 F. Supp. 3d 406 (W.D. Pa. 2016) ............................................................ 40

*State of New York v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988) .................................................................... 50, 54

*Tech., Inc. v. Nat'l Fuel Gas Co.*,
    685 F.2d 41 (2d Cir. 1982) .............................................................................. 40

*United States v. Antar*,
    53 F.3d 568 (3d Cir. 1995) .................................................................. 47, 61, 63

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ............................................................................ 33

*United States v. Bailey*,
    840 F.3d 99 (3d Cir. 2016) ........................................................................ 47, 54

*United States v. Cont'l Grp., Inc.*,
    603 F.2d 444 (3d Cir. 1979) ............................................................................ 47

*United States v. Kushner*,
    305 F.3d 194 (3d Cir. 2002) ..................................................................... passim

*United States v. Patel*,
    879 F.2d 292 (7th Cir. 1989) .............................................................. 48, 57, 61

*United States v. Steele*,
    685 F.2d 793 (3d Cir. 1982) ............................................................................ 62

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ............................................................................ 29

### Statutes

15 U.S.C. § 15b ...................................................................................................... 46

## INTRODUCTION

The Individual Defendants'[2] motions to dismiss generally raise two arguments.  First, they claim that the Plaintiff States' ("States") allegations are not enough to sustain the claims against them.  This argument fails because the Individual Defendants ignore the standards that must apply on a motion to dismiss—including that the Court accepts the allegations as true and draws all logical inferences in favor of the States, considers plausibility, not probability, and views the allegations in context and as a whole—and because the Individual Defendants refuse to accept that the States' numerous and very detailed allegations against them meet these standards.  In short, the Individual Defendants overlook the clear guidance that this Court has given in its previous opinion in this MDL denying motions to dismiss.  *See In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. 2018) (Rufe, J.).

Second, the Individual Defendants argue that the States' claims are time-barred.  For several reasons set forth herein—including that the States have alleged a conspiracy continuing into the limitations period and that the statute of limitations is tolled by the doctrine of fraudulent concealment because the conspiracy alleged is inherently self-concealing and because the States have alleged actual acts of concealment—this argument also fails.

Thus, the Individual Defendants' motions to dismiss must be denied.

---

[2] As used herein, "Individual Defendants" (or "Individual Defendant" in the singular) refers to the individual defendants in the States' Amended Complaint who filed his or her own motion to dismiss the claims against the individual.  *See* footnote 1.  These Individuals Defendants are: David Berthold, James Brown, Tracy Sullivan DiValerio ("Sullivan"), Marc Falkin, James Grauso, Konstantin Ostaficiuk, David Rekenthaler, and Richard Rogerson.

## STANDARD OF REVIEW

This Court has previously described the standard of review for a motion to dismiss under

Rule 12(b)(6):

> [J]udging the sufficiency of a pleading is a context-dependent exercise.  On a motion to dismiss, the Court consider[s] plausibility, not probability . . . .  In other words, Plaintiffs are not required to plead facts that, if true, definitely rule out all possible innocent explanations.  Rather, to withstand dismissal, Plaintiffs must state enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement even if the court believes such proof is improbable.
>
> . . . .
>
> In determining whether to grant . . . Defendants' motions to dismiss, the Court must ordinarily consider only those facts alleged in the complaints, accepting the allegations as true and drawing all logical inferences in favor of the non-moving parties.  [T]he allegations in [each] Complaint must be viewed as a whole.

*In re Generic Pharm.*, 338 F. Supp. 3d at 435–36 (internal quotation marks and citations omitted).

To survive a motion to dismiss, the complaint "need only give the defendant fair notice of what

the claim is and the grounds upon which it rests."  *Id.* at 440 (internal quotation marks omitted).

## ARGUMENT

## I.    The States Adequately Plead a Sherman Act Section 1 Claim Against Each Individual Defendant.

Seven of the Individual Defendants[3] argue, incorrectly, that the States' Amended

Complaint ("Am. Compl.")[4] fails to sufficiently plead a claim against him or her.  These arguments

---

[3] All of the Individual Defendants, except David Rekenthaler, argue that the States' Amended Complaint does not sufficiently allege a claim against him or her.  Rekenthaler's motion to dismiss does *not* argue that claims against him were insufficiently pleaded.  Instead, his motion to dismiss is based solely on the statute of limitations arguments that are addressed in Section II. *See* Defendant David Rekenthaler's Memorandum of Law in Support of His Motion to Dismiss the Plaintiff States' Amended Complaint [Doc. 188-1, Case No. 2407].

[4] Document 106 in Civil Action No. 19-CV-2407-CMR filed on November 1, 2019.

must be rejected.  The States' allegations against all of these Individual Defendants significantly exceed the standard necessary to survive a motion to dismiss.

This Court has explained what the States must plead for a viable claim under Section 1 of the Sherman Act, as well has how such claims should be analyzed on a defendant's motion to dismiss:

> To plead a Section 1 claim, [the] complaint[] must include enough factual matter (taken as true) to suggest that an agreement was made.  The crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express.  An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme.  [T]he issue is whether the pleading delineates to some sufficiently specific degree that a defendant purposefully joined and participated in the conspiracy. . . .
>
> To evaluate the articulated allegations as to an individual defendant in the context of a multi-defendant, multi-faceted conspiracy, the conspiracy must not be compartmentalized. . . .  To provide reasonable notice to a specific defendant of the claim(s) against it, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy.

*Id.* at 437–38 (internal quotation marks and citations omitted).  *See also In re Generic Pharm. Pricing Antitrust Litig.*, 315 F. Supp. 3d 848, 853 (E.D. Pa. 2018) (Rufe, J.) ("An antitrust complaint is sufficient if it contains enough factual matter (taken as true) to suggest that an agreement was made.  As long as the facts pleaded provide plausible grounds to infer an agreement, a well-pleaded complaint may proceed even if it seems that actual proof of those facts is improbable . . . ." (internal quotation marks and citations omitted)).

Further, at the motion to dismiss stage, "the law does not require [the States] to allege with particularity precisely how each Defendant participated in the conspiracy."  *In re Fasteners Antitrust Litig.*, No. CIV.A. 08-MD-1912, 2011 WL 3563989, at *9 (E.D. Pa. Aug. 12, 2011).  *See also In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant.").

Finally, the States "may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two." *In re Generic Pharm.*, 338 F. Supp. 3d at 438 (internal quotation marks omitted).  The States "may withstand dismissal by relying on allegations of circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy. [H]eightened fact pleading of specifics is not required to state a claim . . . ." *Id.* at 440 (internal quotation marks and citations omitted).

Applying these standards to each Individual Defendant, as set forth in the following sections, the States' allegations are undoubtedly sufficient to survive each Individual Defendant's motion to dismiss.

### A.      David Berthold

The States' allegations against Defendant David Berthold ("Berthold") are sufficient to plausibly suggest that he joined and participated in the conspiracy.  The Amended Complaint is replete with hundreds of paragraphs detailing Lupin's collusive conduct with its competitors. Berthold, the Vice President of Sales at Lupin, Am. Compl. ¶ 34, was the Lupin representative in these competitor relationships.  The Amended Complaint contains detailed factual allegations for multiple conspiracies between Lupin and its competitors, and describes Berthold's active role in the conspiracies.

For example:

- In May 2012, Lupin and Aurobindo were preparing to enter the market for Lamivudine/Zidovudine (generic Combivir) and join Teva. *Id.* ¶¶ 258–59.  Before Lupin and Aurobindo obtained FDA approval, the competitors were communicating with each other about how to share the market, including communications involving Defendants David Rekenthaler and Kevin Green (Teva) with *Berthold (Lupin)* and Grauso (Aurobindo), *id.* ¶ 260, including where *Green called Berthold* and Grauso to confirm information that Rekenthaler had obtained from Aurobindo.  *Id.* ¶ 261.  Later that month, shortly before Lupin and Aurobindo were to enter the market, the competitor communications between all three competitors accelerated substantially, including numerous calls among *Grauso, Berthold (Lupin), and Green (Teva)* over a four-day period. *Id.* ¶ 263.  During this

time, these three competitors, *including Berthold*, were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin's and Aurobindo's entry into the generic Combivir market as seamless as possible. *Id.* ¶ 264. *Berthold, Grauso, or Green* would call one of the group and then call the third person to fill them in. *Id.*

As a result of all these communications, the competitors reached agreement regarding the allocation of customers for the generic Combivir market, *id.* ¶ 265, and the new entrants (Lupin and Aurobindo) were able to enter the market without significantly eroding the price due to the understanding among Teva, Lupin, and Aurobindo that each was entitled to its fair share of the market. *Id.* ¶ 269. *See id.* ¶¶ 257–69 for the entire narrative related to the market allocation for generic Combivir.

- In March 2012, when Teva was preparing to enter the market for generic Irbesartan. *Id.* ¶ 271. Teva internally polled its sales team seeking information about competitors that were also making offers to supply Irbesartan. *Id.* at ¶ 272. An account manager at Teva responded: "Lupin is promising offers today." *Id.* at ¶ 273. That day and the next day, *Green (Teva) and Berthold (Lupin)* had two conversations in which *Berthold shared with Green* competitively sensitive information—including the market share that Lupin was seeking (15%), which competitors were launching/not launching the drug, and the identity of the customers that received offers. *Id.* ¶¶ 273, 275. As a result of the competitively sensitive information that Berthold shared with Green (Teva), Teva determined that it was in a position to take up to a 40% market share when it entered the market. *Id.* ¶ 275.

- In April, May, and July 2013, Teva was engaged in communications with Actavis and Lupin regarding Lupin's entry into the market for Drospirenone and ethinyl estradiol (commonly known by the brand name Ocella) to ensure that the competitors would reach a fair share deal. These communications included calls between *Green (Teva) and Berthold (Lupin)* when *Berthold contacted Green* to initiate negotiations on how the competitors would allocate fair share between themselves. *Id.* at ¶ 279. As the parties worked out the details of their arrangement to allocate the market for Ocella, *Berthold spoke several times with Patel and Green of Teva*. *Id.* ¶¶ 282–84, 286–88, 290. As a result of these communications by Berthold with Teva, Teva and Lupin reached an agreement regarding the allocation of accounts between them. *Id.* ¶ 292. *See* ¶¶ 276–92 for the entire narrative regarding Ocella and the coordination among Teva, Actavis, and Lupin.

- In May 2013, as Mylan was preparing to enter the market for Fenofibrate, in which Teva and Lupin were the only major suppliers of the generic drug, *id.* ¶ 169, Teva, Mylan, and Lupin were in regular contact by phone and shared information regarding Mylan's launch of the product and the competitors' plans to allocate market share to Mylan. *Id.* ¶ 172. As part of this coordinated web of phone calls among the competitors, *Berthold (Lupin) had several phone calls with Patel and Green (both of Teva) and Defendant James Nesta (Mylan)*. *Id.* ¶¶ 172–73, 175,

177.   As a result of these numerous competitor communications, including *Berthold's communications with Patel (Teva) and Nesta (Mylan)*, the competitors reached agreement on a market allocation scheme.  *Id.* ¶¶ 176–77.  (To effectuate this market allocation agreement, Teva (through Defendant Kevin Green), kept in frequent contact with both *Lupin (Berthold)* and Mylan (Nesta).  *Id.* ¶ 432.)  *See id.* ¶¶ 168–77 for the entire narrative regarding Fenofibrate and the coordination among Teva, Mylan, and Lupin.

- In October 2013, *Berthold communicated with Teva* (with Defendant Rekenthaler and "T.S.") regarding Lupin's upcoming price increase on Cephalexin Oral Suspension.  *Id.* ¶¶ 753–56.  As a result of this price-increase information *from Berthold*, when a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase, Teva declined to provide a bid and instead put Cephalexin on its price increase list, with *Patel coordinating the price increase with Berthold (Lupin).  Id.* ¶¶ 758–59.  As a result of the coordination between Berthold and Patel, by April 2014, Teva increased its WAC prices for Cephalexin Oral Suspension to exactly match Lupin's prices.  *Id.* ¶¶ 760.  *See also id.* ¶ 744–46, 748–49 (identifying *Patel's communications with Berthold* as Teva prepared for its April 4, 2014 price increases, which included following Lupin's price increase on Cephalexin Oral Suspension).

- In January 2014, Teva learned that a new competitor was entering the market for Norethindrone/ethinyl estradiol (Balziva) and was seeking a share of Teva's business.  *Id.* ¶ 294.  In response to this information, *Patel (Teva) spoke to Berthold (Lupin)* multiple times to discuss how to share the market and to coordinate Lupin's seamless entry into the market.  *Id.* ¶ 296, 298.  As a result of the communications between Patel and Berthold, Patel recommended that Teva concede part of its business to Lupin.  *Id.* ¶ 297.  *See* ¶¶ 293–98 for the entire narrative regarding Norethindrone/ethinyl estradiol (Balziva).

- In February 2014, when Zydus was preparing to launch into the Fenofibrate market, Defendant Green, now at Zydus, colluded with several competitors, *including with Berthold (Lupin)* to share pricing information and allocate market share to his new employer, Zydus.  *Id*. ¶ 433.  In March 2014, Zydus entered the market at WAC pricing that matched Teva, Mylan, and Lupin.  *Id.* ¶ 436.  In the days leading up to Zydus's launch, the four competitors were in regular contact to discuss pricing and allocating market share to Zydus, including calls that *Berthold (Lupin) had with Green (Zydus) and Patel (Teva).   Id.*   The competitors continued their communications, including calls between *Patel and Berthold, id.* ¶ 441–42, as they worked out the allocation of customers.  *See* ¶¶ 431–47 for the entire narrative regarding Fenofibrate and the coordination among Teva, Mylan, Lupin, and Zydus.

- In February 2014, after Teva learned that Lupin would be entering the market for Niacin Extended Release (ER), Teva began planning to increase the price for the drug.  The same day that Patel (Teva) received the price-increase instructions, *she contacted Berthold (Lupin), id.* ¶ 732, and within a week, Teva was ready to implement the price increase.  *Id.* ¶ 733.  Having coordinated the price increase,

6

Teva then began taking steps to divvy up the Niacin ER market with Lupin, the new entrant, to avoid competition that would otherwise erode Teva's high pricing.  *Id.* ¶ 734.  On the same day that Patel discussed creating a "loss of exclusivity" plan for Niacin ER, *Patel called Berthold*, and *Patel and Berthold* had several other calls through which Teva and Lupin agreed which customers Teva would concede to Lupin when it entered the market.  *Id.* ¶ 734–36.  These communications allowed Lupin to enter the market with little or no price erosion.  *Id.* ¶ 737.  After Lupin entered the market, *Patel and Berthold* continued to coordinate to make sure that Lupin obtained the agreed-to customers.  *Id.* ¶ 738.  *See* ¶¶ 729–39 for the entire narrative regarding Niacin ER; *see also* ¶ 129.

- In September 2014, Camber was preparing to enter the market for generic Combivir and join Teva, Lupin, and Aurobindo in that market.  As part of Camber's preparation to enter the market, Defendant Ostaficiuk of Camber engaged in communications with Rekenthaler (Teva) and *Berthold* (Lupin).  *Id.* 1098.  That same day, *Berthold also spoke with a senior executive at Aurobindo* to "close the loop" on the communications related to Camber's entry into the market.  *Id.*

In addition to these many drug-specific communications and agreements involving Berthold, the States allege that Berthold was key to the relationship between Lupin and Teva.  In Defendant Patel's initial May 2013 quality competitor ranking list, Lupin was given a ranking of +2.  *Id*. ¶ 938.  However, when Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3 because Berthold had earned Patel's trust by consistently agreeing to her price increase plans.  *Id*. ¶ 939.  Berthold had a strong relationship with Patel (*e.g.*, from May 2013 through April 2014, Patel and Berthold spoke at least 76 times by phone) and Defendant Green (when Green was at Teva).  *Id.*  Because the relationship between Teva and Lupin was so strong, with Berthold at the center of the relationship, even after Green left Teva and Patel was out of the office on maternity leave, Berthold still found executives at Teva with whom he could communicate regarding price increases.  *Id.* ¶ 941.  *See also* ¶¶ 599–601 (discussing the strong collusive relationship that Lupin had with Teva because of Berthold's relationship and frequent communications with Patel and Green); *id.* ¶¶ 751–57 (detailing how Berthold colluded with Teva through Patel and Green, and then when they were not available, how Berthold communicated with others at Teva, including Defendant Rekenthaler).

Moreover, the States allege that Berthold had a massive number of communications with numerous competitors.  Between March 2011 and October 2018, Berthold exchanged *at least 4,185* phone calls and text messages with contacts at Defendants Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannett (including with Defendants Grauso, Hatosy, Green, Patel, Nesta, Falkin, Kellum, Ostaficiuk, Brown, Rekenthaler, and Nailor).  *Id.* ¶ 1063.

In short, the States' many allegations against Berthold contain "enough factual matter (taken as true) to suggest that an agreement was made" and that Berthold "purposefully joined and participated in the conspiracy."  *In re Generic Pharm.*, 338 F. Supp. 3d at 437–38 (internal quotation marks omitted).

Despite this, Berthold contends that the States have not pleaded enough.  Berthold argues that the States rely on mere allegations of parallel conduct and "innocuous, inconclusive telephone calls between defendants," which he asserts are "purely conclusory."  Memorandum of Law in Support of Defendant David Berthold's Motion to Dismiss the Amended Complaint [Doc. 184-1, Case No. 2407] ("Berthold Memo.") at 10–13.  These arguments fail to accept the totality of what the States actually allege.  With respect to Berthold, rather than alleging parallel conduct, the States have specifically alleged that Berthold engaged in repeated *coordinated* conduct with competitors. *See, e.g.*, Am. Compl. ¶¶ 172–73, 175, 177, 260–61, 263, 273, 275, 279, 282–84, 286–88, 290, 296, 298, 432, 744–46, 748–49, 753–56, 758–59.  Further, because the competitor calls must be evaluated in context of *all* the allegations—including the timing of the calls in relation to company actions and internal company communications—the calls are neither alone nor inconclusive, and the allegations based on the calls are not conclusory (even if the States do not have a transcript of the call).

With respect to three of the drugs identified in the count against Berthold, namely Cefdinir Capsules, Cefdinir Oral Suspension, and Cefprozil Tablets, Berthold claims that the States "do not set forth a single allegation against" him.  Berthold Memo. at 4.  He is wrong.  These three drugs were part of the larger list of price increases that Teva coordinated with its competitors, *including Berthold for Lupin*, in and around May 2013.  *See* Am. Compl. ¶ 604 (identifying 11 calls that *Berthold (Lupin) had with Patel (Teva)* in mid-May 2013 to coordinate pricing, where Teva would follow a Lupin price increase on *Cefdinir Capsules, Cefdinir Oral Suspension, and Cefprozil Tablets*); *id.* ¶ 626–27 (showing that Teva increased prices on several drugs, including on the Lupin-overlap drugs *Cefdinir Capsules, Cefdinir Oral Suspension, and Cefprozil Tablets*, and that Patel and Green (both of Teva) *spoke to Berthold* numerous times in May, June, and July 2013 to coordinate the price increase).  *See also id.* ¶ 940.  Berthold apparently missed the allegations linking him to these three drugs.

In short, the States have sufficiently pleaded Berthold's participation in the conspiracy, and Berthold's motion to dismiss must be denied.

### B.    James Brown

The States' allegations against Defendant James Brown ("Brown") are sufficient to withstand his motion to dismiss.  Much of the Amended Complaint is focused on relationships among Defendant Teva and its competitors, including Defendant Glenmark.  *See, e.g.*, Am. Compl. ¶ 124.  Brown, the Vice President of Sales at Glenmark at the times relevant to the Amended Complaint, *id.* ¶ 36, was the Glenmark representative in many of these relationships.  The Amended Complaint also contains detailed factual allegations that Brown was aware of and participated in various conspiracies to allocate markets and coordinate prices in violation of antitrust laws.

For example:

- In August 2013, Teva learned that it had been underbid by Glenmark for Moexipril at one of its largest wholesaler customers, ABC. *Id.* ¶ 484. Defendant Rekenthaler at Teva emailed his colleague, Defendant Patel, expressing confusion over why Glenmark was challenging Teva's business since the two companies had an agreement to not poach each other's customers so that they could maintain their "fair share." *Id.* ¶¶ 483–84. Patel responded that she already made a call—referring to her call earlier to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC. *Id.* ¶ 485. The following day, *Brown and Patel* had multiple phone conversations with each other during which Patel reminded Brown of their prior agreement not to poach each other's customers after a price increase. *Id.* ¶ 486. As a result of these communications, including the communications between *Brown and Patel*, Glenmark decided to withdraw its offer to ABC and honor its agreement with Teva to not compete on Moexipril. *Id.* ¶ 487. *See id.* ¶¶ 482–87 for the entire narrative related to the market allocation for Moexipril.

- On May 19, 2014, Patel learned that Glenmark had bid a low price for Kariva at Publix, a retail pharmacy purchaser. *Id.* ¶¶ 489. This information sparked a flurry of communications that same day between *Patel and three Glenmark representatives—including Grauso and Brown*—within about two hours. *Id.* ¶490. As a result of these competitor conversations, including multiple calls *between Patel and Brown*, Teva offered Publix a re-bid price to virtually guarantee that the Kariva business would be awarded to Glenmark. *Id.* ¶ 491.

- In October 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") alongside a number of Teva's competitors. *Id.* ¶ 493. The day after she returned from the PCMA event, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin Tablets, that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging. *Id.* ¶ 494. Glenmark, however, had not made this information public, and the price increase would not be effective until nearly a month later. *Id.* At around the time she notified her colleagues of the Glenmark pricing plans, *she exchanged two text messages with Brown*, *id.* ¶ 494, likely continuing to exchange information on the price increase or to confirm information she had already learned. Based on this competitively sensitive information Patel had obtained, *including from Brown*, Teva picked up "a bit of [market] share" to allow Teva to be more in line with fair share principles, while taking care not to "disrupt Glenmark's business too much." *Id.* ¶ 495.

- In September 2014, Glenmark, Teva, and Amneal were the only competitors in the market for generic Norethindrone Acetate. *Id.* ¶ 504. At this time, market share was almost evenly split among the competitors. *Id.* ¶ 505. On September 9, 2014, a customer approached Teva to ask if Teva would lower its pricing on certain drugs, including Norethindrone Acetate. *Id.* ¶ 504. That same day, Patel (Teva) received

phone calls from two different Amneal employees, and one of these Amneal employees, S.R.(1), *spoke several times with Brown* of Glenmark, Amneal's only other competitor (beside Teva) in the Norethindrone Acetate market.  *Id.*  As a result of this web of competitor communications—*including between S.R.(1) (Amneal) and Brown (Glenmark)*—Teva refused to significantly reduce the Norethindrone Acetate price as requested by the customer and even acknowledged that Teva had "bid high" intentionally, thereby reinforcing the fair share understanding among the competitors in the market.  *Id.* ¶ 505.

In addition to these drug-specific communications and agreements involving Brown, the States allege that Patel considered Glenmark one of Teva's highest ranked competitors primarily because Patel had significant relationships with several individuals at Glenmark, including Brown. *Id.* ¶ 594.   Moreover, Patel's communications with Brown to obtain competitively sensitive information from Glenmark increased over time.  *Id.* ¶ 596.  In fact, when a key contact for Patel left Glenmark, Teva was able to maintain its strong connection with Glenmark in part due to Patel's relationship and communications with Brown.  *Id.* ¶ 972.

Furthermore, the States allege that Brown was frequently in contact with numerous competitors, including Defendants Falkin, Patel, Berthold, Green, Ostaficiuk, and Rekenthaler. *See id.* ¶ 1064 (detailing Brown's competitor calls from June 2012 to August 2018).  *See also id.* ¶ 848 (identifying that Brown was one of several competitors that Patel contacted the day before a Teva price increase on various drugs).

Thus, the allegations against Brown—taken as true—are sufficient to sustain the claim against him that he "purposefully joined and participated in the conspiracy."  *In re Generic Pharm.*, 338 F. Supp. 3d at 437–38 (internal quotation marks omitted).

Brown, nevertheless, insists that the States' allegations are not enough.  Brown argues that the States' allegations in Count 21, Am. Compl. ¶ 1291–99, are "boilerplate" allegations that "include[] no well-pled allegations that would give substance to these conclusory allegations as to Brown."  Memorandum of Law in Support of Defendant James Brown's Motion to Dismiss the

Amended Complaint [Doc. 191, Case No. 2407] ("Brown Memo.") at 7.  But this argument completely ignores the rest of the Amended Complaint, including the specific allegations against Brown, discussed above, that are expressly incorporated into and form the basis for the allegations against Brown in Count 21.  *See* Am. Compl. ¶ 1291.

Brown also attempts to use *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007), to support his argument that the words in Count 21 and the supposed "boilerplate" allegations should be considered conclusory allegations.  Brown Memo. at 7.  *In re Elevator* does not support Brown's contentions.  In that case, the Second Circuit agreed with the district court that the complaint's Section 2 allegations enumerated "basically every type of conspiratorial activity that one could imagine . . . .  The list is in entirely general terms without any specification of any particular activities by any particular defendant[; it] is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever."  *In re Elevator Antitrust Litig.*, 502 F.3d at 50–51 (quoting *In re Elevator Antitrust Litig.*, No. 04 CV 1178 (TPG), 2006 WL 1470994, at *2–*3 (S.D.N.Y. May 30, 2006)).  However, the holding in *In re Elevator* does *not* mean that this Court should look at Count 21 by itself and ignore the many detailed facts incorporated therein from rest of the Amended Complaint.  The district court in *In re Elevator* did not dismiss the claims because a *summary count* (like Count 21) had a summary or generic list of allegations but because the *rest of the complaint* was devoid of any "attempt to assert even the barest statement of facts about a particular plaintiff experiencing some wrongdoing resulting in injury to that plaintiff."  *In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *3; *see also id.* at *4 ("[T]here is nothing alleged in the way of specific monopolistic activity by specific defendants from which a conspiracy can even be inferred.").  This is not the case in the States' Amended Complaint.  As discussed above, the Amended Complaint provides specific factual allegations

pointing to Brown.  Brown is wrong that the States rely on boilerplate or conclusory allegations to state a claim against him.

Brown further argues that the Amended Complaint has "no allegations regarding [him] and six" of the drugs that the States have alleged he conspired on and that "Count 21 must be dismissed as to [those] six drugs."  Brown Memo. at 11 (identifying the six drugs as: Adapalene Gel, Fluconazole Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine HCL Tablets).  First, there are specific allegations of Brown participating in the price increase for Pravastatin Sodium Tablets in August 2013, when Teva followed Glenmark's price increase.  Am. Compl. ¶ 670 (identifying, in the "Follow Glenmark, Zydus and Apotex" box on page 195, that Patel (Teva) spoke with Brown twice, allegedly regarding Pravastatin, just three days before the Pravastatin price increase).

Second, all six of those drugs were part of the larger group of price increases that Teva coordinated with its competitors, including Glenmark, in and around May 2013.  *See id.* ¶¶ 604–13 (identifying several calls that Patel (Teva) had with multiple Glenmark employees in mid-May 2013 related to drugs on which Glenmark and Teva would coordinate a price increase (¶¶ 604, 607), explaining how Patel was monitoring potential actions with respect to the Glenmark-overlap drugs to be careful to avoid taking market share from Glenmark after Glenmark's upcoming price increases (¶ 608), detailing calls between Patel and Glenmark employees at the same time as the Glenmark price increases (¶ 609), and describing how Patel and Teva continued to take actions to not disturb the Glenmark price increases and to eventually implement a corresponding Teva price increase, including with at least one other communication with a Glenmark employee (¶¶ 610–14)).  Until March 2014, Brown was not Patel's main Glenmark contact, but as the Vice President of Sales at Glenmark since 2012, *id.* ¶¶ 36, 1064, Brown was in the position to direct and approve

the conduct of others at Glenmark, including those Glenmark employees who communicated with Patel (Teva) regarding the coordinated price increases for the six drugs in question.  *See id.* ¶¶ 1292–93 (alleging that "at least as early as 2013, Brown took active steps to facilitate market allocation and price fixing agreements between Defendant Glenmark and competitors" and "Brown participated directly *or indirectly* in these conspiracies by communicating with competitors, *directing others at Glenmark to communicate with competitors, or tacitly approving of those communications by other Glenmark employees*" (emphasis added)).  *See also id.* ¶ 596 (explaining how, prior to March 2014, Patel communicated with Glenmark about price increases primarily with CW-5, but that when CW-5 left Glenmark in March 2014, Patel and Brown began communicating with each other with much greater frequency).[5]  Thus, the States have pleaded enough to plausibly suggest that Brown joined and participated in the conspiracy—even with respect to drugs (like Adapalene Gel, Fluconazole Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine HCL Tablets) where his role in the conspiracy was one of supervision and approval.

Accordingly, Brown cannot show that the States have failed to meet the plausibility standard for a motion to dismiss, and his motion must be denied.

---

[5] It also appears that the reason that Brown, in May 2013, was not the Glenmark representative directly coordinating price increases with Patel at Teva was that Brown was busy coordinating with another competitor for price increases on other Glenmark drugs.  See Doc. No. 1 in Civil Action No. 20-cv-03539-CMR (the "Dermatology Complaint") ¶¶ 1535–54 (particularly 1539, 1544, 1548, 1550–51, 1553–54 (describing Brown's communications and collusion with Erika Vogel-Baylor of Defendant G&W).

### C.  Tracy Sullivan DiValerio ("Sullivan")

The States' allegations against Defendant Tracy Sullivan DiValerio ("Sullivan")[6] are sufficient to plausibly suggest that she joined and participated in the conspiracy.  First, the States allege that Sullivan, a Director of National Accounts at Defendant Lannett, Am. Compl. ¶ 38, was very well-connected with competitor contacts in the generic pharmaceutical industry and had many contacts with competitors.  She participated in events in which competitor generic pharmaceutical sales representatives met and discussed competitively sensitive information.  *See* Am. Compl. ¶ 111–14 (particularly ¶¶ 112, 114) (explaining the regular "Girls Night Out" ("GNO") and "Women in the Industry" events and Sullivan's attendance at such events).  She also regularly communicated with competitors and maintained relationships with executives of many of the corporate Defendants.  Between March 2011 and August 2016, Sullivan exchanged at least 495 phone calls and text messages with her contacts at Defendants Zydus, Wockhardt, Teva, Greenstone, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge, including with Defendants Hatosy, Patel, Nesta, Ostaficiuk, and Green.  *Id.* ¶ 1079.

Second, the States allege that Sullivan participated in the conspiracy to coordinate prices and allocate the market for Baclofen.  In June 2014, when her employer, Lannett, decided to enter the Baclofen market, a Lannett senior sales executive asked for market intelligence on Baclofen.  Sullivan, using Facebook Messenger, promptly contacted Defendant Patel at Teva, a competitor for Baclofen, to "touch base . . . about some industry news" and to set up a call between them.  *Id.* ¶ 498.  Shortly thereafter, Patel called Sullivan (the first phone conversation between them since

---

[6] In her motion papers, Tracy Sullivan DiValerio refers to herself as "DiValerio."  Because the Amended Complaint refers to her as "Sullivan," the States will refer to her herein as "Sullivan" (instead of "DiValerio").

Patel joined Teva in 2013).  *Id.*  During the call, Sullivan told Patel that Lannett would be entering the Baclofen market shortly.  *Id.*  Later that day, Sullivan confirmed to Patel, in another Facebook Messenger communication, that Lannett would be entering the market by "[d]efinitely Mid July" and that she would "touch base with [Patel] in a few weeks."  *Id.*  "True to her word," Sullivan followed up with Patel, and they spoke again on July 1, 2014.  *Id.* ¶ 499.

On July 11, 2014, Patel and her staff at Teva were evaluating their existing Baclofen business and whether to try to take on additional Baclofen business.  *Id.* ¶ 500.  Patel told a Teva colleague, "not sure if this helps with your review, but there is another entrant coming to market (Lannett).  I'm not sure about their share targets, but I know it's probably soon."  *Id.*  To gather more information about Lannett's intentions, Patel sent a text message to Sullivan that same day, asking if she was "around."  *Id.*  Sullivan and Patel immediately exchanged voicemails and calls. *Id.*  After their calls, Patel sent a text message to Sullivan to say "[t]hank you!!", to which Sullivan responded, "No prob!"  *Id.*

Not long thereafter, on July 22, 2014, Teva was approached by a customer stating that it was contacted by another manufacturer that was going to launch Baclofen in the coming weeks. *Id.* ¶ 501.  The customer asked if Teva wanted to offer a lower price to maintain the account.  *Id.* Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid.  *Id.*  Patel agreed with the decision to concede this account, stating, "I believe this is Lannett," *id.*, with whom (through Sullivan) Patel had recently been in contact.   Teva's refusal to attempt to maintain the account, even though the price was only slightly lower, was in the shadows of Teva's significant price increase for Baclofen in April 2014.  When Lannett entered the Baclofen market in July 2014, it entered at the exact same WAC price as Teva.  *Id.* ¶ 502.  *See id.* ¶¶ 496–

502 for the entire narrative regarding Baclofen and the coordination between Teva (Patel) and Lannett (Sullivan).

These allegations, when viewed in context and accepted as true, plausibly suggest that Sullivan joined and participated in the conspiracy. She had relationships and communicated frequently with many competitors in the industry. *Id.* ¶¶ 112, 114, 1079. She engaged in discussions leading to agreements regarding customer allocation and prices. *Id.* ¶¶ 496–502 (particularly 498–500). *See also* ¶ 1030 (showing that Sullivan was part of the web of communications related to the price increase agreement for Levothyroxine when she confirmed with a customer the price increase information that her colleague at Lannett, K.S., had received from Defendant Mylan (*see* ¶¶ 1012–31 for the entire narrative related to Levothyroxine and Lannett's participation therein).

Notwithstanding these allegations showing that she joined the conspiracy, Sullivan attacks the sufficiency of the States' allegations. Her strategy to dismiss the Amended Complaint as it relates to her is to compartmentalize the allegations and discredit them individually without viewing them holistically. *See, e.g.*, Memorandum of Law in Support of Defendant Tracy DiValerio's Motion to Dismiss the Amended Complaint [Doc. 187-1, Case No. 2407] ("Sullivan Memo.") at 10 ("The Complaint does not allege that any key facet of any conspiracy was adopted or advanced at an industry women event or Girls Night Out."); *id.* ("[T]he general allegations related to communications with others in the industry are nothing more than insinuation without any substance."). This Court has rejected this myopic approach in assessing the sufficiency of allegations on a motion to dismiss. *See In re Generic Pharm.,* 338 F. Supp. 3d at 436 ("[T]he allegations in [each] Complaint must be viewed *as a whole*." (internal quotation marks omitted) (emphasis added); *id.* at 438 ("To evaluate the articulated allegations as to an individual defendant

in the context of a multi-defendant, multi-faceted conspiracy, *the conspiracy must not be compartmentalized*." (internal quotation marks omitted) (emphasis added)).

When viewed in context as required and not in a vacuum, the allegations against Sullivan, as set forth above in this section, more than satisfy the plausibility standard required to defeat a motion to dismiss.  To perform "market research" on Baclofen for Lannett's impending entry into that market, she reached out to a competitor (Patel of Teva, with whom she had not communicated in at least a year) and communicated with that competitor multiple times over a period of a couple of weeks prior to market entry, leading to an agreement between Teva and Lannett that allowed Lannett to enter the market without facing competition from Teva.  *Id.* ¶¶ 496–502 (particularly 498–500).  Sullivan characterizes these phone calls and messages between her and Patel as ambiguous and inconclusive of intent.  *See, e.g.*, Sullivan Memo. at 3 (arguing that "these communications do not demonstrate that there was any agreement").  But, this conveniently overlooks that these various communications between her and Patel occurred *during the exact time* when Lannett was entering the Baclofen market (presumably to now "compete" with Teva), which Lannett eventually did at the *same* WAC price as Teva (rather than at a lower price that would have been necessary to gain market share from the incumbent market participants, including Teva, without an agreement with Teva not to compete).  *Id.* ¶ 502.  It also ignores that Teva, shortly after the Sullivan-Patel communications, ceded one of its existing Baclofen customers to Lannett without making a competitive bid for the business, allowing Lannett a smooth entry into the market.  *Id.* ¶ 501.

Viewed in the context of these detailed Baclofen-specific allegations, the States' additional allegations related to Sullivan—*e.g.*, that she participated in the generic pharmaceutical industry's "Girls Night Out" and "Women in the Industry" events wherein competitors discussed

competitively sensitive information, Am. Compl. ¶ 112, 114, and that she made hundreds of calls to various generic competitors from 2011 through 2016, *id.* ¶ 1079—add credence to the States' assertion that she joined and participated in the conspiracy. *See also* ¶ 1030 (alleging that Sullivan participated in the web of communications related to the price agreements for Levothyroxine). These allegations are sufficient to plausibly suggest Sullivan's participation in the conspiracy, particularly where, at the motion to dismiss stage, "the law does not require [the States] to allege with particularity precisely how each Defendant participated in the conspiracy." *In re Fasteners*, 2011 WL 3563989, at *9.

Consequently, the States have satisfied their obligation to plausibly allege that Sullivan joined and participated in the conspiracy. Her motion to dismiss must be denied.

### D. Actavis Executives: Marc Falkin and Richard Rogerson

The allegations against the Defendant Actavis senior executives—Falkin and Rogerson[7]— are far more than sufficient to sustain a Section 1 claim against each of them. The States allege that Falkin and Rogerson were frequently part of the interwoven discussions and decisions when Actavis and its competitors were discussing and making decisions about allocating drug markets among competitors and fixing drug prices.

#### 1. The Allegations Against Falkin and Rogerson Sufficiently Plead a Sherman Act Section 1 Claim Against Each of Them.

The States allege that Defendants Marc Falkin ("Falkin") and Richard Rogerson ("Rogerson"), together, were part of specific conspiracies and the resulting agreements with competitors to allocate customers or fix prices. For example:

---

[7] Falkin was the Vice President, Marketing, Pricing and Contracts at Defendant Actavis. Am. Compl. ¶ 40. Rogerson was the Executive Director of Pricing and Business Analytics at Defendant Actavis. *Id.* ¶ 57.

- In January 2014, *Patel (Teva) and Rogerson (Actavis)* communicated with each other multiple times to coordinate a price increase for Clarithromycin ER Tablets. *Id.* ¶¶ 772–73.  Later in March and April 2014, Teva and Actavis engaged in communications—between *Rogerson and Patel*, *id.* ¶¶ 776–80, and between *Rekenthaler (Teva) and Falkin (Actavis)*, *id.* ¶ 779–80, regarding increasing the price of Tamoxifen Citrate and Estazolam.  These communications involving Falkin and Rogerson led to an agreement regarding the prices for Clarithromycin ER Tablets, Tamoxifen Citrate, and Estazolam.  *Id.* ¶¶ 769–82.

- In March and April 2014, Teva was in contact with competitors Actavis and Aurobindo at the time when both were planning to enter the market for Amphetamine/Dextroamphetamine Immediate Release.  During this time, Teva had a flurry of calls with Actavis, including several calls between *Patel (Teva) and Rogerson*, *id.* ¶ 338–39, and between *Rekenthaler (Teva) and Falkin*.  *Id.* ¶ 338.  These multiple inter-competitor communications, involving both Falkin and Rogerson, led to Teva conceding a customer to Actavis when Actavis entered the market.  *Id.* ¶¶ 336–39.

- In May 2014, on the same day that Actavis obtained approval to market Clonidine-TSS, *Falkin spoke with Rekenthaler (Teva)* three times.  *Id.* ¶ 345.  The next day, Rekenthaler told his colleagues at Teva that Actavis was entering the market.  Because Teva was concerned about Actavis's pricing and market share plans for Clonidine-TSS, Teva engaged in several calls with Actavis (*Patel with Rogerson*, *Rekenthaler with Falkin*, *id.* ¶ 347) on one day alone, after which Teva agreed to concede two customers to Actavis.  *Patel and Rogerson* continued their discussions over the next several days, *id.* ¶¶ 348, 351, as they worked which additional accounts Teva would concede to Actavis to allow Actavis to achieve its "fair share" of the Clonidine-TSS market.  *Id.* ¶¶ 343–51.

- In August 2014, shortly before Teva's August 28, 2014 price increases, Teva coordinated price increases with Actavis (*Patel with Rogerson; Rekenthaler with Falkin*).  *Id.* ¶ 847.  Then, the day before the price increases, *Patel again contacted Rogerson* several times to discuss the imminent price increases.  *Id.* ¶ 848.

- In September 2014, shortly before Actavis's price increase for Griseofulvin, Actavis was in contact several times with Teva (*Falkin multiple times with Rekenthaler; Rogerson once with Patel*) to coordinate the increase.  *Id.* ¶ 912.  Shortly after Falkin's and Rogerson's communications with Teva, Teva added Griseofulvin to its own price increase list.  *Falkin and Rekenthaler* continued their coordination, *id.* ¶ 914, in the days leading up to Teva's matching price increase in January 2015.  *Id.* ¶¶ 911–14.

In addition, the States allege (without expressly mentioning Rogerson) that Falkin took part in communications among competitors that resulted in agreements to allocate customers or fix prices.  For example:

- In November 2013, when Taro was entering the Nortriptyline market, then shared between only Teva and Actavis, *Falkin (Actavis) communicated with Teva (Rekenthaler and Cavanaugh)* several times over multiple days, Am. Compl. ¶¶ 417, 419, about how the two companies would make room in the market for Taro. Then in March 2014, *Falkin and Rekenthaler* contacted each other several times over a span of four days, *id.* ¶ 427, as the three competitors continued to communicate and work out the details for Taro's Nortriptyline entry. *Id.* ¶¶ 411–28.

- In June 2014, when Actavis was entering the market for Dex Sulfate XR and seeking share, *Falkin communicated to Rekenthaler (Teva)* that Actavis was targeting a "20-25%" share of the market. *Id.* ¶ 341. Based on this information from Falkin about how much share Actavis was seeking, Teva conceded a customer to Actavis when Actavis entered the market. *Id.* ¶¶ 340–42.

- In June 2014, at the same time that Teva was coordinating pricing with Zydus on various drugs, including Topiramate Sprinkle Capsules, Rekenthaler (Teva) was in touch with both Zydus (Defendant Kevin Green) and *Actavis (Falkin)*, the only other competitor in the market for the drug, on the same day. *Id.* ¶¶ 877–82 (¶¶ 881–82 discussing *Rekenthaler's coordination with Falkin*).

- In September 2014, Teva was coordinating with Camber and Actavis regarding the market for Raloxifene. As part of that three-party coordination, Rekenthaler (Teva) had several discussions with Actavis, *including with Falkin*, regarding Actavis's entry into the market. *Id.* ¶¶1091–92. As part of his communications with Actavis, *including with Falkin*, Rekenthaler learned about Actavis's timing for market entry. *Id.* ¶ 1093. *See id.* ¶¶ 1085–1106 for the entire narrative regarding Raloxifene and the coordination among Teva, Camber, and Actavis.

- In December 2014, leading up to Teva's launch of its Celecoxib product, *Rekenthaler (Teva) had numerous phone conversations with Falkin*, *id.* ¶ 362, when Actavis was planning to enter the Celecoxib market, as the two competitors worked out their allocation of customers for the product. *Id.* ¶¶ 356–62.

- In December 2014, Actavis followed Teva's price increase on Desmopressin Acetate Tablets. Leading up to that price increase *Rekenthaler (Teva) had been in frequent contact with Falkin (Actavis)*. *Id.* ¶¶ 885–86.

- In December 2014, *Rekenthaler (Teva) spoke to Falkin (Actavis)* several times to coordinate a price increase for Ciprofloxacin HCL, including on the two days just before Actavis increased its price. *Id.* ¶ 909. The communications between *Falkin and Rekenthaler* were part of a scheme in which Teva communicated with Dr. Reddy's and *Actavis (Falkin)* to coordinate a price increase by all three manufacturers for Ciprofloxacin HCL. *Id.* ¶¶ 902–10.

- In January 2015, shortly before Teva's January 28, 2015 price increases, Teva had identified that it would follow its competitor's price increases for Ciprofloxacin

Tablets.  *Id.* ¶ 890.  In the weeks shortly before the price increases, *Rekenthaler (Teva) was in touch with Falkin* to discuss the upcoming price increases.  *Id.* ¶ 891.

- In January 2015, Actavis notified its customers of an upcoming significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol.  *Id.* ¶ 895.  Shortly before Actavis sent this price increase notice to its customers, Rekenthaler (Teva) coordinated with the two quality competitors in the market, Mylan and *Actavis (Falkin)*, including the day before the price increase.  *Id.* ¶ 896–97.  Based on these conversations, and *more than a month before the Actavis price increase became effective or public*, Teva indicated in internal documents that it was planning to "Follow Competitor – Actavis."  *Id.* ¶ 898.  Teva continued coordinating the price increases among Teva, Actavis, and Mylan, including through communications between *Rekenthaler and Falkin*.  *Id.* ¶¶ 899–901.  *See* ¶¶ 894–901 for the entire narrative regarding Propranolol and the coordination among Teva, Actavis, and Mylan.

- In February 2015, *Rekenthaler (Teva) learned from Falkin* that Actavis planned to enter the market for Budesonide Inhalation.  *Id.* ¶ 354.  *Rekenthaler and Falkin* had additional communications, *id.* ¶ 355, leading to Teva conceding two accounts to Actavis and making plans to streamline Actavis's market entry.  *Id.* ¶¶ 352–55, 564.

The States also allege that Falkin was in contact with high-level executives of many of Actavis's competitors.  *Id.* ¶ 108 (alleging that Falkin was present at dinner in 2014 attended by the executives of several generic manufacturer competitors, including Defendants Berthold (Lupin) and Ostaficiuk (Camber)).

With respect to Rogerson, the States allege (without expressly mentioning Falkin) that he communicated with competitors as part of agreements to allocate customers or fix prices for specific drugs.  For example:

- Shortly after Defendant Patel started at Teva, she was already reaching out to several competitors, *including Rogerson at Actavis (Watson)*.  *Id.* ¶ 587.  This included calls between *Patel and Rogerson*, and Patel and competitors Glenmark and Sandoz, to fix and raise the prices of the drug Nabumetone.  *Id.* ¶¶ 603–04.

- In April and May 2013, Teva was engaged in communications with Actavis and Lupin regarding Lupin's entry into the market for Ocella to ensure that the competitors would reach a fair share deal.  These communications included calls between Rekenthaler and A.B., a senior sales and marketing executive at Actavis, *id.* ¶ 281, and *Patel (Teva) and Rogerson*.  *Id.* ¶¶ 282–84.  Following these calls, Teva agreed to concede business to Actavis.  *Id.* ¶ 285.  *See* ¶¶ 276–92 for the entire narrative regarding Ocella and the coordination among Teva, Actavis, and Lupin.

22

- In July 2013, leading up to Teva's August 9, 2013 price increases, Patel was in touch with several competitors—*including Actavis (Rogerson)*, *id.* ¶ 665—whose drugs were on Teva's preliminary list of price increase candidates. *Id.* ¶ 664–65.

- In February 2014, in preparation for Teva's April 4, 2014 price increases, Patel reached out to several competitors—*including Actavis (Rogerson)*, *id.* ¶ 744—whose drugs were on Teva's list of price increase candidates. *Id.* ¶ 745. Later, in March 2014, Patel was communicating again with competitors—*including with Rogerson*, *id.* ¶ 746—to coordinate the upcoming April price increases. As a result of Patel's communications with Rogerson, Teva had reached an agreement with Actavis that Teva would lead prices increases for certain drugs where Teva overlapped with Actavis (Hydroxyzine Pamoate Capsules) and follow on others (Clarithromycin ER Tablets, Estazolam, Tamoxifen). *Id.* ¶ 748. *Patel further coordinated with Rogerson* shortly before the April 4 price increases. *Id.* ¶ 749.

In addition to the many drug-specific communications and agreements involving Falkin and Rogerson, the States allege that Defendant Patel (Teva) considered Actavis a very "high quality competitor" for Teva, which resulted in "agreements to lead and follow each others' price increases." *Id.* ¶ 581, 587–90. The reason why Actavis was ranked so highly was because of the strong relationships that high-level employees at Teva had with key individuals at Actavis, including between *Patel and Rogerson*, *Rekenthaler and Falkin*, and *Cavanaugh and Falkin*, which strong relationships resulted in frequent competitor communications. *See id.* ¶ 587–88 (recounting the frequent communications between Patel and Rogerson); *id.* ¶ 589–90 (reporting that after Falkin started at Actavis, he communicated with great frequency with Rekenthaler and Cavanaugh).

Finally, the States have alleged that both Falkin and Rogerson were in frequent contact with numerous other competitors. *See id.* ¶ 1066 (detailing Falkin's competitor calls from August 2013 to July 2016); *id.* ¶ 1078 (identifying Rogerson's competitor calls from March 2010 to March 2018).

These numerous allegations against Falkin and Rogerson include "enough factual matter (taken as true) to suggest that an agreement was made" and that Falkin and Rogerson both

"purposefully joined and participated in the conspiracy." *In re Generic Pharm.*, 338 F. Supp. 3d at 437–38 (internal quotation marks omitted). "[T]he facts pleaded provide plausible grounds to infer [] agreement[s]" by Falkin and Rogerson. *In re Generic Pharm.*, 315 F. Supp. 3d at 853 (internal quotation marks omitted).

### 2. Falkin's Arguments Fail to Show that the Allegations Against Him Are Insufficient.

Falkin takes several related shots at the States' allegations against him—all of which fail to justify dismissing the claims against him. Falkin's arguments miss the mark because, like those made by his co-defendants, they ignore many significant and relevant portions of the complaint and fail to consider the Amended Complaint *as a whole and in context*. *See In re Generic Pharm.*, 338 F. Supp. 3d at 436 ("[T]he allegations in [each] Complaint must be viewed as a whole." (internal quotation marks omitted)); *id.* at 435 ("[J]udging the sufficiency of a pleading is a context-dependent exercise." (internal quotation marks omitted)); *id.* at 438 ("To evaluate the articulated allegations as to an individual defendant in the context of a multi-defendant, multi-faceted conspiracy, *the conspiracy must not be compartmentalized.*" (emphasis added) (internal quotation marks omitted)).

For example, Falkin incorrectly argues that the States rely on "conclusory averments" to assert a claim against him. Memorandum of Law in Support of Defendant Marc Falkin's Motion to Dismiss Plaintiffs' Amended Complaint [Doc. 190-2, Case No. 2407] ("Falkin Memo.") at 5–6. That argument completely ignores the rest of the Amended Complaint. The summary allegations in Count 23—the count against Falkin—incorporate and are based on the *multitude of detailed allegations specifically against Falkin*. *See* Section I.D.1 above. Contrary to Falkin's assertion, which overlooks the rest of the Amended Complaint, the States do *not* rely on "conclusory allegations" to state a claim against Falkin.

Falkin also fails to view the allegations in context and as a whole regarding his repeated objection that the States' use of competitor telephone calls to build a case against him is insufficient. Falkin protests extensively that the case against him is based "entirely" on phone records of calls with competitors, including numerous calls that he had with Defendant Rekenthaler of Teva, and that the States don't have a record of what was actually said on these calls. *See, e.g.*, Falkin Memo. at 1 (complaining that "the Complaint amounts entirely to pleading by toll record"); *id.* at 4 ("The mere existence of telephone connections is insufficient to allege a single conspiracy, let alone a constellation."); *id.* at 6 ("None of these averments [of the telephone calls] quotes, paraphrases or conveys the substance of what Falkin or his correspondent actually said."); *id.* at 7 (complaining that "the substance [of calls between Rekenthaler and Falkin] is neither quoted nor paraphrased"); *id.* at 8 (arguing that "the Complaint does not set forth anything Falkin allegedly said or did"). Falkin's argument fails because it impermissibly attempts to compartmentalize his calls by ignoring the context in which they occurred, such as the timing of his calls and other related calls and activities, *e.g.*, calls between Patel (Teva) and Rogerson (Actavis) or between Rekenthaler and other competitors at about the same time as the calls to and from Falkin. *See, e.g.*, Am. Compl. ¶¶ 336–39 (particularly 338) (alleging several calls between Rekenthaler and Falkin at the same time when Patel was in touch with Rogerson and Rekenthaler was in touch with Aurobindo, the third competitor for Amphetamine/Dextroamphetamine Immediate Release); ¶¶ 769–82 (particularly 779–80) (alleging communications between Rekenthaler and Falkin at the same time as communications between Patel and Rogerson, when Teva was considering potential prices increases for drugs on which Teva and Actavis overlapped); ¶¶ 343–51 (particularly 345, 347) (alleging that Rekenthaler was in contact with Falkin the day before Rekenthaler announced to his Teva colleagues that Actavis was entering the market for

Clonidine-TSS, which was followed up by further calls between Rekenthaler and Falkin and between Patel and Rogerson); ¶¶ 911–14 (particularly 912) (alleging that Falkin was in touch with Rekenthaler one day before Teva announced a price increase for Griseofulvin).  When *all* the allegations related to Falkin are viewed in context, and not compartmentalized, it is clear that the States' claim against Falkin is *not* built on the "mere existence" of telephone calls between Falkin and Rekenthaler.  There is much, much more.

Further, the fact that the Amended Complaint does not quote or paraphrase the content of Falkin's voluminous competitor calls does *not* mean that the allegations against him do not "plausibly suggest that [he] actually joined and participated in the conspiracy."  *In re Generic Pharm.*, 338 F. Supp. 3d at 438.  The Amended Complaint is *full* of allegations about the customer allocation and price-fixing agreements that resulted from the conspiracies of which Falkin's communications with Rekenthaler were a part.  *See* Section I.D.1 above.  Falkin does not cite *any* authority suggesting that the States, in order to meet the plausibility standard for a motion to dismiss, are required to quote or paraphrase what Falkin said on those many calls.  And, to sufficiently allege Falkin's participation in a conspiracy, the States may rely on a combination of direct evidence and "circumstantial evidence (and the reasonable inferences that may be drawn therefrom)," *In re Generic Pharm.*, 338 F. Supp. 3d at 440 (internal quotation marks omitted), including, for example, inferences about what was discussed and agreed to by Falkin and Rekenthaler on those many calls when viewed in context with other evidence such as other communications and the actual market allocation and price increase actions.  Therefore, to survive Falkin's motion to dismiss, the States are not required to quote or paraphrase what Falkin and Rekenthaler said on their many calls.

Falkin also takes issue that some of the numerous calls between Falkin and Rekenthaler are used by the States to support allegations regarding multiple drugs. *See* Falkin Memo. at 9–10. This argument ignores that the Amended Complaint contains many allegations that Defendants, including Falkin and Actavis, often worked on anticompetitive agreements for *multiple drugs at the same time*. *See, e.g.*, Am. Compl. ¶ 891 (alleging that Teva (Patel and Rekenthaler) communicated with its several competitors, including Actavis (Falkin), about increasing the prices for *several* drugs). There is nothing in the Amended Complaint to suggest that Defendants could not and did not talk about multiple drugs on one call or that the States cannot use one call to support the allegations related to more than one drug. Hence, this argument is irrelevant to whether the States' allegations plausibly suggest that Falkin joined and participated in the conspiracy.

There are other examples where Falkin attempts to escape the claim against him by ignoring the totality and context of the allegations. For instance, Falkin attempts to dismiss the Clonidine-TSS allegations related to him, *see* Falkin Memo. at 11, even though he, a high-level executive at Actavis, had three calls with Rekenthaler *on the same day that Actavis was granted approval to market Clonidine-TSS*, Am. Compl. ¶ 345, which were followed the *next day* by Teva starting to have internal discussions about which customers it could concede to Actavis, *id.* ¶ 346, and by further communications between Rekenthaler (Teva) and Falkin, and Patel (Teva) and Rogerson (Actavis), to "convince Actavis to revise its pricing and market share plans for Clonidine-TSS to more acceptable level," immediately followed by internal Teva communications about which customers to concede. *Id.* ¶ 346. These allegations are sufficient to plausibly suggest that Falkin joined the conspiracy agreement to allocate customers for the drug, even if the Amended Complaint does not allege further involvement by Falkin as the details of the agreement were worked out. Another example is Falkin's argument regarding Desmopressin. Falkin claims,

incorrectly, that Teva learned of Actavis's decision to follow the Teva price increase "from a customer." Falkin Memo. at 11. But, contrary to Falkin's understanding, the Amended Complaint alleges that Teva knew that Actavis would follow the Teva price increase before Actavis actually raised its price. Thus, when Teva received, from a customer, a request to reduce its pricing on Desmopressin, Teva *already* knew that it did not need to respond to the requests for a lower price— because it *already* had agreements with its competitors (including Actavis, with which Teva (Rekenthaler) had coordinated the price increases through Falkin) that they would follow the Teva price increase. *See* Am. Compl. ¶¶ 883–87.

Finally, Falkin makes irrelevant "nitpick" arguments against the States' phone call allegations. He complains that: the States have not included a drug-specific allegation relating to every one of the numerous calls between Falkin and competitors; some of the calls identified in the call charts in the Amended Complaint have a zero-second duration; the States have not included all of the information and details for each competitor communication alleged to be part of a drug-specific conspiracy. Falkin Memo. at 12. These arguments do not change the fact that the abundant allegations against Falkin, taken in context and viewed as a whole, are sufficient to plausibly suggest that he participated in the conspiracies and, therefore, should be ignored.

Falkin identifies two drugs listed in his count (Am. Compl., Count 23, ¶ 1312), namely Buspirone Hydrochloride Tablets and Drospirenone and ethinyl estradiol (Ocella), for which he claims there are no allegations in the Amended Complaint against him. Falkin Memo. at 12–13. After further review of the Amended Complaint, the States concede that these two drugs were inadvertently included on the lists of drugs in Falkin's count.

Nevertheless, the inadvertent inclusion of these two drugs in Falkin's count provides no basis for dismissing the claim against him with regard to the other drugs identified. As detailed

above in this section and in Section I.D.1 above, there are more than enough allegations against Falkin to plausibly suggest that he joined and participated in the conspiracy and to deny his motion to dismiss.  Further, the States' claim against Falkin is not necessarily limited to the drugs identified in the Amended Complaint, *see* Am. Compl. ¶ 1312 ("The generic drugs subject to these market allocation and price-fixing agreements [in which Falkin participated, directly or indirectly] include *at least the following* . . . ." (emphasis added)), and the States reserve the right to introduce evidence and prove that Falkin joined and participated, directly or indirectly, in conspiracies with respect to drugs that are not expressly identified in the count against him.

In summary, none of Falkin's arguments overcome the conclusion compelled by an in-context review of the many allegations in the Amended Complaint related to Falkin—that the States have plausibly suggested that Falkin joined and participated in the conspiracy.

### 3. Rogerson Incorrectly Argues that the Allegations Against Him Merely Show Interdependent Decision Making or Conscious Parallelism.

Rogerson argues, incorrectly, that the many allegations against him "show at best . . . interdependent decision making or conscious parallelism."  Defendant Richard Rogerson's Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Amended Complaint [Doc. 183, Case No. 2407] ("Rogerson Memo.") at 4.  The interdependent pricing and conscious parallelism argument is inapposite here.  This defense typically arises when, unlike this case, there are no specific allegations concerning direct competitor communications, interactions, and agreements. For example, the plaintiff's case in *Valspar*, the case upon which Rogerson relies in support of his argument, Rogerson Memo. at 3–5 (discussing *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185 (3d Cir. 2017)), was based "primarily" on evidence of parallel actions by the defendants.  *Valspar*, 873 F.3d at 194 (explaining that the plaintiff had "base[d] its case primarily on the 31 parallel price increase announcements issued by the competitors during the alleged

conspiracy"). *See also Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 464 (E.D. Pa. 2020) (explaining that the "Plaintiff basically alleges that Endo was engaged in what is commonly referred to as 'parallel pricing'). In contrast to *Valspar* and cases dealing with interdependent pricing and conscious parallelism, the Amended Complaint with respect to Rogerson does *not* merely rely on parallel actions. Rather, the States include and rely on *numerous* allegations that Rogerson *directly communicated* with Patel of Teva to coordinate and reach agreements regarding the allocation of customers and price increases. *See, e.g.*, Am. Compl. ¶¶ 276–92 (particularly 282–84), 336–39 (particularly 338–39), 343–51 (particularly 347–48, 351), ¶¶ 664–65 (particularly 665), 743–49 (particularly 744, 746, 749), 769–82 (particularly 772–73, 776–80), 847–48, 911–14 (particularly 912). Consistent with and in addition to these allegations of direct communications and coordination involving Rogerson, the States allege that Rogerson and Patel were in contact shortly after Patel began at Teva, *id.*, ¶ 577, that Rogerson and Patel had a strong relationship, resulting in frequent communications with each other, *id.* ¶ 587–88, 1078, and agreements "to lead and follow each others' price increases." *Id.* ¶ 581.

Thus, the cases discussing interdependent pricing and conscious parallelism, like *Valspar* and *Pelletier*, *see* Rogerson's Memo. at 3–5, are inapplicable here. Rather, the States' many allegations concerning Rogerson's communications with Patel "include enough factual matter (taken as true) to suggest that an agreement was made" and to "plausibly suggest that [Rogerson] actually joined and participated in the conspiracy." *In re Generic Pharm.*, 338 F. Supp. 3d at 437–38 (internal quotation marks omitted).

Finally, the States "are not required to plead facts that, if true, definitely rule out all possible innocent explanations" about Rogerson's many communications with Patel. *Id.* at 435 (internal quotation marks omitted). Therefore, Rogerson's argument that the numerous communications he

had with Patel merely show "interdependent decision making and conscious parallelism," Rogerson Memo. at 4–5, must be ignored for purposes of evaluating Rogerson's motion. The States have alleged far more than enough to survive Rogerson's motion to dismiss.

### E.  James Grauso

The States' allegations against Defendant James Grauso ("Grauso") are sufficient to plausibly suggest that he joined and participated in the conspiracy. As a senior executive for Aurobindo[8] and Glenmark,[9] Grauso engaged in collusive conduct with his competitors. The Amended Complaint alleges in detail that Grauso was aware of and participated in conspiracies to allocate markets and coordinate prices in violation of antitrust laws.

For example:

- In May 2012, Lupin and Aurobindo were preparing to enter the market for Lamivudine/Zidovudine (generic Combivir) and join Teva. Am. Compl. ¶¶ 258–59. Before Lupin and Aurobindo obtained FDA approval, the competitors were communicating with each other about how to share the market, including communications involving Defendants David Rekenthaler and Kevin Green (Teva) with Defendants Berthold (Lupin) and *Grauso (Aurobindo)*, *id.* ¶ 260, including where *Green called Grauso* and Defendant Berthold (Lupin) to confirm information obtained from Aurobindo by Rekenthaler. *Id.* ¶ 261. Later that month, shortly before Lupin and Aurobindo were to enter the market, the competitor communications between all three competitors accelerated substantially, including numerous calls among *Grauso, Berthold (Lupin), and Green (Teva)* over a four-day period. *Id.* ¶ 263. During this time, these three competitors, *including Grauso*, were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin's and Aurobindo's entry into the generic Combivir market as seamless as possible. *Id.* ¶ 264. *Grauso, Berthold, or Green* would call one of the group and then call the third person to fill them in. *Id.*

  As a result of all these communications, the competitors reached agreement regarding the allocation of customers for the generic Combivir market, *id.* ¶ 265, and the new entrants (Lupin and Aurobindo) were able to enter the market without significantly eroding the price due to the understanding among Teva, Lupin, and Aurobindo that each was entitled to its fair share of the market. *Id.* ¶ 269. *See id.*

---

[8] Grauso was a Senior Vice President, Commercial Operations at Aurobindo. *Id.* ¶ 42.

[9] Grauso was the Executive Vice President, N.A. Commercial Operations. *Id.*

¶¶ 257–69 for the entire narrative related to the market allocation for generic Combivir.

- In July 2013, as Teva developed its next price increase list, Defendant Patel (Teva) spoke directly with multiple competitors, *including Grauso (Aurobindo)*. *Id.* ¶ 663–65.

- On May 19, 2014, Patel learned that Glenmark had bid a low price for Kariva at Publix, a retail pharmacy purchaser. *Id.* ¶ 489. This information sparked a flurry of communications that same day between *Patel and three Glenmark representatives—including Grauso and Brown*—within about two hours. *Id.* ¶ 490. As a result of these competitor conversations, Teva offered Publix a re-bid price to virtually guarantee that the Kariva business would be awarded to Glenmark. *Id.* ¶ 491.

Additionally, the States allege that Grauso was a prolific communicator with his competitors, with *thousands* of competitor calls, including with Defendants Berthold, Green, Ostaficiuk, Brown (when Grauso was at Aurobindo), Patel, Aprahamian, Rekenthaler, Nailor, and Cavanaugh. *See id.* ¶¶ 1067–68 (detailing the multitude of Grauso's competitor calls from December 2011 to October 2018).

Finally, the States allege that Grauso, in response to the States' investigation into the generic pharmaceutical industry, reached out to at least one competitor to coordinate his response to the States. The same day that the States sent a subpoena to Grauso, through his counsel, Grauso spoke to Defendant Ara Aprahamian. Also, the day before a conference call that the States had set up with Grauso's counsel, Aprahamian spoke to his lawyer and then shortly after called Grauso. Then, the day after the conference call between Grauso's counsel and the States, Aprahamian and Grauso spoke again on the phone. *Id.* ¶ 1134.

These allegations against Grauso include "enough factual matter (taken as true) to suggest that an agreement was made" and that Grauso "purposefully joined and participated in the conspiracy." *In re Generic Pharm.*, 338 F. Supp. 3d at 437–38 (internal quotation marks omitted).

Grauso, however, refuses to accept that the allegations against him are sufficient to survive his motion to dismiss. Grauso's primary argument is that the States' allegations against him are merely "conclusory allegations" because they are based on phone records without any content. *See* Memorandum of Law in Support of Defendant James Brown's Motion to Dismiss the Amended Complaint [Doc. 182-1, Case No. 2407] ("Grauso Memo.") at 5–10; *see also id.* at 4–5 (claiming that there is an "absence of any facts to support Plaintiffs' allegations other than cell phone records" and that the allegations based on the phone records are merely "conclusory allegations"). Grauso is wrong. It is inappropriate for him to divorce the phone records from the larger context of the Amended Complaint because "[j]udging the sufficiency of a pleading is *a context-dependent exercise*." *In re Generic Pharm.*, 338 F. Supp. 3d at 435 (internal quotation marks omitted) (emphasis added). Grauso fails to acknowledge that the States are *not* relying solely on the phone records but are, instead, relying on *all* of the evidence *in context*, including the timing of the calls and other communications, and the timing of price increases or customer allocation decisions. Moreover, courts find that phone records, viewed in context with all of the factual allegations, may be sufficient to deny a motion to dismiss. *See, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017) (considering phone calls exchanged between competitors as part of the factual allegations making up the context for a motion to dismiss analysis); *United States v. Apple, Inc.*, 791 F.3d 290, 302, 307–09, 319 & n.18 (2d Cir. 2015) (concluding that the evidence—which included phone call records analyzed in context—supported the finding of a price-fixing agreement). Thus, the phone records are not merely "conclusory allegations" as Grauso claims.

For example, Grauso argues that, with respect to the generic Combivir conspiracy, the records of Grauso's calls are not enough because "[w]ithout any additional facts, it cannot simply

be assumed that every call between competitors involved price fixing."  Grauso Memo. at 8.

Grauso's argument, however, mistakenly overlooks that Grauso (Aurobindo) was in *frequent*

communication with competitors at Teva (Green) and Lupin (Berthold) *at the same time* that Lupin

and Aurobindo were preparing to enter the generic Combivir market with Teva.  Am. Compl.

¶¶ 260, 261, 263, 264.  He also ignores that after (and as a result of) those competitor calls, Teva

identified which customers it had negotiated to retain when Aurobindo and Lupin entered the

market.  *Id.* ¶¶ 265–68.  He further fails to acknowledge the allegation that when Lupin and

Aurobindo did enter the market, they were able to do so without disrupting the market and

significantly eroding the price—something that would not have been possible without Grauso and

the other competitors illegally sharing information.  *Id.* ¶ 269.  Therefore, the phone records are

not "conclusory allegations" and must be viewed in the context of the other allegations, for

example, the timing and content of the internal communications at Teva and the timing of Teva's

actions after the phone calls, including those to and from Grauso.  Grauso is so focused on the

phone records in the Amended Complaint that he misses the forest for the trees.  As mentioned

above, the phone records are only part of the allegations related to Grauso and can be used, with

other allegations, to plausibly suggest that Grauso joined and participated in the conspiracy.  *In re

Generic Pharm.*, 338 F. Supp. 3d at 438.

Grauso also argues that there are no facts negating an "equally plausible" reason why

someone in charge of Commercial Operations would be speaking to a competitor.  Grauso Memo.

at 6.  However, that is not the proper standard for a motion to dismiss, where, instead, the Court

must "accept[] the allegations as true and draw[] all logical inferences in favor of" the States, the

States "are not required to plead facts that, if true, definitely rule out all possible innocent

explanations," and the Court "consider[s] plausibility, not probability." *In re Generic Pharm.*, 338 F. Supp. 3d at 435–36 (internal quotation marks omitted).

Grauso also argues that the Amended Complaint does not allege that Grauso had "any authority or role in marketing or sales." Grauso Memo. at 8. However, the Amended Complaint *does* allege that as a result of Grauso's communications with competitors, agreements were reached and actions were taken regarding market allocation and prices. That is enough to sustain the claim that Grauso, a Senior Vice President at Aurobindo and an Executive Vice President at Glenmark, Am. Compl. ¶ 42, joined and participated in the conspiracy.

Finally, Grauso argues that there is no factual basis upon which to allege that he "fixed any price." Grauso Memo. at 10–13. This argument entirely misses the mark. The drugs listed in the count against Grauso—Desogestrel/Ethinyl Estradiol Tablets (Kariva), Gabapentin Tablets, and Lamivudine/Zidovudine (generic Combivir), Am. Compl. ¶ 1321—are drugs for which the States alleged *market allocation conspiracies*. *See id.* ¶¶ 488–91 (Kariva: Teva offered a customer a nominal reduction on its bid to virtually guarantee Glenmark would be awarded the business); *id.* ¶¶ 492–95 (Gabapentin Tablets: Patel (Teva) worked with Glenmark to allow Glenmark to pick up "a bit of share" to be more in line with fair share principles); *id.* ¶¶ 257–69 (generic Combivir: Teva, Lupin, and Aurobindo negotiated as Lupin and Aurobindo entered the market so the two companies could gain market share without eroding the price). Whether these drug-specific conspiracies are labeled as price fixing or as market allocation, the States sufficiently alleged that Grauso participated in anticompetitive conspiracies while at Aurobindo and Glenmark.

Grauso's motion to dismiss must be denied.

F.      Konstantin Ostaficiuk

1.      The Amended Complaint Alleges a Plausible Sherman Act Section 1
         Claim Against Ostaficiuk.

The Amended Complaint plausibly alleges a Sherman Action Section 1 claim against Defendant Konstantin Ostaficiuk ("Ostaficiuk")—who was the President of Camber Pharmaceuticals Inc. ("Camber")—for conspiring with Teva on the drug Raloxifene Hydrochloride Tablets ("Raloxifene") and with Teva, Lupin, and Aurobindo on the drug Lamivudine/Zidovudine ("Lamivudine" aka generic "Combivir").  Am. Compl. ¶¶ 52, 1372–80. Though only a named defendant with respect these two drugs, Ostaficiuk was a frequent collaborator with competitors.  Between March 2011 and August 2017, Ostaficiuk exchanged at least 458 phone calls with contacts at Defendants in this case.  *Id.* at ¶ 1075.  He was a participant in exclusive industry social events, including the January 2014 cartel dinner with 13 other high-ranking generic manufacturing executives—including Defendant Berthold, with whom he would later collude on Lamivudine—and a September 2014 multi-day golf trip where he would collude with Defendant Rekenthaler on Raloxifene and Lamivudine.  *Id.* at ¶ 110.

Regarding the drug-specific conspiracies in which Ostaficiuk joined and participated, the States allege the following:  In September of 2014, Camber was planning to enter the markets for two drugs where Teva overlapped: Raloxifene and generic Combivir (which Teva, Lupin, and Aurobindo had already divvied up).  *Id.* at ¶¶ 1087–90.  Because Rekenthaler (Teva) did not yet have a strong relationship with Ostaficiuk, *see id.* at ¶ 1095, he planned to use an upcoming event to collaborate with Ostaficiuk on the drugs where they overlapped.  *Id.* at ¶ 1093.  In an email discussion with his colleagues about Camber's Raloxifene launch, Rekenthaler made his intent clear, stating "I'll know more about them after my trip this week."  *Id*. at ¶ 1093.  The "trip" Rekenthaler referenced was a multi-day outing in Kentucky from September 17–19, 2014 where

Rekenthaler, Ostaficiuk, and other generic manufacturing executives played golf together during the day and socialized at night. *Id.* at ¶¶ 110, 1094. By the end of the trip, Ostaficiuk considered Rekenthaler one of his "fraternity brothers." *Id.* at ¶ 110.

After telling his colleagues he would collude with Ostaficiuk during their trip, Rekenthaler did just that. Before Ostaficiuk and Rekenthaler met during their trip, Camber had sent an offer to Teva's customer Econdisc for Raloxifene. *Id.* at ¶1093. After socializing on the trip, Rekenthaler and Ostaficiuk had a series of five calls on September 21 and 22. As a result of their discussions, Camber issued a revised bid to Econdisc to secure its business for Raloxifene. *Id.* at ¶1095. Two days later, on September 24, another Teva employee reduced to writing that which Rekenthaler already knew from his conversations with Ostaficiuk: "Camber indicated they are targeting Econdisc and a small retailer . . . and then they would be 'done.'" *Id.* at ¶ 1096.

On September 24, Defendant Patel informed another Teva colleague, "FYI. Dave [Rekenthaler] is working on verifying the Camber price. Stand by." *Id*. at ¶ 1097. Twenty minutes after this email, Rekenthaler called Ostaficiuk. *Id.*

In the midst of colluding with Teva on Raloxifene, Ostaficiuk also colluded with Teva, Lupin, and Aurobindo on generic Combivir. On September 24, following his call with Rekenthaler to confirm Camber's price to Econdisc on Raloxifene, Ostaficiuk called Rekenthaler and then immediately called Defendant Berthold of Lupin to discuss generic Combivir. *Id.* at ¶ 1098. Ostaficiuk had another call with Berthold before then speaking with Rekenthaler again. *Id.* In the midst of these calls, Berthold spoke with his contact P.M., a senior operations executive at Aurobindo, for several minutes to relay Camber's intentions regarding the generic Combivir launch. *Id.*

On September 25, Ostaficiuk and Rekenthaler had two more calls. *Id.* at ¶ 1099. That same day, in discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene market, and armed with the information Rekenthaler had gathered from Ostaficiuk, K.G. (of Teva) concluded: "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." *Id.* at ¶ 1099.

Also on September 25, a Camber executive instructed a colleague to contact potential customers for Raloxifene. *Id.* at ¶ 1100. However, Camber's sales and contract teams were instructed; "if Teva, no offer." *Id.* at ¶ 1100, 1103. Ostaficiuk had worked out a similar agreement with Berthold of Lupin on generic Combivir, and thus, these teams would "not seek[] any Lupin business on Lamo/Zidovudine [aka generic Combivir]." *Id.* at ¶ 1103. These outreach calls, however, prompted Rekenthaler to call Ostaficiuk the following day to tell him that Teva did not want Camber challenging any more of its customers. *Id.* at ¶ 1102. The following business day, Ostaficiuk emailed Camber employees telling them: "We do not offer anything to any Teva customers… [n]ot even a 'bad price'! Please acknowledge…We do not want to upset them more!" *Id.* at ¶ 1102. A senior sales executive at Camber replied that Camber's sales teams were "requesting incumbent details" but had not made offers to Teva's customers for Raloxifene or for Lupin's customers on generic Combivir. *Id.* at ¶ 1103. This statement regarding generic Combivir, of course, came just days after the calls between Ostaficiuk and Berthold of Lupin. *Id.* at ¶ 1099. Ostaficiuk thanked the Camber executive and noted that "we don't want to antagonize either of them and start a war." *Id.* ¶ 1103.

Ostaficiuk's commitment to these conspiracies is bolstered by Teva's reaction to developments the following week when Teva was again misinformed by a large customer that

Camber had made an unsolicited bid for Raloxifene.  *Id.* at ¶¶ 1104–05.  Rekenthaler expressed

disbelief that Camber made such a bid, stating: "You're positive they sent them an offer?"  *Id.* at

¶ 1104.  Another employee likewise expressed disbelief, stating: "I thought they were done after

securing Econdisc?"  *Id*.  Teva then contacted the customer and learned it was a misunderstanding;

Camber had not in fact made a bid.  *Id.* ¶ 1105.

Ostaficiuk also demonstrated his understanding that he was participating in a conspiracy

when, in December 2014, Camber learned of supply problems at Teva on Raloxifene.  *Id*. at ¶ 1106.

A Camber employee indicated to Ostaficiuk that picking up the customer would not violate the

rules of "fair share" because "**Fair share only applies when there is not supply constraints.**"

*Id.* (emphasis in original).  Ostaficiuk did not question the suggestion that he had a "fair share"

agreement with Teva, but rather instructed the employee to "go fishing and gather information

before we commit."  *Id.*

"[A]ccepting the allegations as true and drawing all logical inferences in favor of [the

States]," the Amended Complaint thus plausibly "suggest[s] that an agreement was made" and that

Ostaficiuk "purposefully joined and participated in the conspiracy."  *In re Generic Pharm*., 338 F.

Supp. 3d at 436–38 (internal quotation marks omitted).[10]

---

[10] In an effort to persuade the Court that dismissal—rather than continued discovery and
litigation—is appropriate, Ostaficiuk suggests that, based on the fact that the States had a pre-suit
investigation, these allegations in the Amended Complaint must be all of the evidence that the
States have or will ever marshal against him to prove his illegal conduct.  Ostaficiuk Memo. at 17
n.9.  His contention could not be further from the truth.  Since filing the Amended Complaint, the
States have discovered significant evidence establishing Ostaficiuk's unlawful conspiracies.  Such
additional evidence includes express statements by Ostaficiuk indicating that he was using the
September 2014 golf trip to gather intel from competitors to obtain fair share for Camber in the
Raloxifene market and documents regarding his participation in Camber's development of the
same sort of "Quality Competitor" ranking utilized by Teva.  But, because Federal Rule of Civil
Procedure 12(d) would not permit introduction of these highly incriminating and later discovered

Ostaficiuk, however, incorrectly insists that the States must plead more.  Memorandum of Law in Support of Defendant Konstantin Ostaficiuk's Motion to Dismiss the Amended Complaint [Doc. 185-3, Case No. 2407] ("Ostaficiuk Memo.") at 7–19.  In support, he cites to various opinions discussing the weight and credibility of evidence presented at summary judgment or trial, which of course are inapplicable to the question of whether plaintiffs have alleged enough factual material to state a plausible claim at the motion to dismiss stage.[11]  The only two cases to which Ostaficiuk cites that deal with motions to dismiss are *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) and *Erie County, Ohio v. Morton Salt, Inc*., 702 F.3d 860 (6th Cir. 2012), both of which are entirely distinguishable.

In *Burtch*, the court did not rule that communications generally between defendants in an antitrust conspiracy are insufficient to state a claim.  Instead, the court was applying a nearly one-hundred-year-old rule specifically concerning communications about *creditworthiness*, namely that "[e]xchanging information regarding the creditworthiness of customers does not violate the Sherman Act."  *Burtch*, 662 F.3d at 222 (citing *Cement Mfrs.' Protective Ass'n v. United States*, 268 U.S. 588, 599–600 (1925)).  Ostaficiuk's quotation from the case, however, deceptively omits this critical detail about *creditworthiness* communications.  *Compare* Ostaficiuk Memo. at 16 *with*

---

materials on a motion to dismiss for purposes of determining the sufficiency of the pleadings, the States do not attach them here.

[11] Among Ostaficiuk's cited cases, the following deal with the sufficiency of proof at the summary judgment stage:  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999); *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750 (E.D. Pa. 2017); *Resco Prods., Inc. v. Bosai Minerals Group Co., Ltd.*, 158 F. Supp. 3d 406 (W.D. Pa. 2016); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777 (M.D. Pa. 2014).  One case deals with the weight of evidence at trial:  *Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41 (2d Cir. 1982).

*Burtch*, 662 F.3d at 228.  Ostaficiuk also ignores that, unlike the language from *Burtch* that he

quotes, the States allege much more than competitor communications alone.  Meanwhile, in *Erie*

*County*, the court simply found that an allegation of a failure to compete, *without more*, is

insufficient to establish a bid rigging claim.  *Erie County*, 702 F.3d at 870.  In fact, a governmental

report on which the complaint was based even noted that it "failed to find evidence that the two

companies communicated" regarding bids.  *Id*. at 866.  Here, though, the States allege a litany of

calls, meetings, and emails involving Ostaficiuk that are far beyond a mere failure to compete.

### 2.    Ostaficiuk's Reliance on Teva's "Quality Competitor" List Is Misplaced and Misleading.

Ostaficiuk relies extensively on Camber's relatively low position on Teva's May 2014

"Quality Competitor" list to argue that the States' allegations against Ostaficiuk are implausible.

*See, e.g.*, Ostaficiuk Memo. at 1–2, 5, 15, 17–18.  However, as the States explained, "low quality

competitors" on the list were viewed as such because they were "not viewed as strong leaders or

followers *for price increases*"; however, with respect to *market share allocations* "even companies

that Defendant Patel and Teva referred to as 'low quality competitors' . . . *consistently complied*

*with the principles of 'fair share' and 'playing nice in the sandbox.'*"   Am. Compl. ¶ 1084

(emphasis added).  Thus, even though as of May 2014 Camber was not viewed by Teva as a

"quality competitor" in terms of price increases, "Camber adhered to the fair share understanding

and consistently applied those rules in dealing with its competitors" to allocate markets.  *Id*. at

¶ 1086.  The States' allegations against Ostaficiuk relate to market allocations for Raloxifene and

generic Combivir, not coordinated price increases.  As such, Ostaficiuk's arguments regarding

Camber's position on the "Quality Competitor" list is misplaced, and his repeated splicing together

of out-of-context quotations from disparate parts of the Amended Complaint to misrepresent the

States' allegations is wholly misleading.[12]   Beyond misrepresenting the States' allegations, his repeated appeal to the "Quality Competitor" list also ignores the fact that the list was prepared months before Rekenthaler sought out Ostaficiuk during the September 2014 golf outing to initiate a market allocation agreement.  *See id.* at ¶¶ 1085, 1093–94.

### 3. Ostaficiuk's Attachment of Material Not in the Amended Complaint Does Not Render the States' Claims Implausible and Is Entirely Consistent with the Alleged Conspiracy.

Ostaficiuk attaches two exhibits to his motion to dismiss in an effort to have the Court step into the impermissible role of weighing evidence as though faced with summary judgment or a bench trial.  But, "[o]n a motion to dismiss, the Court consider[s] plausibility, not probability,… accepting the allegations as true and drawing all logical inferences in favor of non-moving parties." *In re Generic Pharm.*, 338 F. Supp. 3d at 435–36.  Nothing in the exhibits that Ostaficiuk attaches, however, renders the States' claims improbable, much less implausible.

Ostaficiuk's Exhibit 1 is an email string of ███████████████████
███   Ostaficiuk incorrectly argues that the document shows that ███████████████
█████████████████████.  Ostaficiuk Memo. at 3.  Ostaficiuk claims that the document shows that ████████████████████████████████
████████████████████.   Latching onto one paragraph regarding information that ██████████████ Ostaficiuk asks the Court to ignore that a separate paragraph explicitly states that ██████████████████████████

_____

[12] As just one example, the first page of Ostaficiuk's Memorandum splices together out-of-context snippets from three separate paragraphs to misrepresent that the Amended Complaint says that Camber's position on the list meant that Camber did not "play nice in the sandbox", did not respect "fair share," and "was likely to try to 'steal Teva's market share.'"  Ostaficiuk Memo. at 1. That, of course, is the opposite of what the States actually alleged.  *See* Am. Compl. ¶¶ 1084–86.

███████████████████████.'"  Ostaficiuk Memo. at 3 & Ex. 1 at 6 (emphasis added).  Besides

being contradicted by the document he cites, Ostaficiuk's argument—█████████████████

████████████████████████████████████████████████—would

make little sense unless ███████████████████████████████████

██████████████, which of course may still be indicative of an antitrust conspiracy.  *See In re*

*Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 242–48 (E.D. Pa. 2016) (concluding that

a conspiracy may exist where the co-conspirators communicate through a "conduit").[13]  Ostaficiuk

additionally argues that the document shows that he could not be the source of other sensitive

competitive information—█████████████████████████████████

███████████████████████████████████████████████████

██████████████████████—because Teva does not attribute a source for

the information and merely talks about what ███████████████.   Ostaficiuk Memo. at 4 &

Ex. 1 at 2–6.  In doing so, he asks the Court to turn a blind eye both to the suspicious and

contemporaneous communications between him and Rekenthaler, *see* Am. Compl. ¶¶ 1096–99,

and to the States' allegations that this sort of language was often employed by Defendants to hide

the fact that *their competitors* were the ones providing information to further their illegal

conspiracies.  *See, e.g.*, Am. Compl. ¶¶ 184, 246, 261, 354, 548, 623, 642–45, 659, 861, 1017,

1123–26.

---

[13] It is worth noting that in addition to using customers as conduits to send information to
hide their collusion, *e.g.*, Am. Compl. ¶¶ 228–31, Defendants also falsely claimed in their written
communications to their colleagues that customers were the source of competitive information in
an effort to obscure the fact that the information actually came directly from communications with
a competitor.  *See, e.g., id.* ¶¶ 548, 1017.

Ostaficiuk also argues that because ████████████████████████████████████ this must defeat any claim of collusion.  Ostaficiuk Memo. at 3–4, 13–14.  But, as the States allege repeatedly, the use of cover bids was a common tactic used by Teva and other Defendants to feign the appearance of competition.  *See, e.g.*, Am. Compl. at ¶¶ 16, 134, 201–03, 224, 233, 531, 615.[14] And just minutes after Patel of Teva had indicated that "Dave [Rekenthaler] is working on verifying the Camber price," it appears Rekenthaler called Ostaficiuk for that exact purpose.  *Id.* at ¶ 1097.

Ostaficiuk next argues that the email string conclusively proves there was competition, not collusion, between Teva and Camber because, after being errantly informed that ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████  Ostaficiuk Memo. at 5.  Until such time as Rekenthaler knew this to be true, it is unsurprising that he would believe that Teva would need to defend against a co-conspirator who breaks his or her promise.  But, ████████████████  and the States allege, Rekenthaler and others at Teva were highly skeptical that Camber would have made such a bid based on the strength of the agreement reached with Ostaficiuk and, after further investigation, they learned that Camber had *not* submitted a bid, but rather had complied with the market allocation agreement.  Am. Compl. ¶¶ 1104–05.

Ostaficiuk's Exhibit 2 is ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████  "**Fair share only applies when there is not supply**

---

[14] The concept of cover bids is one with which Ostaficiuk was familiar.  *See* Am. Compl. at ¶ 1102 (Ostaficiuk directing employees to not make offers to Teva customers, "[n]ot even a 'bad price'!").

**constraints.**" Am. Compl. ¶ 1106 (emphasis in original); Ostaficiuk's Memo. at 6, 11.  The States contend that this supports the inference that Ostaficiuk's response to the email shows he was well aware of the concept of "fair share" and that he was part of an ongoing market allocation conspiracy.  Ostaficiuk argues that this "supports the opposite inference" that Camber was actually a vigorous competitor because he claims that ███████████████████████████████ ████████████████████.  Ostaficiuk Memo. at 6, 11.  Aside from the fact that it does not indicate whether Camber actually followed through, the document actually suggests the contrary interpretation, namely that Ostaficiuk not only acknowledged but explicitly acted in accordance with his understanding of the "fair share" agreement with Teva.  *Id*. at 6, 11 & Ex. 2 at 1–2.

At the end of the day, Ostaficiuk's introduction of documents outside the Amended Complaint is nothing more than an attempt to have the Court step into the role of weighing evidence and evaluating competing inferences.  Ostaficiuk is free to introduce these documents and argue competing inferences to a jury, but that is not the role of the Court at the motion to dismiss stage.  *In re Generic Pharm*., 338 F. Supp. 3d at 435–36.

For all these reasons, Ostaficiuk's motion to dismiss must be denied.

## II.     The States' Claims Against the Individual Defendants Are Timely.

All of the Individual Defendants incorrectly argue that the claims against them are time barred.  For the following reasons, the statute of limitations arguments for each of the Individual Defendants must be rejected.

A.     **The States Have Alleged a Conspiracy Continuing into the Period that Is Within Four Years of the Filing of the Original Complaint.**

The fact that the States have alleged a conspiracy continuing into the period four years before the filing of the Original Complaint,[15] *see* 15 U.S.C. § 15b (four-year statute of limitations for the Sherman Act), defeats the Individual Defendants' statute of limitations arguments. "In a price-fixing case, a cause of action accrues and the statutory period *begins anew every time defendants commit an overt act that is part of the violation* and that injures the plaintiff." *In re Fasteners*, WL 3563989, at *3 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)) (emphasis added).

Here, the States *have* alleged a conspiracy continuing into the period that is within four years before the May 10, 2019 filing of the Original Complaint. The States allege several overt acts that are part of the market allocation and price fixing violations committed by the co-conspirators, including acts of concealment, that occurred after May 10, 2015. *See, e.g.*, Am. Compl. ¶¶ 159, 256, 1130, 1133, 1134. The continuing conspiracy also includes the many competitor communications made in furtherance of the overarching conspiracy that were made after May 10, 2015. *See, e.g.*, *id.* ¶¶ 588, 590, 592, 598, 972, 1062–66, 1068, 1070, 1073–76, 1078–79. Because of the many allegations that the conspiracy continued after May 10, 2015, the Individual Defendants' statute of limitations arguments all fail.

B.     **The Continuing Acts of Co-conspirators Are Attributed to Each of the Individual Defendants.**

Even where there is no specific allegation that a particular Individual Defendant participated in the conspiracy after May 10, 2015, the continuing conspiratorial acts of the co-

---

[15] The States' "Original Complaint" was filed on May 10, 2019. *See* Doc. No. 1 in Civil Action No. 19-CV-2407-CMR.

conspirators are attributed to each Individual Defendant. "[E]ach member of the charged conspiracy is liable for the substantive crimes his coconspirators commit in furtherance of the conspiracy *even if he neither participates in his co-conspirators' crimes nor has any knowledge of them . . . .*" *United States v. Bailey*, 840 F.3d 99, 112 (3d Cir. 2016) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)) (emphasis added). "Under the law of conspiracy, a defendant is liable for his own *and his co-conspirators' acts for as long as the conspiracy continues* unless he withdraws prior to the conspiracy's termination." *United States v. Kushner*, 305 F.3d 194, 198 (3d Cir. 2002) (emphasis added). Consequently, because there are many allegations that the conspiracy continued after May 10, 2015, *see* Section II.A above, it is irrelevant to the statute of limitations analysis that the Amended Complaint may not contain allegations that a particular Individual Defendant participated in the conspiracy after May 10, 2015.

### C. No Individual Defendant Effectively Withdrew from the Conspiracy or Took Affirmative Acts to Limit His or Her Liability.

While an Individual Defendant could have avoided liability for the continuing acts of his or her co-conspirators by withdrawing from the conspiracy, *see Kushner*, 305 F.3d at 198, there is nothing suggesting that *any* Individual Defendant *did* withdraw from the conspiracy. "Withdrawal takes more than cessation of criminal activity." *Id. See also United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 467 (3d Cir. 1979) (holding that a conspirator cannot withdraw from a conspiracy merely by ceasing activity in furtherance of the conspiracy). Rather, the defendant bears the burden of showing much more in order to effectively withdraw from the conspiracy: "The defendant must present evidence of some affirmative act of withdrawal on his part, typically *either a full confession to the authorities* or *communication to his co-conspirators that he has abandoned the enterprise* and its goals." *Kushner*, 305 F.3d at 198 (internal quotation marks omitted) (emphasis added). *See also United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995), *overruled on*

*other grounds by Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) (explaining that "the burden is . . . on the defendant to prove (a)ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators" (internal quotation marks omitted)); *United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989) ("[T]he burden of withdrawal lies on the defendant." (internal quotation marks omitted)).

For purposes of each Individual Defendants' statute of limitations arguments on a motion to dismiss, there is *nothing* showing that *any* of the Individual Defendants met the requirements to withdraw from the alleged conspiracies. Therefore, each Individual Defendant remains liable for the specific alleged acts of his or her co-conspirators that occurred after May 10, 2015, thus defeating their statute of limitations arguments.

> **D.** **The Statute of Limitations Was Tolled by the Self-Concealing Conspiracy.**

In addition to the many specific allegations of the conspiracy continuing after May 10, 2015, the Individual Defendants' statute of limitations arguments fail because of the fraudulent concealment doctrine. Due to the nature of the conspiracy, the statute of limitations was tolled, and it is inappropriate to dismiss the claims against the Individual Defendants on statute of limitations grounds.

First, because "antitrust claims often can only be proven by facts which, prior to discovery, remain largely in the hands of the alleged conspirators," when whether fraudulent concealment tolled the statute of limitation is at issue, "'dismissals prior to giving the plaintiff ample opportunity for discovery *should be granted very sparingly*.'" *In re Aspartame Antitrust Litig.*, No. CIV.A.2:06-CV-1732, 2007 WL 5215231, at *4 (E.D. Pa. Jan. 18, 2007) (quoting and citing *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976)) (emphasis added). In such cases, a court applies "the flexible Rule 9(b) standard in order to determine whether the fraudulent concealment allegation has been properly pled." *Id.*

48

Second, "[t]he equitable doctrine of fraudulent concealment is read into every federal statute of limitations." *Id.* at *3 (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

Third, because the States have alleged an inherently self-concealing conspiracy, the States have satisfied the requirements for the fraudulent concealment doctrine to toll the statute of limitations. "To sustain a fraudulent concealment allegation in [the Third] Circuit, a plaintiff must establish three elements: (1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable diligence in attempting to uncover the relevant facts." *In re Fasteners*, 2011 WL 3563989, at *3 (internal quotation marks omitted). Because the States have alleged a self-concealing antitrust conspiracy, they have sufficiently alleged that the Individual Defendants actively misled the States, which prevented the States from recognizing the validity of the claims with the limitations period. *See id.* at *4 (explaining that, "for the most part courts in [the Third] Circuit have applied the 'self-concealing' standard to antitrust conspiracies"); *id.* at *5 ("Where a plaintiff alleges a price-fixing conspiracy, the self-concealing standard is consistent with the principles of equitable tolling."); *id.* at *3–*5 (holding that where the plaintiffs "have alleged a self-concealing [antitrust] conspiracy," they satisfied the requirement of pleading that the defendant actively misled the plaintiff); *In re Aspartame*, 2007 WL 5215231, at *6 (holding that, because "[s]ecrecy was a necessary element to the success of defendants' alleged [price-fixing] conspiracy," the "plaintiffs were not required to plead affirmative acts of concealment in order to be protected by the fraudulent concealment doctrine"). Failure to recognize the self-concealing nature of the conspiracies alleged in the Amended Complaint would "reward [the] co-conspirators for the successful perpetuation of their secrecy," which "furthers no equitable objectives." *In re Fasteners*, 2011 WL 3563989, at *5.

Fourth, the States have alleged many specific acts of concealment, including by certain Individual Defendants, that toll the running of the statute of limitations. *See, e.g.*, Am. Compl. ¶¶ 213, 261, 648, 693, 931, 1118 (providing several examples where Defendant Rekenthaler concealed his actions); *id.* ¶¶ 1123–34 (recounting examples of concealment of the conspiracies and obstruction of the related investigations, including some that occurred after May 10, 2015); *id.* ¶ 1128–29 (alleging that Patel deleted texts with several competitors, including Defendants Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and Sullivan, after "Rekenthaler warned Patel to be careful about communicating with competitors" and told her that "that the government was showing up on people's doorsteps"). *See also, e.g.*, *id.* ¶¶ 159–60 (discussing how the conspirators took steps to cover up evidence of the conspiracy); *id.* ¶¶ 548, 1017 (describing how the conspirators often concealed the true source of the competitive information they obtained by saying that it came from a "customer"); *id.* ¶¶ 16, 134, 201–03, 224, 233, 531, 615 (alleging that the conspirators used cover or inflated bids to give the appearance of competition and to hide their collusion). And, because "a defendant is liable for his own and his co-conspirators' acts for as long as the conspiracy continues," *Kushner*, 305 F.3d at 198, acts of concealment by one Defendant are attributed to *each* Individual Defendant. *See State of New York v. Hendrickson Bros.*, 840 F.2d 1065, 1084–85 (2d Cir. 1988) (holding that, "[w]hile there was no evidence of affirmative acts performed by the other defendants to conceal the conspiracy, . . . the trial court properly instructed the jury that if it found that the bid-rigging conspiracy continued in existence at the time of [one defendant group's] coverup activities, *it could find that those activities were also attributable to the other members of the conspiracy*," and that "it was entirely appropriate for the court to allow *use of [one defendant group's] actions against the other*

*coconspirators—even if the latter did not know of the actions*—since they were acts in furtherance of the conspiracies" (emphasis added)).

And finally, to the extent that the States need to rely on equitable tolling of the statute of limitations because of the conspirators' fraudulent concealment, the issue of the States' due diligence should not be decided on a motion to dismiss.  "In order to toll the statute of limitations due to fraudulent concealment, a plaintiff must also plead and prove that he neither knew, nor, in the exercise of due diligence, could reasonably have known of the offense."  *In re Aspartame*, 2007 WL 5215231, at *6 (internal quotation marks and citations omitted).  However, "[i]ssues of diligence and constructive notice, which are inherently factual, generally *should not be decided on a motion to dismiss*."  *Id.* (emphasis added).  "Determining the date on which a plaintiff discovered, or reasonably should have discovered, the purported wrongdoing is an inherently factual inquiry *that is usually not ripe for resolution on a motion to dismiss*."  *In re Fasteners*, 2011 WL 3563989, at *5 (emphasis added).  Therefore, a court "may only dismiss a complaint for lack of due diligence where the pleadings and public disclosures demonstrate beyond doubt that plaintiff can prove no facts to support the claim."  *Id.* (internal quotation marks omitted).  "Moreover, where an alleged conspiracy is self-concealing, a plaintiff must only exercise diligence when she is aware of 'red flags' that definitively apprise plaintiff of the cause of action."  *Id.*

> To grant a motion to dismiss in this context, a defendant must point to undisputed facts in the record which demonstrate conclusively that [plaintiff] had notice of [its] claims, and, that, had it exercised reasonable diligence, it would have discovered adequate grounds for filing this antitrust lawsuit during the limitations period.  It is not enough . . . to point to facts which *might* have caused a plaintiff to inquire, or *could* have led to evidence supporting his claim.

*Id.* (emphasis in original) (internal quotation marks and citations omitted).

Thus, it is inappropriate to dismiss the States' claims against the Individual Defendants on a statute of limitations argument based on the statement in the Amended Complaint that

Connecticut, in July 2014, began an "investigation into suspicious price increases for certain general pharmaceuticals." Am. Compl. ¶ 4. There is nothing showing that the States, before May 10, 2015, were "aware of 'red flags' that definitively apprise[d] [the States] of the cause of action" against *any* of the Individual Defendants. *In re Fasteners*, 2011 WL 3563989, at *5. Now is not the time to judge whether the States knew or, "in the exercise of due diligence, could reasonably have known of the offense" against any of the Individual Defendants. *In re Aspartame*, 2007 WL 5215231, at *6 (internal quotation marks omitted).

Consequently, even without the specific allegations of the conspiracy continuing beyond May 10, 2015, this Court must reject the Individual Defendants' attempts to obtain dismissal of a self-concealing conspiracy that also includes several specific allegations of concealment.

E.   **The Statute of Limitations Arguments of Each Individual Defendant Fail to Show that the States' Claims Are Time-Barred.**

Based on the principles discussed in Sections II.A through II.D above, *all* of the statute of limitations arguments raised by the Individual Defendants must be rejected.

The following sections discuss specific statute of limitation arguments raised by the Individual Defendants and why the arguments fail.

1.   **David Berthold**

Berthold argues that the States' claims against him are time-barred because the States have not alleged anything against *him* within the four years prior to May 10, 2019. Berthold Memo. at 14. This argument first ignores that the States have alleged that Berthold's competitor communications in furtherance of the overarching conspiracy continued *beyond* May 10, 2015—including communications with Defendant Kevin Green, Am. Compl. ¶ 1063, with whom Berthold engaged in many specific conspiratorial acts. *See, e.g.*, *id.* ¶¶ 172, 177, 260–61, 263, 273, 275,

279, 282–83, 286, 288, 432–33, 436) (detailing Berthold's collusive communications with Green); Section I.A above.

Berthold's argument also overlooks that the States have alleged a conspiracy continuing beyond May 10, 2015, that the acts of other conspirators after May 10, 2015, including specific acts of concealment, are effective against him, and that the fraudulent concealment doctrine tolls the statute of limitations because the conspiracy is inherently self-concealing. *See* Sections II.A, II.B, II.D above.

Accordingly, Berthold's statute of limitations argument must be rejected.

### 2.    James Brown

Brown argues that the States' claims against him are untimely because they do not allege a sale of drug subject to the alleged conspiracies to any plaintiff or include any allegations against him within the four years prior to May 10, 2019. Brown Memo. at 11–13. This argument ignores the States allegations that Brown's competitor communications in furtherance of the overarching conspiracy continued *beyond* May 10, 2015—including communications with S.R.(1), a sales representative at Amneal, Am. Compl. ¶ 1064, with whom Brown engaged in specific conspiratorial acts such as in the Norethindrone Acetate price increase. *See id.* ¶¶ 504–05; Section I.A above.

Brown's argument also ignores that the States have alleged a conspiracy continuing beyond May 10, 2015, that the acts of other conspirators after May 10, 2015, including specific acts of concealment, are effective against him, and that the fraudulent concealment doctrine tolls the statute of limitations because the conspiracy is inherently self-concealing. *See* Sections II.A, II.B, II.D above.

Thus, Brown's statute of limitations argument fails.

### 3.     Tracy Sullivan DiValerio ("Sullivan")

Sullivan argues that the claims against her are time-barred because all of the allegations against her occurred more than four years before the Original Complaint was filed on May 10, 2019.  Sullivan Memo. at 11.  To be sure, the States' allegations set forth an extremely detailed account of some of Sullivan's conspiratorial activities with Teva employee Nisha Patel in 2014 concerning the illegally coordinated entry of Lannett into the Baclofen market.  *See* Section I.C above.  However, Sullivan's involvement in the overall conspiracy does not end there.  Sullivan's argument otherwise ignores the States' allegations that Sullivan had at least *495* communications with competitors in furtherance of the overarching conspiracy, many of them after May 10, 2015. Indeed, 67 of those communications were with Teva employees Defendant Patel and J.P. and occurred in April 2016, well within the statute of limitations period.  Am. Compl. ¶ 1079.

Sullivan is also incorrect that the "fraudulent concealment" doctrine is inapplicable here. Sullivan Memo at 11–14.  As explained in Section II.D above, the antitrust conspiracies, in which Sullivan participated, are by their very nature self-concealing, and Sullivan's attempt to discredit that well-settled principle by citing inapposite case law fails.  In particular, Sullivan tries to distance herself from her co-conspirators by stating that their destruction of documents or attempts to conceal conduct cannot be imputed to her.  Sullivan Memo. at 13.  She cannot do this, as the acts of concealment by one defendant are attributed to *each* Individual Defendant.  *See Hendrickson Bros.*, 840 F.2d at 1085 ("[I]t was entirely appropriate for the court to allow use of [one defendant group's] actions against the other coconspirators—even if the latter did not know of the actions—since they were acts in furtherance of the conspiracies."); *Bailey*, 840 F.3d at 112 ("[E]ach member of the charged conspiracy is liable for the substantive crimes his coconspirators commit in furtherance of the conspiracy even if he neither participates in his co-conspirators'

crimes nor has any knowledge of them . . . .").  *See also* Section II.B above.  Therefore, contrary to Sullivan's argument, the fraudulent concealment doctrine applies to her.

Sullivan's remaining statute of limitations argument can be summarily dispatched.  In contending that the "continuing violation exception" is inapplicable to her, Sullivan claims that "the States' allegations as to [Sullivan] do not include any initial action that violates the antitrust laws . . . ."  Sullivan Memo. at 14.  The detailed allegations involving her role in the Baclofen and Levothyroxine conspiracies belie that position.  *See* Section I.C above.  Moreover, Sullivan did nothing to withdraw from the overall conspiracy, as explained in Section II.C above.  On the contrary, the hundreds of communications in which Sullivan engaged with competitors through at least 2016, many of which were with Teva employees (a company with which she colluded), Am. Compl. ¶ 1079, bolster the States' claims against her past May 10, 2015.

Therefore, Sullivan's statute of limitations arguments must be rejected.

### 4.    Marc Falkin

Falkin's first statute of limitations argument is that there could be no fraudulent concealment because Connecticut started investigating suspicious generic drug price increases in July 2014.  Falkin Memo. at 13–14.  As addressed in Section II.D above, the fact that Connecticut began an investigation in July 2014 does not mean that the States, before May 10, 2015, were "aware of 'red flags' that definitively apprise[d] [the States] of the cause of action" against Falkin, *In re Fasteners*, 2011 WL 3563989, at *5, and therefore does not justify dismissal of the claims against Falkin.

Falkin's second statute of limitation argument appears to be that the continuing violation exception cannot apply to him because the States "fail to describe Falkin's joinder in the conspiracy, in the first instance."  Falkin Memo. at 14 (internal quotation marks omitted).  That argument ignores that the States' many allegations related to Falkin include "enough factual matter

(taken as true) to suggest that an agreement was made" and that Falkin "purposefully joined and participated in the conspiracy." *In re Generic Pharm.*, 338 F. Supp. 3d at 437–38 (internal quotation marks omitted). *See* Sections I.D.1and I.D.2 above. Falkin's argument also fails to acknowledge that the States allege that his competitor calls continued well after May 10, 2015. Am. Compl. ¶ 1066 (detailing that Falkin was in communication with several competitors, including Defendants Cavanaugh, Brown, Nesta, Berthold, Nailor, Aprahamian, and Patel, after May 10, 2015) and that the acts of other conspirators after May 10, 2015, including specific acts of concealment, are effective against him. *See* Sections II.A, II.B, II.D above.

Thus, Falkin's statute of limitations arguments fail.

### 5. James Grauso

Grauso argues that the claims against him are outside of the statute of limitations because the allegations against him occurred more than four years before the filing of the Original Complaint. Grauso Memo. at 13. Grauso's argument fails. First, the States have alleged a conspiracy continuing into the period that is less than four years before the Original Complaint was filed in May 2019. *See* Sections II.A and II.B above. And the States allege that *Grauso*, at least as late as July 2018, engaged in actions in furtherance of the conspiracies, specifically that he coordinated with another Defendant (Ara Aprahamian) concerning responses to the government inquiries:

> As just one example, on July 17, 2018 the States sent a subpoena to Defendant Grauso, through his counsel. That same day, Grauso spoke to Defendant Aprahamian for more than twelve (12) minutes. The States then set up a conference call with Defendant Grauso's counsel for July 25, 2018. The day before that call – July 24, 2018 – Defendant Aprahamian spoke to his lawyer, and then shortly thereafter called Defendant Grauso. The next day, shortly after a conversation between the States and counsel for Defendant Grauso, Defendants Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

Am. Compl. ¶ 1134.  The States also allege that Grauso's competitor communications—including with Defendants Berthold, Green, Aprahamian, Nailor, and Cavanaugh—extend well past May 2015.  *Id.* ¶ 1068.  "[A]ccepting the allegations as true and drawing all logical inferences in favor of" the States, *In re Generic Pharm.*, 338 F. Supp. 3d at 435–36, the States have thus alleged a conspiracy continuing into the limitations period and that *Grauso himself* was still participating in the conspiracy at least as recently as July 2018, Am. Compl. ¶¶ 1068, 1134, less than four years before the Original Complaint was filed in May 2019.

Second, while it appears that Grauso is arguing that he got out of the conspiracy when he left Aurobindo, Grauso Memo. at 13, there is nothing showing that he *actually withdrew* from the conspiracies in which he had participated while at Aurobindo.  Withdrawal requires communication to the authorities or co-conspirators, *Kushner*, 305 F.3d at 198, and the "burden of withdrawal lies on" Grauso.  *Patel*, 879 F.2d at 294 (internal quotation marks omitted).  *See also* Section II.C above.  Grauso cannot show that, by leaving Aurobindo, he effectively withdrew from the conspiracies in which he had participated while at Aurobindo.  He merely states that "[t]he above Combivir episode with Aurobindo [is] well outside the statute of limitations.  Mr. Grauso left Aurobindo and began working at Glenmark in February 2014" and that he "left Aurobindo well outside the four year statute of limitations."  Grauso Memo. at 9, 13.  However, merely stating that he changed jobs (within the same conspiracy-ridden industry) is not enough to withdraw from the conspiracy.  The States have alleged an industry-wide conspiracy, s*ee, e.g.*, Am. Compl. ¶¶ 15, 18, 117, 143, and all Grauso did was go from *one member of the conspiracy* (Aurobindo) to *another member of the conspiracy* (Glenmark).  Am. Compl. ¶ 42.  Under these circumstances, Grauso's departure from Aurobindo cannot—by itself—constitute a "communication" to the authorities or co-conspirators that would automatically remove him from the industry-wide conspiracy.

*Kushner*, 305 F.3d at 198.  Further, Grauso's actions after he left Aurobindo belie any argument that he left the conspiracy when he moved from Aurobindo to Glenmark:  Within a few months after he left Aurobindo and while an employee at another of the Defendant co-conspirator companies (Glenmark), he engaged in competitor calls showing that he had *not* exited the conspiracy—and most certainly had not communicated his exit to his co-conspirators. *See, e.g.*, Am. Compl. ¶ 665 (identifying a Grauso communication with Patel (Teva) while he was at Aurobindo); ¶ 490 (describing a conspiratorial communication in May 2014 between Grauso and Patel after Grauso moved to Glenmark); ¶ 1068 ("[B]etween February 2014 and October 2018 [while employed by Glenmark], [Grauso] exchanged at least 2,018 phone calls and text messages with his contacts at Defendants Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Greenstone, Dr. Reddy's, Amneal, Rising, Par, Breckenridge, Upsher-Smith, and Mylan."); ¶ 1134 (describing Grauso's coordination with Aprahamian).

Accordingly, the claims against Grauso are not time-barred.  He never withdrew from the conspiracy (even when he left Aurobindo for Glenmark), but instead continued acting in furtherance of the conspiracy at least well into 2018.

### 6.    Konstantin Ostaficiuk

Ostaficiuk's statute of limitations argument is that the Connecticut Attorney General started investigating suspicious generic drug price increases in July 2014.  Ostaficiuk Memo. at 19.  As addressed in Section II.D above, the fact that Connecticut began an investigation in July 2014 does not mean that the States, before May 10, 2015, were "aware of 'red flags' that definitively apprise[d] [the States] of the cause of action" against Ostaficiuk, *In re Fasteners*, 2011 WL 3563989, at *5, and therefore does not justify dismissal of the claims against Ostaficiuk.

### 7.    David Rekenthaler

The Amended Complaint includes several allegations of Rekenthaler's knowing participation in conspiracies to allocate customers and fix prices for generic drugs. *See, e.g.*, Am. Compl. ¶ 110 (negotiating with Defendant Ostaficiuk regarding Camber's anticompetitive entry in the market); *id.* ¶¶ 120–21 (engaging in numerous phone calls with competitors); *id.* ¶ 129 (participating in Teva conceding market share to Lupin); *id.* ¶ 153 (providing a Teva price increase list to Sandoz after laundering it through his personal e-mail address); *id.* ¶ 181 (showing concern that Mylan might retaliate against Teva for taking more than its fair share without consulting Mylan); *id.* ¶ 204 (refining Teva and Mylan's market allocation agreement); *id.* ¶ 1129 (warning Defendant Patel that the government was showing up on people's doorsteps); *id.* ¶ 1133 (receiving a call from Patel on the day that a government search warrant was executed against Patel and then immediately calling two other Teva executives, even though Rekenthaler was no longer employed by Teva).  Evidence of Rekenthaler's conspiring with Rogerson and Falkin of Actavis is also alleged, as recounted above.  *See* Section I.D.1 above.

Rekenthaler does not counter these allegations.  Instead, he rests on the single argument that the States' claim against him is time-barred.[16]  Rekenthaler attempts to limit the allegations against him to the time during which he was employed by Teva, saying that the Amended Complaint contains no allegations of any anticompetitive "acts by Rekenthaler in furtherance of the alleged conspiracy to allocate markets and to fix prices after he left Teva in April 2015." Defendant David Rekenthaler's Memorandum of Law in Support of His Motion to Dismiss the

---

[16] Rekenthaler joins the three motions to dismiss filed by Defendants on the grounds that the States lack standing to bring federal claims, that the state law claims fail for a variety of reasons, and that the States have engaged in claim splitting.  Rekenthaler does not further develop these arguments in his separately filed Motion to Dismiss.

Plaintiff States' Amended Complaint [Doc. 188-1, Case No. 2407] ("Rekenthaler Memo.") at 1–3.  Yet the States specifically allege that Rekenthaler engaged in actions in furtherance of the conspiracies in which he had participated, coordinating with other Defendants (Patel and Cavanaugh) concerning responses to the government inquiries in 2016 after he left Teva:

> The coordination did not stop there.  When the federal government executed a search warrant against Defendant Patel at her home on June 21, 2017 [sic: 2016], she immediately called Defendant Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Defendant Apotex. Rekenthaler then immediately called Defendant Cavanaugh and C.B., another senior Teva executive.  Rekenthaler spoke several times to Defendant Cavanaugh before then calling his own attorney and speaking twice. Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

Am. Compl. ¶ 1133.

"[A]ccepting the allegations as true and drawing all logical inferences in favor of" the States, *In re Generic Pharm.*, 338 F. Supp. 3d at 435–36, the facts alleged show that Rekenthaler was conspiring in June 2016, less than four years before the Original Complaint was filed in May 2019.  The multiple telephone contacts alleged in Paragraph 1133 show that Rekenthaler *continued* to act in furtherance of the overarching conspiracy—at least as late as June 2016—after he left Teva in April 2015.

Notwithstanding the specific allegation showing that Rekenthaler continued acting in furtherance of the conspiracy as late as June 2016, Rekenthaler argues that the States cannot rely on the "continuing violation" doctrine to extend the state of limitations and that when he left Teva's employ, his participation in the conspiracy automatically ended.  Rekenthaler Memo. at 6–8. Rekenthaler cites several cases for his claim that when a given defendant left a company, that person exited the conspiracy, thereby terminating their liability for the consequences of the wrongful acts.  The first, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), describes the "continuing violation" doctrine: "each overt act that is part of the violation and that injures the plaintiff, *e.g.*,

each sale to the plaintiff, starts the statutory period running again," but a new predicate act cannot be alleged to save the claim from failing due to the statute of limitations. *Id.* at 189–90 (internal quotation marks omitted). Rekenthaler then claims that the "continuing violation" doctrine does not apply to him because when he left Teva's employ, his participation in the conspiracy automatically ended. But here, contrary to Rekenthaler's argument, the allegations of Rekenthaler's acts in 2016 are not of *new predicate acts*, relating to new a conspiracy. Rather, the alleged acts occurring in 2016, Am. Compl. ¶ 1133, are *additional* acts in continuing furtherance of the *existing* conspiracies. Thus, the States have adequately alleged that Rekenthaler continued participating in the conspiracy into the four-year window prior to the filing of the Original Complaint. *See also* Section II.A above.

Further, what is missing from his defense is anything showing that he *actually withdrew* from the conspiracies in which he had participated. Withdrawal requires communication to the authorities or co-conspirators, *Kushner*, 305 F.3d at 198, and the "burden of withdrawal lies on" Rekenthaler. *Patel*, 879 F.2d at 294 (internal quotation marks omitted). *See also Antar*, 53 F.3d at 583 (explaining that the defendant has "the burden . . . to prove (a)ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators" (internal quotation marks omitted)). *See also* Section II.C above.

Rekenthaler cannot meet that burden for purposes of his motion to dismiss. He argues that when he left Teva, he withdrew from the conspiracy. Rekenthaler Memo. at 6–8. But, this argument fails because the States have alleged an industry-wide conspiracy, s*ee, e.g.*, Am. Compl. ¶¶ 15, 18, 117, 143, and all Rekenthaler did was go from *one member of the conspiracy* (Teva) to *another member of the conspiracy* (Apotex). Am. Compl. ¶ 1133. Under these circumstances, Rekenthaler's departure from Teva cannot—by itself—constitute a "communication" to the

authorities or co-conspirators that would automatically remove him from the industry-wide conspiracy.  *Kushner*, 305 F.3d at 198.  Further, Rekenthaler's actions after he left Teva show that he did *not* made a clean break from the conspiracy when he left Teva:  Barely more than a year after he left Teva and while an employee at another of the co-conspirator companies (Apotex), he engaged in a series of phone calls showing that he had *not* exited the conspiracy—and most certainly had not communicated his exit to his co-conspirators.  Am. Compl. ¶ 1133.  Hence, the cases cited by Rekenthaler for the proposition that a conspirator can escape a conspiracy merely by ending his employment, and not engaging in additional actions in furtherance of the conspiracy, are inapposite.[17]

Rekenthaler also claims that "[t]he Amended Complaint also fails to allege that Rekenthaler continued receiving any benefit from the alleged conspiracy," Rekenthaler Memo. at 8.  That assertion is irrelevant here.  Rekenthaler cites and quotes *Antar* for the proposition that "resignation and a 'total severing of ties with the enterprise may constitute withdrawal from the conspiracy,' provided that the defendant does not "continue[] to do acts in furtherance of the conspiracy and continue[] to receive benefits from the conspiracy's operations.'"  Rekenthaler Memo. at 7 (quoting *Antar*, 53 F.3d at 583).  Rekenthaler cannot rely on the "continuing benefit"

---

[17] None of the cases cited by Rekenthaler apply to the situation here, where a defendant moved from one defendant-conspirator employer to another defendant-conspirator employer and continued to act in furtherance of the conspiracy.  Rekenthaler cites *In re High Fructose Corn Syrup Antitrust Litig.*, 293 F. Supp. 2d 854 (C.D. Ill. 2003), *Pope v. Bond*, 641 F. Supp. 489 (D.D.C. 1986), and *United States v. Steele*, 685 F.2d 793 (3d Cir. 1982).  Rekenthaler Memo. at 7.  These cases involve the simple termination of employment with no further actions by the defendant in furtherance of the conspiracy.  Rekenthaler also cites *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999) and *Krause v. Perryman*, 827 F.2d 346 (8th Cir. 1987).  Rekenthaler Memo. at 7.  These cases are even less relevant than the cases cited above in this footnote here because they involve the sale of an interest in business, by which the defendant or publicly disseminated media reports effectively gave notice to the co-conspirators of the defendants' departure from the conspiracy.

language from *Antar* because he *never* severed ties with the conspiracy and *did* "continue[] to do acts in furtherance of the conspiracy." *Antar*, 53 F.3d at 583. *See* Am. Compl. ¶ 1133. Thus, the States are not required to allege that he continued receiving benefits from the conspiracy after he left Teva to show that he did not withdraw from the conspiracy.

Rekenthaler also argues, incorrectly, that the doctrine of fraudulent concealment does not apply and that the States had notice of the claims prior to May 2015. *See* Rekenthaler Memo. at 3–6. As set forth above in Section II.D above, because the collusion alleged here is inherently self-concealing, tolling the statute of limitations is justified. Further, the States have alleged that *Rekenthaler himself* took several steps to conceal the conspiracy. *See, e.g.*, ¶¶ 213, 693 (alleging that Rekenthaler avoided providing information in writing); ¶ 261 (alleging that Rekenthaler concealed his source of competitive information by saying that he learned information from "our good friend" because he knew that identifying the source in writing would give evidence of the conspiratorial communication between competitors); ¶ 648 (alleging that Rekenthaler provided a Teva price increase list to a competitor by sending the list from his Teva work e-mail account to his personal e-mail to the person e-mail of his competitor); ¶ 931 (alleging that Patel and Rekenthaler, after either had a call with a competitor, provided an in-person debrief of the communication to avoid putting the illegal communication in writing); ¶ 1118 (alleging that Rekenthaler "was aware that communicating with competitors about pricing and market allocation was illegal, and took steps to avoid any evidence of his wrongdoing"); ¶¶ 1128–29 (alleging that Patel deleted texts with several competitors after "*Rekenthaler* warned [her] to be careful about communicating with competitors" and told her that "that the government was showing up on people's doorsteps"). *id.* ¶ 1133 (alleging Rekenthaler's involvement in the communications related to coordinating Patel's response to the government). These Rekenthaler-specific

concealment allegations provide additional reasons to reject Rekenthaler's argument that the doctrine of fraudulent concealment does not apply to him.

And, as discussed above in Section II.D above, the fact that Connecticut began an investigation in July 2014 does not mean that the States, before May 10, 2015, were "aware of 'red flags' that definitively apprise[d] [the States] of the cause of action" against *Rekenthaler*, *In re Fasteners*, 2011 WL 3563989, at *5, and does not justify dismissal of the States' claim against Rekenthaler. This is particularly true here, where the States have alleged that Rekenthaler engaged in many acts to conceal the conspiracies.

In summary, the States have pleaded direct evidence of Rekenthaler's participation in the conspiracy while he was employed by Teva and of his *continuing* participation in the conspiracy at least as late as June 2016. Am. Compl. ¶ 1133. The concerted action is demonstrated by the series of phone calls between Defendants Patel, Rekenthaler, Cavanaugh, and another Teva employee, C.B., who all called multiple times to coordinate Patel's response to the government. These acts in June 2016 prevent the claim filed in May 2019 from failing due to the four-year statute of limitations. Further, the doctrine of fraudulent concealment of these inherently self-concealing acts serves as an additional argument that the States did not "sit on their hands and watch" as the period to bring their Sherman Act claims came and went. Rekenthaler thus cannot achieve a dismissal of the claim against him based on his statute of limitations arguments.

### 8.    Richard Rogerson

Rogerson argues that the States have not alleged anything against *him* within the four years prior to May 10, 2019. Rogerson Memo. at 5–6. This argument ignores that the States have alleged that Rogerson's competitor communications in furtherance of the overarching conspiracy continued *beyond* May 10, 2015—including communications with Defendant Patel, Am. Compl. ¶ 1078, with whom Rogerson engaged in many specific conspiratorial acts. *See* Am. Compl.

¶¶ 282–84, 338–39, 347–48, 351, 577, 665, 744, 746, 749, 772–73, 776–80, 847, 912 (detailing Rogerson's anticompetitive communications with Patel); Section I.D.1 above.

Rogerson's argument also overlooks that the States have alleged a conspiracy continuing beyond May 10, 2015, that the acts of other conspirators after May 10, 2015, including specific acts of concealment, are effective against him, and that the fraudulent concealment doctrine tolls the statute of limitations because the conspiracy is inherently self-concealing.  *See* Sections II.A, II.B, II.D above.

Hence, Rogerson's statute of limitations arguments must be rejected.

### III.    The State Law Claims Should Not Be Dismissed.

Most of the Individual Defendants also argue that the supplemental state law claims must be dismissed because they are derived from the federal claims.[18]  The argument fails.  First, because the federal claims should not be dismissed, as discussed herein, neither should the state law claims.  Second, many of the state law claims are not derived from federal claims.  Because none of the Individual Defendants address the specifics of any state law claims, those issues do not merit further briefing at this point.

### CONCLUSION

The States' claims against each Individual Defendant are more than sufficient to survive the motions to dismiss and are not time-barred.  Accordingly, for the reasons set forth herein, each of the Individual Defendants' motions to dismiss must be denied.

---

[18] *See* Berthold Memo. at 14–15; Brown Memo. at 13; Sullivan Memo. at 14; Falkin Memo. at 14–15; Grauso Memo. at 1; Ostaficiuk Memo. at 20; Rogerson Memo. at 6.

Dated: January 15, 2021

Respectfully Submitted,

PLAINTIFF STATE OF CONECTICUT
WILLIAM TONG
ATTORNEY GENERAL

PLAINTIFF STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

By: */s/ W. Joseph Nielsen*
    W. Joseph Nielsen
    Federal Bar No. ct20415
    Assistant Attorney General
    55 Elm Street
    P.O. Box 120
    Hartford, CT 06141-0120
    Tel: (860) 808-5040
    Fax: (860) 808-5391
    Joseph.Nielsen@ct.gov

By: */s/ John K. Olson*
    John K. Olson
    Deputy Attorney General
    Consumer Protection Division
    954 W. Jefferson Street, 2nd Floor
    P.O. Box 83720
    Boise, ID 83720-0010
    Tel: (208) 332-3549
    Fax: (208) 334-4151
    John.Olson@ag.idaho.gov

**Liaison Counsel for the Plaintiff States**

**Counsel for Plaintiff State of Idaho**

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court by using the CM/ECF system, which will serve a copy on all interested parties registered for electronic filing.


/s/ *John K. Olson*
John K. Olson
Deputy Attorney General